Henry S. Kneedler *versus* David M. Lane, Charles B. Barrett, J. Ralston Wells, and Isaac Ashmead, Jr.

Francis B. Smith *versus* David M. Lane, Charles B. Barrett, J. Ralston Wells, and Christian Young.

William Francis Nickels *versus* William E. Lehman, N. N. Marsellis, Charles Murphy, and Ebenezer Scanlan.

The constitutionality of the United States Conscription Law of March 3d 1863, considered and discussed by the judges of the Supreme Court at Nisi Prius, and decided by a majority of the court to be within the constitutional powers vested in Congress. Liability of state and federal officers to suit in state court for acting to the injury of a citizen without constitutional authority. Constitutional power of Congress to "raise armies," discussed. Liability of drafted citizen to rules and articles of war. Validity of injunction to restrain commission of personal tort, doubted. Practice on motion to discharge preliminary injunction.

In the Supreme Court of Pennsylvania. In Equity.

These were proceedings founded on three bills in equity, filed in the Supreme Court for the Eastern District, by the complainants above named, for themselves and others who might legally become parties thereto, against the above-named respondents, who were the officers of the Enrolling Board of the Fourth Congressional District of Pennsylvania, under the Act of Congress entitled "An Act for enrolling and calling out the national forces, and for other purposes," approved March 3d 1863.

Two of the complainants, William F. Nickels and Henry S. Kneedler, being under the age of thirty-five years, were within the first class of enrolment and draft, as provided by the act. Francis B. Smith, the other complainant, who was over the age of thirty-five years and married, was within the second class of enrolment and draft.

In other respects the cases were alike, and depended on the same principles.

The bills severally set forth the age and residence of complainants; the passage and approval of the Act of Congress above mentioned, and its provisions; the erection of the Fourth Congressional District into a military district for the purposes of the

[*Kneedler et al. v. Lane et al.*]

act; the appointment of the respondents as provost-marshals and enrolling officers; the enrolment and draft of the complainants severally; and the service on each of notice of the enrolment and draft under the act, with orders to report at the place of rendezvous on a day therein named, or in default thereof "be deemed as deserters, and subject to the penalty prescribed therefor by the rules and articles of war," with an offer of transportation, &c., &c.

The bills further set forth that the complainants severally had repeatedly repaired to the place of rendezvous named in the notice, but owing to a press of business in the enrolling board, had not as yet been mustered into the military service, but were in daily expectation of being so mustered.

The complainants then further averred that the Act of Congress above mentioned is in derogation of the reserved rights of the states, and of the rights and liberties of the citizens thereof, and that the same is unconstitutional and void, there being delegated by the states or the people thereof to the federal government no power to enact such a law, but that the power of calling forth the militia is only exercisable in the manner provided for by the Act of Congress approved May 2d 1792, the Act of February 28th 1795, the Act of February 18th 1819, and the previous acts of Congress on this subject approved by Act of July 17th 1862.

The complainants then further objected to the inequality of the thirteenth section of the act; the want of fairness in preparing the enrolment; the fact that the list was not required to be open to public inspection for the correction of errors and omissions, by reason of which many persons not exempted under the act were omitted from the enrolment and the draft in the district, which rendered it fraudulent and void; that the proceedings under the act were unlawful because the conscription was imposed on certain districts and states, and not on certain other states and districts or parts thereof.

Then followed the proper interrogatories under the bill, with a prayer for an injunction to restrain the respondents from "further proceeding with or under the said enrolment, requisition, and draft of citizens of this Commonwealth, and of persons of foreign birth who have declared their intentions to become citizens under and in pursuance of law, to perform compulsory military duty in the service of the United States, and from all other proceedings which violate the rights and invade the personal liberty of such persons under pretence of executing the said law of the United States, and particularly from all proceedings under this pretence against the persons of the complainants," with prayer for a subpoena, &c.

On filing these bills, a motion for a special injunction was

[Kneedler *et al. v.* Lane *et al.*]

made in each case at Nisi Prius before WOODWARD, J., who requested his brethren to sit with him at the hearing.

The time fixed for hearing the cases was September 23d 1863, of which due notice was given to *George A. Coffey*, United States District Attorney, and the Hon. *John C. Knox* and *J. Hubley Ashton*, who, it was understood, were associated with the district attorney in the cause.

The counsel for the complainants were *George M. Wharton, Peter McCall, Charles Ingersoll*, and *George W. Biddle*, Esqs.

When the cause was reached, the counsel for the United States did not appear, and, in answer to the last notice given by the counsel for complainants to one of the counsel for the United States, the reply was that they did not intend to appear.

Lowrie, C. J., suggested that if an affidavit of the service of these notices were filed, the case could be proceeded in without the other counsel; which was accordingly done.

*George M. Wharton* and *Charles Ingersoll*, for complainants.

There being a disagreement in the court, the judges delivered separate opinions at Pittsburgh, on Monday, the 9th of November, 1863, as follows:—

LOWRIE, C. J.—These are three bills in equity, wherein the plaintiffs claim relief against the defendants, who, acting under the Act of Congress of the 3d March last, well known as the Conscription Act, claim to coerce the plaintiffs to enter the army of the United States as drafted soldiers. The claim of the plaintiffs is founded on the objection that that act is unconstitutional. The question is raised by a motion for a preliminary injunction, and might have been heard by a single judge. But at the request of our brother Woodward, who allowed the motion, and on account of the great importance of the question, we all agreed to sit together at the argument. But we are very sorry that we are left to consider the subject without the aid of an argument on behalf of the government, by the proper legal officers of the government having deemed it their duty not to appear.

For want of this assistance I cannot feel such an entire conviction of the truth of my conclusions as I would otherwise have, for I cannot be sure that I have not overlooked some grounds of argument that are of decisive importance. But the decision now to be made is only preliminary to the final hearing, and it is to be hoped the views of the law officers of the government will not then be withheld.

We have, however, a much greater difficulty in the decision of this question, and one that is quite inevitable. It is founded on the fact that the question has become a question of politics, and the great parties of the country have divided upon it. People

have not awaited the decision of the courts on the subject, and could not be expected to do so; but have studied and decided it for themselves, or have rallied, in opposing ranks, in support of leaders who profess to have studied it, or have done so. Our own history shows that our courts have no moral authority adequate to bring such divisions into unity. That sort of authority requires a much larger degree of mutual confidence between the courts and the people than is usual in our experience, especially in times of popular excitement.

All men believe themselves impartial in the decision even of party questions, and therefore it is impossible for them to abandon their decisions on the mere authority of any one, unless when they feel that authority to be final. Partiality in such matters seldom proceeds from any dishonest purpose, and generally arises from giving undue prominence to some purpose or idea that is in itself quite proper, and, of course, this is usually done quite unconsciously. In times of excitement it is quite impossible to avoid this, and hence, in such times, moderate views are very sure to be condemned, and even government itself, in all its departments, is sure to be driven into measures which, in the course of a few years, are condemned and pass away. With a sort of moral polarity, the extremes of social excitement breed each other, and moderation falls, for awhile, powerless between them; and usually it is only by severe social trials that this condition of society is remedied, and then it is discovered what were the purposes and ideas to which undue prominence had been given, to the disturbance of the order and harmony of the state.

On this question we ought to be able to avoid this vice, which is so common in all moral and political reasoning; for our appeal is to the constitution, a written standard, adopted by us all, sworn to by many of us, and obligatory on all who exercise the rights of citizenship under it, until they can secure its alteration in a regular and peaceable way. By that standard alone can we try this act. Is it authorized by the federal constitution?

That constitution, adopting our historical experience, recognises two sorts of military land forces—the militia and the army, sometimes called the regular, and sometimes the standing army, and delegates to Congress power "to raise and support armies" and "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions." But though this act of Congress is intended to provide means for suppressing the rebellion, yet it is apparent that it is not founded on the power of "calling forth the militia," for those who are drafted under it have not been armed, organized, and disciplined

9 Wr.—16

under the militia law, and are not called forth as militia under state officers, as the constitution requires: Art. 1, 8, 16.

It is therefore only upon the power to raise armies that this act can be founded, and as this power is undisputed, the question is made to turn on the ancillary power to pass "all laws which shall be necessary and proper" for that purpose: Art. 1, 8, 18. It is therefore a question of the mode of exercising the power of raising armies. Is it admissible to call forced recruiting a "necessary and proper" mode of exercising this power?

The fact of rebellion would not seem to make it so, because the inadequacy or insufficiency of the permanent and active forces of the government for such a case is expressly provided for by the power to call forth the usually dormant force, the militia; and that therefore is the only remedy allowed, at least until it has been fully tried and failed, according to the maxims *expressio unius est exclusio alterius,* and *expressum facit cessare tacitum.* No other mode can be necessary and proper so long as a provided mode remains untried; and the force of these maxims is increased by the express provision of the constitution, that powers not granted are reserved, and none shall be implied from the enumeration of those which are reserved: Amendments 9, 10. A granted remedy for a given case would therefore seem to exclude all ungranted ones. Or, to say the least, the militia not having been called forth, it does not and cannot appear that another mode is necessary for suppressing the rebellion.

And it seems very obvious that a departure from the constitutional mode cannot be considered necessary because of any defect in the organization of the militia, for Congress has always had authority to correct this, and it cannot possibly found new powers in its own neglect of duty. Most of the presidents have repeatedly called the attention of Congress to this subject, and yet it has never been adequately attended to. I do not know why it might not have been performed since this rebellion commenced, and yet I do not know that it could.

Though, therefore, this act was passed to provide means for suppressing the rebellion, yet the authority to pass it does not depend on the fact of rebellion. That fact authorizes forced levies of the militia under their own state officers, but not for the regular army.

But it is not important that Congress may have assigned an insufficient reason for the law. If it may pass such a law for any reason, we must sustain it for that reason. The question, then, is, may Congress, independent of the fact of rebellion or invasion, make forced levies in order to recruit the regular army? If it may, it may do so even when no war exists or threatens, and make this the regular mode of recruiting; it may disregard

[Kneedler *et al. v.* Lane *et al.*]

all considerations of age, occupation, profession, and official station; it may take our governors, legislators, heads of state departments, judges, sheriffs, and all inferior officers, and all our clergy and public teachers, and leave the state entirely disorganized; it may admit no binding rule of equality or proportion for the protection of individuals, states, and sections. In all other matters of allowed forced contribution to the Union, duties, imposts, excises, and direct taxes, and organizing and training the militia, the rule of uniformity, equality, or proportion is fixed in the constitution. It could not be so in calling out the militia, because the emergency of rebellion or invasion does not always allow of this.

But for the recruiting of the army no such reason exists, and yet, contrary to the rule of other cases, if it may be recruited by force, we find no regulation or limitation of the exercise of the power, so as to prevent it from being arbitrary and partial, and hence we infer that such a mode of raising armies was not thought of, and was not granted. If any such mode had been in the intention of the fathers of the constitution, they would certainly have subjected it to some rule of equality or proportion, and to some restriction in favour of state rights, as they have done in other cases of compulsory contributions to federal necessities. We are forbidden by the constitution from inferring the grant of this power from its not being enumerated as reserved; and the rule that what is not granted is reserved, operates in the same way, and is equivalent to the largest bill of rights.

No doubt it would be unreasonable to suppose that Congress would so disregard natural rights as to take such an advantage of this want of regulation of their power as that above indicated; but the fathers of the constitution did presume that some such things are possible, and therefore they would have regulated the mode, if such a mode had been intended. It needed no regulation, if all recruits were to be obtained in the ordinary way, by voluntary enlistments.

Our jealousy of the usurpation of dominant parties is quite natural, and has been inherited through many generations of experience of Cavalier and Roundhead, Court and Country, Whig and Tory, parties, each using unconstitutional means of enforcing the measures which they deemed essential or important for the public welfare, or of securing their own power : and the fathers of the constitution had experienced such usurpations from the very beginning of the reign of George III., and were not at all inclined to grant powers which, for want of regulation, might possibly become merely arbitrary. They had had no experience of forced levies for the regular army, except by the states them-

selves, and it seems to me they did not intend to grant such a power to the federal government.

Besides this, the constitution does authorize forced levies of the militia force of the states in its organized form, in cases of rebellion and invasion, and, on the principle that a remedy expressly provided for a given case, excludes all implied ones, it is fair to infer that it does not authorize forced levies in any other case or mode. The mode of increasing the military force for the suppression of rebellion being given in the constitution, every other mode would seem to be excluded.

But even it be admitted that the regular army may be recruited by forced levies, it does not seem to me that the constitutionality of this act is decided. The question would then take the narrower form—Is this mode of coercion constitutional?

It seems to me that it is so essentially incompatible with the provisions of the constitution relative to the militia that it cannot be. On this subject, as on all others, all powers not delegated are reserved. This power is not expressly delegated, and cannot be impliedly so if incompatible with any reserved or granted power. This is not only the express rule of the constitution, but it is necessarily so; for we can know the extent to which state functions were abated by the federal constitution only by the express or necessarily implied terms of the law or compact in which the abatement is provided for. And this is the rule in regard to the common law; it is changed by statute only so far as the expression of the statute requires it to be.

Now, the militia was a state institution before the adoption of the federal constitution, and it must continue so, except so far as that constitution changes it, that is, by subjecting it, under state officers, to organization and training according to one uniform federal law, and to be called forth to suppress insurrection and repel invasion, when the aid of the federal government is needed, and it needs this force. For this purpose it is a federal force; for all others it is a state force, and it is called in the constitution "the militia of the several states:" Art. 2, 2, 1. It is, therefore, the standing force of the states, as well as in certain specified respects the standing force of the Union. And the right of the states to have it is not only not granted away, but is expressly reserved, and its whole history shows its purpose to be to secure domestic tranquillity, suppress insurrections, and repel invasions. Neither the states nor the Union have any other militia than this.

Now, it seems to me plain that the federal government has no express, and can have no implied power to institute any national force that is inconsistent with this. This force shall continue, says the constitution, and the federal government shall make

laws to organize and train it as it thinks best, and shall have the use of it when needed; this seems reasonable and sufficient. Is the force provided for by this act inconsistent with it?

It seems to me it is. By it all men, between the ages of twenty and forty-five, are "declared to constitute the national forces," and made liable to military duty, and this is so nearly the class which is usually understood to constitute the militia force of the states that we may say that this 'act covers the whole ground of the militia, and exhausts it entirely. It is, in fact, in all its features, a militia for national, instead of state purposes, though claiming justification only under the power to raise armies, and accidentally under the fact of the rebellion. In England this can be done, because the state, being a unit there, there can be no place for the distinction between state and federal powers, and the army and militia forces become naturally confounded.

It seems to me this is an unauthorized substitute for the militia of the states. If valid, it completely annuls, for the time being, the remedy for insurrection provided by the constitution, and substitutes a new and unprovided one. Or rather, it takes that very state force, strips it of its officers, despoils it of its organization, and reconstructs its elements under a different authority, though under somewhat similar forms. If this act is law, it is supreme law, and the states can have no militia out of the class usually called to militia duty; for the whole class is appropriated as a national force under this law; and no state can make any law that is inconsistent with it. The state militia is wiped out if this act is valid, except so far as it may be permitted by the federal government. If Congress may thus, under its power to raise armies, constitute all the state militiamen into "national forces" as part of the regular army, and make them "liable to perform duty in the service of the United States when called out by the president," I cannot see that it may not require from them all a constant military training under federal officers as a preparation for the greatest efficiency when they shall be so called out, and then all the state militia and civil officers may be put into the ranks, and subjected to the command of such officers as the president may appoint, and every one would then see that the constitutional state militia becomes a mere name. The constitution makes it, and the men in it a national force in a given contingency, and in a prescribed form, but this act makes them so irrespective of the constitutional form and contingency. This is the substantial fact, and I am not able to refine it away.

And it seems to me that this act is unconstitutional, because it plainly violates the state systems in this; that it incorporates into this new national force every state civil officer, except the governor, and this exception might have been omitted, and every

[Kneedler *et al. v.* Lane *et al.*]

officer of all our social institutions, clergymen, professors, teachers, superintendents of hospitals, &c., and degrades all our state generals, colonels, majors, &c., into common soldiers, and thus subjects all the social, civil, and military organization of the states to the federal power to raise armies, potentially wipes them out altogether, and leaves the states as defenceless as an ancient city with its walls broken down. Nothing is left that has any constitutional right to stand before the will of the federal government.

If this be so, the party in power at any time holds all state rights in its hands. It is subject to no restraints, except that of the common morality of the time and of the party, and every one knows how weak and changeable this is in times of popular excitement, when the party in power, convinced of the rightness and greatness of its own ends, thinks lightly of the modes and forms that in any way obstruct or retard their attainment. There are no constitutional restraints of this power, if it exists, and therefore if the unsteady morality of party excitements will bear it, the party in power may require all the troops to be drafted from the opposite party, or from states and sections where it prevails.

Our fathers saw these dangers, and intended the constitution to stand as a restraint upon party power. They knew that a party in power naturally encroaches upon every institution that obstructs its will, and is inclined, when its power totters, to adopt extreme, unusual, and unconstitutional measures to maintain it; and they intended to guard against this. They knew how Episcopalians, Independents, and Presbyterians, Cavalier and Roundhead, Court and Country, Whig and Tory parties, had each in turn, when in power, tyrannized over their opponents, and sacrificed or endangered public liberty; they had felt how great was this evil in all the partisan struggles that preceded our Revolution, and they desired posterity to profit by their experience. The very restriction upon appropriations for the support of the army exceeding two years, is copied from our English ancestors, and was deemed by them a constitutional limitation of the party in power. None of our constitutions, state or federal, have any purpose or function more important than that of restraining and regulating the party that may chance to be in power, and that is one of the most important purposes of the separation of governmental functions into different departments.

Let any one recall a few of the instances in English history alone, without reference to our own or Roman or Grecian history, wherein liberty has been sacrificed to the interests of a party in power, and he will see how important are our constitutional

restrictions, and how little probable it is that so great a power as this should have been left by our fathers without restriction: Courts of High Commission, Ecclesiastical Commission, and Star Chamber and High Courts of Justice, and Special Commissions of Oyer and Terminer, under such judges as Scroggs and Jeffries, created for the purpose of trying and condemning acts which no law forbade—liberty of speech and of the press most cruelly punished by such courts when it ventured on too free a dissent from the policy 'of the dominant party—informations by the attorney-general substituted in such cases for indictments by the grand jury—members of parliament expelled because their opposition was offensive or dangerous to the ruling power—military officers dismissed because of their political opinions, as were Lord Shelbourne, General Conway and Colonel Barré, under the Grenville ministry, for their opinions in favour of America—rumors of plots, real or fictitious, such as the Oates Conspiracy, the Meal Tub and Rye House Plots, raised and magnified in order to alarm the people against all opposition, and facilitate the downfall of dangerous rivals—patronage, pensions, and seats in parliament corruptly disposed of in opposition to public liberty—and the control of the militia so attempted to be usurped as to produce a revolution that resulted in the execution of Charles I.   But it seems to me that all this experience was lost, in relation to a most important power, if the whole state militia system can be set aside by the federal government at the very time when it ought to act with most vigour, as is done by this act.   All this clearly shows how little reliance can be placed upon mere partisan morality in political affairs, and how necessary it is to have an acknowledged standard, such as the compact of the constitution by which it is to be moderated and tried.

In England the popular jealousy of power was usually directed against the party which was ordinarily represented by the king, because he was a permanent authority; but in this country, in the act of framing the federal constitution, it could be directed against no other power but that which the people were then creating, or the parties that were sure to contend for it; and history tells us that this jealousy was intense and watchful, and it was perfectly natural and inevitable that it should be so. States as well as individuals are careful in putting themselves under the power of others.   That was the power to be feared in its relations with the states, and I know not how it is possible to suppose that under the power to raise armies, they were really giving up their whole militia system, at the time when it is most needed, to be the instrument of a suspected power, a federal party in power, always prone, whatever be its name, to place *its* respect for the time-honoured doctrines of constitutional liberty

in subordination to the intemperate, and therefore often disingenuous zeal for party success. In great political commotions, liberty is in its greatest peril, because, neither party knowing how to give or to receive those reasonable concessions, or that generous respect that is necessary to restore peace, the occasion demands force, and alarm or excitement gives it an undue measure, which increases the resistance, and consequently the excitement or alarm and the force, until all the bulwarks of constitutional liberty are passed or swept away.

If Congress may institute the plan now under consideration, as a necessary and proper mode of exercising its power "to raise and support armies," then it seems to me to follow with more force that it may take a similar mode in the exercise of other powers, and may compel people to lend it their money; take their houses for offices and courts; their ships and steamboats for the navy; their land for its fortresses; their mechanics and workshops for the different branches of business that are needed for army supplies; their physicians, ministers, and women for army surgeons, chaplains, nurses, and cooks; their horses and wagons for their cavalry and for army trains, and their provisions and crops for the support of the army. If we give the latitudinarian interpretation, as to mode, which this act requires, I know not how to stop short of this. I am sure there is no present danger of such an extreme interpretation, and that even partisan morality would forbid it; but if the power be admitted we have no security against the relaxation of the morality that guides it, I am quite unable now to suppose that so great a power could have been intended to be granted, and yet to be left so loosely guarded.

It may be thought that even voluntary enlistments in the regular army have the same sort of inconsistency with the militia system as forced recruiting has; but more careful reflection will show that it is not so. Enlistment in the army takes away a part of the militia; but every militia system allows for this, and the general purpose of both is the same—the constitution of a military force. And, besides this, it is of the very nature of the system that it leaves every man free in the pursuit of his ordinary calling, and binds no man to any part of the militia, except by reason of his residence, which he may abandon or change as he pleases.

This act seems to me to be further unconstitutional in that it provides for a thorough confusion between the army and the militia, by allowing that the regular soldiers obtained by draft may be assigned, by the president, to any corps, regiment, or branch of service he pleases; whereas the constitution keeps the two forces distinct. Under this law, the president may even send them to the navy. Under the militia system, every man

[Knœdler *et al. v.* Lane *et al.*]

goes out with his neighbors and friends, and under officers with whom he is acquainted. It is very properly suggested that, in 1790, General Knox, the Secretary of War under President Washington, and with his approval, and in 1814, Mr. Monroe, President Madison's Secretary of War, recommended plans of recruiting the army, which were very similar to this one, and no doubt this is some argument in favor of its constitutionality. But, notwithstanding our great reverence for those illustrious names, it is impossible to admit them as very influential on this question, when we consider that neither of those plans was adopted by Congress, and the subject never received such a discussion as to settle the question. Instead of Mr. Monroe's plan, a pure militia bill was reported by Mr. Giles from the senate's committee on military affairs.

I have noticed an argument that, because the notorious Hartford Convention opposed the war of 1812, and with it Mr. Monroe's plan of recruiting the army, therefore, opposition to a similar plan now ought to be suspected as unpatriotic. No doubt such an argument may have some influence, but it has no real value in ascertaining truth, for even bad men may have many correct principles. It was not for opposition to Mr. Monroe's plan that that convention became notorious. Even their denunciation of it seems intended as a prefatory apology for their other schemes; for it was not prepared until two months after the plan had been virtually abandoned by the report of Mr. Giles's plan to the senate. The condemnation of the Hartford Convention was founded mainly on the undue and selfish prominence which it gave to, and the agitations it raised in favor of its own sectional interests, when the country was engaged in a dangerous war—its opposition to the admission of new states, for fear of losing the balance of power—its demand that negroes should be considered part of the militia—its opposition to persons of foreign birth being allowed to hold office, and to its real or supposed intention to produce a secession of the Eastern States, if it should not succeed in its measures. Their views, therefore, even by inversion, or *ad invidiam,* amount to nothing in favor of this law.

On the subject of our authority to hear such a case, I must infer, from the refusal of the federal counsel to appear, that it is denied; and I express my views as well as I am able without that assistance which I think they ought to have rendered.

No one denies that a federal, as well as a state officer, acting without constitutional authority, to the injury of any one, is liable to be sued for his acts in the state courts, and I am quite unable to discover that there is any distinction in such cases between preventive and redressive remedies. As at present advised, I cannot doubt that the state courts, having authority to deter-

[Kneedler *et al. v.* Lane *et al.*]

mine the right in such cases in the first instance, they may exercise it according to any known remedy that suits the case, legal or equitable.

No ordinarily well educated man can doubt that, independent of the federal constitution, such universal juridical power is inherent in the states, and might by them be assigned to their judiciary, as it is in our state in the authority.to enjoin against all acts contrary to law and prejudicial to the rights of individuals; and, therefore, this power remains to the states, unless it is taken away by direct prohibition, or is otherwise incompatible with the federal system.

No one that I know of pretends that it has been directly taken away. Indeed, so far as the constitution itself goes, it is expressly left to the states and therefore to the state courts; for the constitution actually institutes no court but the Supreme Court; and it gives to it no original jurisdiction except in cases where a foreign minister or consul or a state is a party. For all other cases within the federal power, it gives only appellate jurisdiction. And, as there may be no other than state courts to try those cases, the appellate jurisdiction of the Federal Supreme Court necessarily leaves an original jurisdiction in them.

True, the constitution authorizes such inferior federal courts as Congress may think proper to establish; but the authority to establish such inferior courts cannot divest this original state jurisdiction; for Congress might never exercise its authority, or it might not assign to them the whole of this original jurisdiction, or it might not assign it to them exclusively of the state courts. The very frame of the constitution, therefore, admits that the states may have the original jurisdiction of such cases, subject to the appellate jurisdiction of the Federal Supreme Court, and no federal law has yet forbidden it to them, even if this may be done.

And such a judiciary system was not at all strange to the fathers of the constitution, and is well known in history. It was the very system of the colonies before our independence. Our colonial courts had authority to try all kinds of cases, whether arising under colonial or under imperial law, and the only remedy for misjudgment was by appeal or writ of error to the proper imperial courts in England; and so it was in Ireland before the Union. And so it is everywhere with courts and other authorities that are merely local in their constitution and jurisdiction; they administer even the general law of state, but always subject to the appellate authority of a more general jurisdiction. And this appellate jurisdiction was in general considered sufficient to preserve the Anglo-Saxon courts in due subordination to the royal courts after the Norman conquest; though *certiorari* to transfer causes before trial was also in use, and no

[Kneedler *et al. v.* Lane *et al.*]

Norman was bound to abide the judgment of a Saxon court to whose jurisdiction he chose to object. No doubt a similar practice can be traced in every country, not purely despotic, where different state organizations or different peoples have been united under one general government. In many cases the paramount law is *international* law, and yet national or state courts may decide what it is, subject to the appellate jurisdiction of treaties or of armies.

With all this present to the minds of the fathers of the constitution, it seems to me that they could not have intended a departure without giving expression to their intention, and this they have not done. They seem even to express the contrary when they declare the constitution and the laws made under it to be, not merely federal law, but "the supreme law of the land," and require all state officers to be sworn to support it. That mere federal *authority* does not exclude state *action*, is very well illustrated by this very subject of the militia, where the federal authority to legislate has never been regarded as preventing actual state legislation. And the danger of conflicts between federal and state authorities is not different in its character from that which may arise between different departments of the same government, and lead to results that are quite insoluble. Mutual trust and respect and a careful adherence to the constitution can alone save us from such difficulties.

It is with very real distress that I find my mind forced into this conflict with an act of Congress of such very great importance in the present juncture of federal affairs; but I cannot help it, and the question is so presented that I cannot evade it. Possibly an argument from the counsel of the government might have saved me from this, if it is an error; and it may yet produce a different result on the final hearing, which I trust will take place so soon that no public or private injury may arise from any misjudgment now and here.

Certainly, in this great struggle, we owe nothing to the rebels but war, until they submit, unless it be that we do not let the war so depart from its proper purpose as to force them to submit to a constitution and system different from that against which they have rebelled. But we do owe it to each other, to minorities and individuals, that no part of that sacred compact of union shall become the sport of partisan struggles, or be subjected to the anarchy of conflicting moralities, urged on by ambitious hopes veiled in the background. Our solemn oaths and plighted faith have made that compact the shield of state constitutions, institutions, and peculiarities, and of their right to their own free development, against all arbitrary and intermeddling action of the central government (which in all free

[Kneedler *et al. v.* Lane *et al.*]

countries represents a party), and I venture to hope that that shield will continue to afford its intended protection.

What I have written I have written under a very deep sense of the responsibility imposed upon me by my position, and with an earnest desire to be guided only by the constitution. Very many will be dissatisfied with my conclusions; but I submit to the judgment of God, and also to that of my fellow citizens when the present troubles shall have passed away and are felt no more.

I am in favor of granting the injunction in favour of each of the defendants for his own protection, but not for the staying of all proceedings under the act.

> ORDER.—November 9th 1863. Preliminary injunction (in each case) granted for the protection of the plaintiff, on his giving bond with surety, to be approved by the prothonotary, in the sum of $500, according to law, and refused for any further purpose.

Concurring opinion by

WOODWARD, J.—On the 3d day of March 1863, the Congress of the United States passed an act for "enrolling and calling out the national forces, and for other purposes," which is commonly called the Conscription Law. The plaintiffs, who are citizens of Pennsylvania, have set forth the act fully in their bills, and they complain that they have been drafted into the military service of the government in pursuance of said enactment, but that the same is unconstitutional and void, and that the defendants, who are engaged in executing the act, have violated the rights, and are about to invade the personal liberty of the plaintiffs; and thereupon they invoke the equitable interposition of this court to enjoin the defendants against a further execution of the said act.

For the jurisdiction of this court to set aside an act of Congress as unconstitutional, and to grant the relief prayed for, I refer myself to the views of the Chief Justice in the opinion he has just delivered in these cases, and I come at once to the constitutional question.

The act begins with a preamble which recites the existing insurrection and rebellion against the authority of the United States, the duty of the government to suppress insurrection and rebellion, to guaranty to each state a republican form of government, and to preserve the public tranquillity, and declares that for these high purposes a military force is indispensable, "to raise and support which all persons ought willingly to contribute," and that no service can be more praiseworthy and honourable than the maintenance of the constitution and union; and then goes on to provide for the enrolling of all the able-bodied male

citizens of the United States, and persons of foreign birth who have declared their intention to become citizens, between the ages of twenty and forty-five years, and these able-bodied citizens and foreigners, with certain exceptions afterward enumerated, are declared to be "*the national forces*," and made liable to perform military duty when called out by the president.   The act divides the country into military districts, corresponding with the congressional districts, provides for provost-marshals and enrolling boards, and regulates the details of such drafts as the president shall order to be made from the national forces so enrolled.   The payment of $300 excuses any drafted person, so that it is in effect a law providing for a compulsory draft or conscription of such citizens as are unwilling or unable to purchase exemption at the stipulated price.   It is the first instance, in our history, of legislation forcing a great public burthen on the poor. Our state legislation, which exempts men who are not worth more than $300, from the duty of paying their own debts, is in striking contrast with this Conscription Law, which devolves upon such men the burthen which belongs to the whole "national forces," and to which "all persons ought willingly to contribute." This, however, is an objection to the spirit of the enactment rather than to its constitutionality.

The description of persons to be enrolled, able-bodied citizens between twenty and forty-five years of age, is substantially the description of the militia as defined in our Pennsylvania statutes, and probably in the statutes of all the states.   The national forces, then, mean the militia of the states—certainly include the militia of Pennsylvania.   This expression, "national forces," is modern language, when so applied.   It is not found in our constitutions, either state or federal, and if used in commentaries on the constitution and in history, it will generally be found applied to our land and naval forces in actual service—to what may be called our standing army.   It is a total misnomer when applied to the militia, for the militia is a state institution.   The general government has no militia.   The state militia, always highly esteemed as one of the bulwarks of our liberties, are recognised in the federal constitution, and it is not in the power of Congress to obliterate them, or to merge them in "national forces."   Unless there is more magic in a name than has ever been supposed, this Conscript Law was intended to act upon the state militia, and our question is, therefore, whether Congress has power to impress or draft the militia of the state.

I cannot perceive what objection can be taken to this statement of the question, for surely it will not be argued that *calling* the militia national forces, makes them something else than the militia.   If Congress did not mean to draft the militia under this

[Kneedler *et al. v.* Lane *et al.*]

law, where did they expect to find the national forces? "All able-bodied white male citizens, between the ages of twenty-one and forty-five years, residing in this state, and not exempted by the laws of the United States," with certain specified exceptions, constitute our state militia. Will it be said that the Conscript Law was not intended to operate on these? I think it will not. Then if it does touch, and was framed and designed to draft this very class of citizens, no possible objection can be taken to the above statement of the question we have to decide.

I therefore repeat the question with great confidence in its accuracy, Has Congress the constitutional power to impress or draft into the military service of the United States the militia men of Pennsylvania?

This question has to be answered by the Constitution of the United States, because that instrument, framed by deputies of the people of the states, and ratified and put into effect by the states themselves in their respective corporate capacities, delegates to Congress all the powers that body can exercise. These delegations are either express or such implications as are essential to the execution of expressly delegated powers.

There are but three provisions in the Constitution of the United States that can be appealed to in support of this legislation. In our ordinary editions they stand numbered as clauses 13, 16, and 17 of the 8th section of Art. 1 of the Constitution.

"13. Congress shall have power to raise and support armies, but no appropriations of money to that use shall be for a longer term than two years."

"16. Congress shall have power to provide for calling forth the militia to execute the laws of the Union, to suppress insurrections, and repel invasions.

"17. Congress shall have power to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress."

"To raise armies"—these are large words, what do they mean? There could be no limitation upon the number or size of the armies to be raised, for all possible contingencies could not be foreseen; but our question has not reference to numbers or size, but to the *mode* of raising armies. The framers of the constitution, and the states which adopted it, derived their ideas of government principally from the example of Great Britain— certainly not from any of the more imperial and despotic governments of the earth. What they meant to make was a more free constitution than that of Great Britain—taking that as a

model in some things—but enlarging the basis of popular rights in all respects that would be consistent with order and stability. They knew that the British army had generally been recruited by voluntary enlistments, stimulated by wages and bounties, and that the few instances of impressment and forced conscriptions of land forces had met with the disfavour of the English nation, and had led to preventive statutes. In 1704, and again in 1707, conscription bills were attempted in Parliament, but laid aside as unconstitutional. During the American revolution, a statute, 19 Geo. 3, ch. 10, permitted the impressment of "idle and disorderly persons not following any lawful trade, or having some substance sufficient for their subsistence," and this was as far as English legislation had gone when our federal constitution was planned. Assuredly the framers of our constitution did not intend to subject the people of the states to a system of conscription which was applied in the mother country only to paupers and vagabonds. On the contrary, I infer that the power conferred on Congress was the power to raise armies by the ordinary English mode of voluntary enlistments.

The people were justly jealous of standing armies. Hence they took away most of the war power from the executive, where, under monarchical forms, it generally resides, and vested it in the legislative department, in one branch of which the states have equal representation, and in the other branch of which the people of the states are directly represented according to their numbers. To these representatives of the states and the people, this power of originating war was committed, but even in their hands it was restrained by the limitation of biennial appropriations for the support of the armies they might raise. Of course no army could be raised or supported which did not command popular approbation; and it was rightly considered that voluntary enlistments would never be wanting to recruit the ranks of such an army. The war power, existing only for the protection of the people, and left, as far as it was possible to leave it, in their own hands, was incapable of being used without their consent, and therefore could never languish for enlistments. They would be ready enough to recruit the ranks of any army they deemed necessary to their safety. Thus the theory of the constitution placed this great power, like all other governmental powers, directly upon the consent of the governed.

The theory itself was founded on free and fair elections, which are the fundamental postulate of the constitution. If the patronage and power of the government shall ever be employed to control popular elections, the nominal representatives of the people may cease to be their real representatives, and then the armies which may be raised may not so command public confidence as to attract the necessary recruits, and then conscript

[Kneedler *et al. v.* Lane *et al.*]

laws, and other extra-constitutional expedients may become necessary to fill the ranks. But governmental interference with popular elections will be a subversion of the constitution, and no constitutional argument can assume such a possibility.

Supposing, then, that the people are always to be fairly represented in the halls of Congress, I maintain that it is grievous injustice to them to legislate on the assumption that any war, honestly waged for constitutional objects, will not always have such sympathy and support from the people as will secure all necessary enlistments. Equally unjust to their intelligence is it to suppose that they meant to confer on their servants the power to impress them into a war which they could not approve.

When to these considerations we add the ability of a great country like ours, to stimulate and reward enlistments, both at home and abroad, by bounties, pensions, and homesteads, as well as by political patronage in countless forms, we see how little necessity or warrant there is for implying a grant of the imperial power of conscription.

If the very improbable case be supposable, that enlistments into the federal armies might become so numerous in a particular state as sensibly to impair its own proper military power, is it not much more improbable that the states meant to confer upon the general government the power to deprive them, at its own pleasure, altogether of the militia by forced levies? Yet this might easily happen if the power of conscription be conceded to Congress. There are no limitations expressed—nothing to compel Congress to observe quotas and proportions as among the several states—nothing to prevent their raising armies wholly from one state, taking every able-bodied citizen out of it to the endangering, if not utter undoing of all its domestic interests.

There is nothing in the history of the constitution, nor in the debates upon it in the conventions, federal and state, nor in those excellent contemporaneous papers known as the "Federalist," to justify the suspicion that this vast and dangerous power lies wrapped up in the few plain words of the 13th clause, but, on the contrary, the most indubitable evidence is derivable from all those sources that the thought of subjecting state militia to federal draft had no existence in the minds of that day. If such a construction had been anticipated, the objections which the constitution encountered in the state conventions would doubtless have been found insurmountable. But what ought to be sufficient to settle the question is the language of clauses 16 and 17, which, if it have any meaning at all, absolutely forbids the interpretation on which the Conscription Act is founded. And these clauses must be taken in connection with the 13th in fixing the meaning of the words "to raise and support armies,' because the constitution, like most other

written documents, is its own best interpreter, and must be construed as a whole—by its four corners, as we sometimes say. Therefore, if we concede this dangerous power to the language of the 13th clause, we destroy the force and effect of the words of the 16th and 17th clauses. We make the instrument self-destructive, which is violative of all canons of construction. Congress shall have power to provide for calling forth the militia in the manner and subject to the limitations prescribed in clauses 16 and 17, and therefore I argue Congress has not the power to draft them. Is an express rule of the constitution to give way to an implied one? If the 13th clause confers power to draft the militia, the words of the 16th and 17th clauses are the idlest that were ever written. But if the 13th conferred only the power to enlist volunteers, then the subsequent clauses become very intelligible—stand well with the 13th, and add essentially to the martial faculties of the federal government. Look at those clauses. The militia are to be called forth to execute the laws of the Union, suppress insurrections, and repel invasions, to be organized, armed, and disciplined by the state, but according to the laws of Congress, and such part of them as may be employed in the service of the United States are to be governed by the president, but officered by the respective states. Now, this Conscription Law recites an " existing insurrection and rebellion" as the ground and reason, not for calling forth the militia under the above provisions, but for *drafting* them into the military service of the United States. The very case has occurred in which the constitution says the militia shall be called out under state officers, but Congress says they shall be drafted in contempt of state authority. This cannot be put on that clause of the constitution which authorizes Congress to make all laws necessary and proper for carrying into execution the foregoing powers, because that is not a grant of any additional power, but only of the legislative faculty to execute " the foregoing powers." What those powers are is first to be ascertained, and then, in virtue of this provision, Congress may provide the necessary and proper laws. The question we are dealing with has not reference to the mere forms of legislation, but to the essential powers of government. If *any* conscription law may be directed against state militia, for the suppression of rebellion and insurrection, this may be conceded to be a valid enactment, but whether a government of limited and expressly delegated powers may, for such a purpose, forcibly take away the militia of other governments, which are sovereign in their respective spheres, is a question which the instrument of delegation can alone answer. Congress have said in this act that the rights of states may be thus disregarded. General Washington and the men of his day did not so read the constitution, when, in suppressing the

Whiskey Insurrection in this state, they paid the most scrupulous regard to the rights and powers of the state. Under pressure of a foreign war, a conscript bill was reported in Congress in 1814, but it did not pass, and if it had it would have been no precedent for this law, because we are now dealing with an insurrection, and insurrections are specially provided for in the constitution. If to support a foreign war, Congress may draft the militia, which I do not admit, the *power of* draft to suppress insurrections is not to be implied, since another mode of suppressing insurrections is expressly provided. When a state is called on for its quota of militia it may determine by lot who of the whole number of its enrolled militia shall answer the call, and thus state drafts are quite regular, but a congressional draft *to suppress insurrection,* is an innovation that has no warrant in the history or text of the constitution. Either such a law or the constitution must be set aside. They cannot stand together.

And happily no ill consequences can flow from adhering to the constitution, for the standing army of the federal government, recruited by enlistments in the ordinary mode, with the state militia, called forth according to the constitution, are a force quite sufficient to subdue any rebellion that is capable of being subdued by force of arms. Such a formidable force, wisely wielded, in connection with a paternal and patriotic administration of all other constitutional powers, will never fail to put down refractory malcontents, and preserve peace and good order among the American people. This Conscript Law, therefore, not sanctioned by the constitution, is not adapted to the exigencies of the times, nor likely to have success as a war measure.

In its political bearings, even more than in its military aspects, it is subversive of the constitution, and of the rights of citizens that depend upon state authority. A few thoughts will make this plain.

It is impossible to study our state and federal constitutions, without seeing how manifestly the one was designed to guard and maintain the personal and social rights of the citizen; the other to take care of his external relations. Nurture, education, property, home, wife and children, servants, administration of goods and chattels after death, and a graveyard in which to sleep the sleep of death, these are among the objects of state solicitude, for the protection of which the state provides civil authorities, and back of them the *posse comitatus* and the militia to make the civil administration effectual. Now, if the principle be admitted that Congress may take away the state militia, who does not see that the ultimate and final security of every man's domestic and personal rights is endangered? To the extent delegated in the constitution nobody questions the right of Congress to control the state militia, but

[Kneedler *et al. v.* Lane *et al.*].

if to the extent to which this enactment goes, the states will be reduced to the condition of mere counties of a great commonwealth, and the citizen of the state must look to the federal government for the enforcement of all his domestic rights as well as for the regulation of his external relations.

The citizen of the state needs protection from foreign foes and Indian tribes—peaceful intercourse and commerce with all the world—a standard of values, and of weights and measures that shall be common to all the states, and a postal system that shall be co-extensive with interstate trade and commerce. To adjust and maintain these external relations of the citizen, are high duties which the constitution has committed to the federal government, and has furnished it with all necessary civil functionaries, and with power to levy and collect taxes from the people of the states, to raise and support armies, to provide a navy, and to call forth the militia to execute the laws.

Thus is the American citizen amply provided, by means of constitutions that are written, with protection for all his rights, natural and artificial, domestic and foreign, but, as the war power of the general government is his ultimate security for his external, so is the militia his ultimate security for his internal or domestic rights. Could the state governments strike at the war power of the federal government without endangering every man's rights? In view of the existing rebellion, no man would hesitate how to answer this question, and yet is it not equally apparent that when the federal government usurps a power over the state militia which was never delegated, every man's domestic rights (and they are those which touch him most closely) are equally endangered?

The great vice of the Conscript Law is, that it is founded on an assumption that Congress may take away, not the state rights of the citizen, but the security and foundation of his state rights. And how long is civil liberty expected to last, after the securities of civil liberty are destroyed? The Constitution of the United States committed the liberties of the citizen in part to the federal government, but expressly reserved to the states, and the people of the states, all it did not delegate. It gave the general government a standing army, but left to the states their militia. Its purposes in all this balancing of powers were wise and good, but this legislation disregards these distinctions, and upturns the whole system of government when it converts the state militia into "national forces," and claims to use and govern them as such.

Times of rebellion, above all others, are the times when we should stick to our fundamental law, lest we drift into anarchy on one hand, or into despotism on the other. The great sin of the present rebellion consists in violating the constitution, where-

[Kneedler *et al. v.* Lane *et al.*]

by every man's civil rights are exposed to sacrifice. Unless the government be kept on the foundation of the constitution, we imitate the sin of the rebels, and thereby encourage them, whilst we weaken and dishearten the friends of constitutional order and government. The plaintiffs in these bills have good right, I think, as citizens of Pennsylvania to complain of the act in question, not only on the grounds I have indicated, but on another to which I will briefly allude.

The 12th section provides that the drafted person shall receive notice of the rendezvous at which he is to report for duty, and the 13th section enacts "that if he fails to report himself in pursuance of such notice without furnishing a substitute or paying the required sum therefor, he shall be deemed a deserter, and shall be arrested by the provost-marshal, and sent to the nearest military post for trial by court-martial." The only qualification to which this provision is subject, is that upon proper showing that he is not able to do military duty, the board of enrolment may relieve him from the draft.

One of the complainants, Kneedler, has set forth the notice that was served on him in pursuance of this section, and by which he was informed that unless he appeared on a certain day, he would be "deemed a deserter, and be subject to the penalty prescribed therefor by the rules and articles of war." I believe the penalty of desertion, by the military code, is any corporeal punishment a court-martial may choose to inflict, even to that of being put to death.

Can a citizen be made a deserter before he has become a soldier? Has Congress the constitutional power to authorize provost-marshals, after drawing the name of a freeman from a wheel and serving him with a ten days' notice, to seize and drag him before a court-martial for trial under military law? This question touches the foundations of personal liberty.

In June 1215, the barons of England and their retainers, a "numerous host, encamped upon the grassy plain of Runnymede," wrung from King John that great charter which declared among other securities of the rights and liberties of Englishmen, that "no freeman shall be arrested, or imprisoned, or deprived of his freehold, or his liberties, or free customs, or be outlawed or exiled, or in any manner harmed, nor will we (the king) proceed against him, nor *send any one against him by force of arms,* unless according to the sentence of his peers (which includes trial by jury), or the common law of England." Here was laid the strong foundation of the liberties of the race to which we belong. And yet not here, for Magna Charta *created* no rights, but only reasserted those which existed long before at common law. It was for the most part, says Lord Coke, merely

declaratory of the principal grounds of the fundamental laws of England. Far back of Magna Charta, then, in the customs and maxims of our Saxon ancestry, those principles of liberty lay scattered which were gathered together in that immortal document, which four hundred years afterwards were again reasserted in two other great declaratory statutes, "The Petition of Right," and "The Bill of Rights," and which were transplanted into our Declaration of Independence, the bill of rights to our state constitution, and the amendments to our federal constitution, and which have thus become the heritage of these plaintiffs. Says the 5th article of the amendments : "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger." What is the scope of this exception? The land or naval forces mean the regular military organization of the government, the standing army and navy, into which citizens are introduced by military education from boyhood, or by enlistments, and become, by their own consent, subject to the military code, and liable to be tried and punished without any of the forms or safeguards of the common law. In like manner the militia, when duly called out and placed "in actual service," are subject to the rules and articles of war, all their common law rights of personal freedom being for the time suspended. But when are militiamen in actual service? When they have been notified of a draft? Judge Story, in speaking of the authority of Congress over the militia, says : "The question when the authority of Congress over the militia becomes exclusive, must essentially depend upon the fact when they are to be deemed in the actual service of the United States. There is a clear distinction between calling forth the militia and their being in actual service. These are not contemporaneous acts, nor necessarily identical in their constitutional bearings. The president is not commander-in-chief of the militia, except when in actual service; and not merely when they are ordered into service. *They are subjected to martial law only when in actual service, and not merely when called forth before they have obeyed the call.* The Acts of 1795, and other acts on the subject, manifestly contemplate and recognise this distinction. *To bring the militia within the meaning of being in actual service, there must be obedience to the call, and some acts of organization, mustering, rendezvous, or marching done in obedience to the call in the public service:*" Story's Con. Law, vol. 3, § 1208.

If it be suggested that this plain rule of common sense and constitutional law is not violated by the Conscription Act, because it applies to the "national forces," I reply as before, that this is only a new name for the militia, and that the constitu-

[Kneedler *et al. v.* Lane *et al.*]

tional rights of a citizen are not to be sacrificed to an unconstitutional name. When Judge Story was endeavouring to mark, with such distinctness, the time at which the common law rights of the citizen ceased, and his liability to military rule began—the time, in a word, when he became a soldier—why did it not occur to his fertile mind that Congress could render this distinction valueless and unmeaning by a new nomenclature—by calling the militia "national forces?" It is not difficult to conceive how such a suggestion would have fared had it occurred or been made to him. But it is difficult, in the presence of the grave issues of the present day, to treat so frivolous a suggestion with the dignity and forbearance the occasion demands.

I have shown what rights of personal liberty these plaintiffs inherited from a remote ancestry, and how they are guaranteed to them by our constitutions, and at what time they are to give place to martial law, and surely if a wheel set in motion by Congress can crush and grind those rights out of existence, without regard to the limitations of the constitution, some weightier reason should be found for it than the misnomer which the act so studiously applies to the militia—some reason that is worthy to stand instead of Magna Charta, our constitutions, and all our traditional freedom.

The only one that I have ever heard suggested, and which is applicable against all the views advanced in this opinion, is called military necessity. The country is involved in a great civil war, which can be brought to an honourable close only by an energetic use of all our resources, and no restraints should be tolerated, in such circumstances, save only those which Christian civilization has imposed on all warfare. Whatever is according to the constitution, the argument claims, may be done of course, whatever is over and beyond the constitution is justified as military necessity, and of that the president and Congress are exclusive and final judges.

The amount of the argument is, that the exigencies of the times justify the substitution of martial law for the constitution. But what is martial law? Blackstone and Sir Mathew Hale tell us, "it is built upon no settled principles, but is entirely arbitrary in its decisions, is in truth and reality no law, but something indulged rather than allowed as law." The unrestrained will of one or a number of men, then, is the rule which the argument substitutes for the constitution. It is of no consequence that the will thus set up for supreme law is that of men whom a majority of the people have chosen, because, according to our system, the majority can only choose men to administer the constitution as it is written. Majorities, as a power recognised by law, have no more right to establish a despotism than a minority would have. But may majorities or minorities set

[Kneedler *et al. v.* Lane *et al.*]

aside the constitution under pressure of rebellion and insurrection?

As the constitution anticipates and provides for such calamities, it is a reproach to its wisdom to say that it is inadequate to such emergencies. No man has any historical right to cast this reproach upon it. No current experience proves it. It never can be proved except by an unsuccessful use of the legitimate powers of the constitution against rebellion, and then the thing proved will be that the instrument needs amendment, which its machinery is flexible enough to allow. Even such a melancholy demonstration would do no more than point out necessary amendments—it would not surrender the people to the arbitrary will of anybody. Presidents and congressmen are only servants of the people, to do their will, not as that will may be expressed under passion or excitement, but as it stands recorded in the constitution. It is the constitution, indeed, which makes them presidents and congressmen. They have no more power to set up their will against the constitution than so many private citizens would have. Outside of that they are only private citizens.

I do not, therefore, feel the force of the argument drawn from the distressing circumstances of the time. Bad as they are, we make them worse by substituting arbitrary power for constitutional rule, but if we made them better, and not worse, the judicial mind ought not to be expected to approve the substitution, for it can recognise no violation of the constitution as a legitimate vindication of the constitution. To place ourselves under despotic sway in order to bring back rebels to the constitution we have given up, is a procedure that perplexes the student of political science, and will quite confound the historian of our times.

There are other features of the Conscript Law that deserve criticism, but not to extend my opinion farther, I rest my objections to its constitutionality upon these grounds :—

1st. That the power of Congress to raise and support armies, does not include the power to draft the militia of the states.

2d. That the power of Congress to call forth the militia, cannot be exercised in the forms of this enactment.

3d. That a citizen of Pennsylvania cannot be subjected to the rules and articles of war until he is in actual military service.

4th. That he is not placed in such actual service when his name has been drawn from a wheel, and notice thereof has been served upon him.

For these reasons I am for granting the injunction.

Concurring opinion by

THOMPSON, J.—The Act of Congress, under which the complainant in this case is required to enter the army of the United

[Kneedler *et al. v.* Lane *et al.*]

States as a soldier, for a period of three years or during the war, provides for the enrolment, by officers of the United States, of all persons liable to do military duty, between the ages of twenty and forty-five years, and classifies them. The names of all persons thus enrolled were required to be put into a wheel, and the requisite number for the districts, with a surplus of 50 per cent. for contingencies, were to be drawn thence, under the supervision of certain federal officers. Those thus drawn from the wheel, if not exempted, from disability or otherwise, will be compelled to serve for the period mentioned, or find acceptable substitutes, or commute the service by the payment of $300.

Beyond all controversy this is a draft, or involuntary conscription from the militia of the state, without any requisition upon state executives, or upon officers in command of the militia in the states, and without any reference to state authorities whatever. Is this enactment in accordance with the federal constitution? The answer to this question determines the case, for it is not denied that the complainant is within the provisions of the act, and was drawn as and for a soldier under its provisions. He must therefore serve, if the act be constitutional, or seek exemption under some of its provisions.

Our jurisdiction of the case I think is plain. We have authority to restrain acts contrary to law, and prejudicial to the rights of individuals: Act of 16th June 1836. If the Act of Congress of 3d March 1863, under and by virtue of which the complainant is holden as a soldier, and sought to be coerced into the service, be not constitutional, the custody of his person under pretence of it is contrary to law, and prejudicial to his interests. The injury, too, if the proceedings be illegal, is undoubtedly within what is denominated irreparable injury or mischief, and hence the propriety of the specific remedy. An action for damages would perhaps not be sustainable under a recent act of Congress, but if it should be, it would be against parties who intended no injury, and from whom, on account of obeying what they supposed to be law, in conducting the proceedings against him, but little could be recovered, although the soldier may have been carried to distant places, from his home, and may have undergone great hardships and vicissitudes. I dismiss this branch of the case with this short view of it, and with the additional remark that if our judgment is against the constitutionality of the law, the case can be removed to the federal judiciary at Washington, if the authorities there see proper, and be reviewed by the court in the last resort in such cases; a thing which the President of the United States has on a recent occasion expressed a wish for, and determination to facilitate.

I now proceed to the main question. The Constitution of the United States defines and enumerates the powers of the general

government, and limits them by the solemn declaration, that "the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The government established by the constitution is, therefore, a limited government, beyond the limitations of which, including necessary incidents of expressly granted powers, all exercise of authority by Congress is mere usurpation. We should remember this in construing the constitution; and we should remember, also, that the entire machinery of government, provided by it, was poised between checks and balances, designed not only to prevent it from transcending its own orbital limits, but to guard against aggressions from other sources. The objects to be attained, as declared in the preamble, must also be kept in view, when we are called to expound its provisions; and we are bound to construe it so as to preserve and advance them all. The purpose, as declared in the preamble, was "to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." Each of these objects are supposed to be secured by the constitution, and no one of them must be overlooked in a too eager desire to lend a supposed efficiency to some other. To do so, would endanger the whole. To "provide for the common defence" is one purpose avowed for establishing the constitution, and the duty devolves on Congress to execute it; but it must not be executed in such a manner as to encroach on the paramount purpose of securing "the blessings of liberty to ourselves and our posterity," also declared. This is one instance to show that no legislation, nor no construction, can be valid or sound which is not in harmony with every provision of the constitution.

In the light of these general and fundamental principles, we must investigate the grave questions presented by the bill of the complainant, now before us. And here I may express my regret that it did not meet the views of the government officials, having in charge the law department for this United States district, to appear at the argument of this case, of which they had notice, and give us the benefit of their views and researches on the momentous questions involved. It can hardly, I presume, be fairly attributable to a disregard of what might be the ultimate judicial action of the state on the question, or in contempt of state authority altogether. Whatever may have been the reasons for the course adopted, the magnitude of the question involved is not at all diminished thereby, nor is our duty most carefully to examine the whole case in all its aspects, the less imperative.

Is the act of Congress, approved March 3d 1863, entitled "An act for enrolling and calling out the national forces, and for

other purposes," now familiarly known as the Conscription Act, constitutional?

In order to provide for the common defence, and thereby promote the general welfare, Congress has, by the constitution, power to "raise and support armies," and "to provide and maintain a navy." It was under no extraordinary pressure of circumstances or emergent necessity that this power was granted. It was deemed to be, and thereupon introduced as a part, of the ordinary machinery of government; the convention acting on an axiom as old as government itself, "that the surest means of avoiding war is to prepare for it in times of peace." Without such a power, "it would," says Story, in his Commentaries on the Constitution, § 1185, "present the extraordinary spectacle to the world of a nation incapacitated by a constitution of its own choice from preparing for defence before actual invasion."

It was an ordinary power, not superinduced by impending war. "In the mild season of peace," says the Federalist, No 2, "with minds unoccupied by other subjects, they (the convention) passed many months in cool, uninterrupted, and daily consultation; and finally, without having been awed by power, or influenced by any passion, except love for their country, they presented and recommended to the people the plan produced by their joint and unanimous councils." Is there room for a doubt that, under such circumstances, the mode in which the power to "raise armies" was to be executed was the accustomed one,— namely, by voluntary enlistments? At the time this was the usual mode of raising and recruiting armies in Great Britain, and the people of this country were better acquainted with the laws, customs, and even habits of the people of England than of those of any other people in the world. Notwithstanding we had been at war with them, and an angry spirit had been generated between the two countries, yet it is a notorious fact that their customs and laws were generally adopted in this country, and to this day continue to a great extent. Voluntary enlistments, as by contract, was the general method of raising armies there and with us, prior to and at the time the constitution was framed. As this was the customary mode, every presumption supports the idea that this was the only mode in the minds of the framers of the constitution. Indeed, it is a common law rule, that when anything is directed to be done, without special instructions as to how the act is to be performed, the customary mode of doing it is supposed to be included in the direction. We cannot suppose that at the moment the country had achieved its liberty, at so much cost of blood and treasure, that such a despotism over the lives and liberties of men, would be incorporated into the constitution as would authorize Congress to fill the armies to be raised, by conscription, as if by the agency

of the press-gang. This was no more in the contemplation of the convention than that the civil department of the government should also be filled by coercive measures.   Can any one now be credulous enough to believe that if a power had been supposed to exist, to raise an army, not by voluntary means but by coercive, especially as there were no limits fixed as to its magnitude, that the constitution would have been ratified by the states ? The idea would, it seems to me, be preposterous.   Without such a thought once having been suggested by the opponents of the constitution, a standing army to be raised in the usual way was a source of many fears in the public mind.   It was thought to be dangerous to liberty in its very nature; but what would have been thought if it had been discovered or avowed that in its creation it might be directly and openly destructive of the individual liberties of those who were to compose it, and that it might be extended to embrace all the able-bodied citizens in the states !   It required many numbers of the ablest paper ever written on the constitution, I mean the Federalist, to remove those fears.   See Federalist, from No. 24 to 28, inclusive, on this subject.

The constitution was adopted in ignorance, certainly, of any such power, if it does exist, and it has required the lapse of three-quarters of a century to develope its latent evils.   The moral evidences are all against the idea, and I think something more demonstrative will show that these evidences stand not alone.

The power to raise an army by conscription or coercion (the words are nearly synonymous—a conscript is one taken by lot from the conscription, or (enrolment) list,—" and compelled to serve as a soldier or sailor:" Web. Dict. verb, " Conscript,"), rests alone on the idea that the power is unlimited, as to the means to be used, as well as to the numbers of which it may be composed.   If there were no other power or principle in the constitution to be affected in its operation by such a view, there would be force in the idea.   But the constitution must be administered so that the whole may stand in full force, unimpaired by any particular portion.

The limitation of a power may appear otherwise than by express terms.   Its scope may be curtailed by the necessity to preserve some other function necessary to co-exist for the preservation of the whole.   One object in framing the constitution, as already remarked, was to " perpetuate the blessings of liberty." It can hardly be contended for by any one, that the execution of a power which would effectually destroy this object, would be constitutional.   Again: a power so executed as to destroy the reserved rights of the states, could hardly be claimed to be constitutional.   There are, therefore, limitations as effectual as if

expressed, " *ut res magis valeat quam pereat*" is a maxim out of which this grows.

A limitation of this power was undoubtedly supposed to exist in the discretion of Congress; but that cannot be relied on in this argument.  To give it any force would be to allow the acts of Congress to be evidence to establish the proper discretion of Congress.  This would be to argue in a circle, and would prove nothing.  We are testing the acts of Congress, not by Congress, but by the constitution.  So, too, it was supposed to exist in a time when no more voluntary enlistments could reasonably be procured, or when they might not be procured rapidly enough.  That this was so is demonstrable by the fact that the constitution provides for calling out the militia when the army may not be sufficient.  I use this contingent expression, because I look on the army as an ordinary power, and ordinarily to be used, unless insufficient for the end in view, or the exigencies of the times.  However this may be, it is absolutely certain that the military forces of the government, for all purposes, were to be the army and the militia.

In the article of the constitution containing the power to "raise and support armies," and consecutive to that, and other war powers, and as part of them, is the power to be found in Congress "to provide for calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasion:" "To provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively the appointment of officers, and the authority of training the militia according to discipline prescribed by Congress."

The army to be raised, and the militia liable to be employed in the service of the United States, are the constituted military forces of the government.  They co-exist, and must co-exist, if the constitution be obligatory.  We sometimes employ volunteers, but they are merely a form, as they are a part of the militia, and do not militate against the idea of the two species of forces.  It is conceded that both may not be required in any given case, but both must exist, or rather the militia cannot be destroyed or extinguished by an act of Congress.  The constitution forbids this by the positive injunction to provide for organizing, arming, and disciplining them.  They are the security of the states against the federal government, and their only security; for the states themselves are not allowed to support armies.

"It may safely be received as an axiom in our political system," says the Federalist, No. 28, "that the state governments will in all possible contingencies afford complete security against invasions of the public liberty by the national authority." * * *

[*Kneedler et al. v. Lane et al.*]

" They can at once adopt a regular plan of opposition in which they can combine all the resources of the community !" How can this security be afforded against the danger of invasion of the public liberty by the national authority, unless there be some military force with which to resist it? What resources are there in a community if all the " able-bodied men" may be absorbed in the national forces? It will at once be agreed, I think, in view of the constitutional provisions cited, that the militia, the only power of the states, must be maintained intact, and that no system is constitutional which extinguishes them. Let us inquire, therefore, whether or not the Act of Congress of the 3d of March 1863, known as the Conscription Act, does not in fact attempt the complete demolition of the militia of the states.

The preamble to the act, sets forth the existence of insurrection and rebellion; that a military force is indispensable to suppress it; that to raise and support such force, " all persons ought willingly to contribute." It is therefore enacted, section 1, " That all able-bodied male citizens of the United States, and persons of foreign birth, who shall have declared on oath their intention to become citizens in pursuance of the laws thereof, between the ages of twenty and forty-five years, except as excepted, are hereby declared to constitute the national forces, and shall be liable to perform military duty in the service of the United States, when called out by the president for that purpose." Then follow numerous provisions for classifying them; for the lottery or draft of the required number in each military district; the closing up of the wheel until again required, and the order and term of service, not as militia men belonging to and officered by the states, but as parcel of the army of the United States, " raised and supported" under the clause of the constitution which provides for raising and supporting armies, and to be officered by federal authority exclusively.

Every able-bodied man in the United States, between twenty and forty-five, is by these provisions enrolled, and declared to constitute the national forces. This covers the entire *materiel* of the militia in the Union. All able-bodied white men between twenty-one and forty-five years, are liable as militia men in this commonwealth, and it is believed that this is about or near the standard in most if not all the other states. This act is broader, both as to age and colour. The specified age, however, amounts to nothing, for Congress, by a very slight extension of power in fixing the standard, could just as well have made it to include all between the ages of eighteen and sixty. Let the power be once established, the right must follow, and in this way every man in public or private life in a state, between those ages, might be included. No one is exempt under the present law but the governor. All other officers, judges, legislators, representatives

in Congress, sheriffs, magistrates, county and township function-
aries of every description, if under forty-five, are liable now to
be forced in the army, or to commute by the payment of $300,
or to find substitutes. As it is, this would draw heavily upon
the public, and necessary local officers; but if extended to the
ages of eighteen and sixty, as it could as readily be made to do,
it might include all, not excepting even the governor. Can it be
that the machinery of our government is so incongruous as to
admit of this? Can it for a moment be believed that the framers
of the federal constitution intended to create such a monstrous
power? One that would not only absorb the military authority
of the state, but the civil also. This is exactly the principle of
this enactment, and to a great extent will be the practical work-
ings of it.

I hold that the act plainly and directly destroys the militia
system of the states, as recognised in the constitution, and the
Acts of Congress of 1792 and 1795. By its provisions the
militia are to be enrolled as part of the national forces, another
term, as will be seen, for national armies, and it requires each
individual so enrolled to answer and report himself, when drawn,
to the military officers of the federal government, under the
pains and penalties prescribed for desertion. If this is not
taking possession of the entire *materiel* of the militia, and con-
sequently of the militia itself bodily, I cannot comprehend the
meaning or effect of language.

The direct object of the act is to constitute the national forces
of the same material as that which constitutes the militia of the
states, and for that purpose a federal enrolment is made, and a
portion so enrolled is drawn from the wheel and separately and
individually transferred to the army of the United States, to be
commanded not by state but by United States officers. They are
henceforth not militia men but regulars. They are to be carried
into the army under the power granted to Congress "to raise
and support armies;" not under that other power which autho-
rizes Congress "to provide for calling out the militia to execute
the laws, suppress insurrection, and repel invasion." If called
out in this capacity, it would be done by requisition of the presi-
dent upon state authorities, at least upon state military officers,
and then the militia would come forth in organized bodies, not
as individuals, and be officered by state authority. This is widely
different from directing the federal authority to each individual,
to conscript him in his individual character, and to compel him
to serve not with state contingents and under state officers, but
under federal or army officers.

In short, the provisions of the act incorporates into the federal
armies the entire material constituting the militia, by directing
their authority to them individually, without a requisition on the

states, and without any power in any state to appoint a single officer to command them, although the entire force was by the constitution to be, when called into the service of the United States, under the military officers of the state. An act, disregarding such plain provisions of the constitution, is certainly unconstitutional, if such a thing be possible at all of any act of Congress.; and this view, if correct, establishes conclusively the limitation on the power to raise and support armies. Those enrolled and not drawn out of the wheel at the first draft, remain subject to be called out afterwards. They are the unemployed national forces, and are declared to be subject to be called into service under the plan of the act for two years after the 1st of July succeeding the enrolment, to serve for three years or during the war. It is true, when called into service, the act says they shall be "placed on the same footing in all respects as volunteers, including advance pay and bounty, as is now provided by law." I presume it is not meant by this, that the conscripts are to elect their own officers. But even if this were so, it would be no less a deprivation of the right of the states to appoint the officers of their militia, and unconstitutional for that reason.

As the enrolment or conscription into the national forces for two years, although unemployed, is nevertheless an incorporation of them with the national forces, it is a withdrawal of them for that period from the control of the states. The act would be worth nothing if the states might resolve that this should not be. The act of Congress is supreme or it is nothing. If it be supreme, then the enrolled men can be, and are, directly under the federal authority all the time, and thus every citizen or enrolled person, in or out of service, may be liable to be controlled by military law all the time, if Congress chooses. Can this be possible? What is to become of the states and their sovereignty, a matter often sneered at, but among the most distinct, clear, and cherished principles in the whole body of the constitution? One portion of the militia conscripted and actually in the field, the balance conscripted and not yet in the field, but subject to the military authority of the United States; where are the militia, and where is the security of the states against being entirely absorbed, and against invasions of the public liberty by the national authority, which the writers of the Federalist thought existed in the militia? It is neither in the field nor at home; it is abolished.

Apprehensions, doubtless, of just such an enactment as this now under consideration, superinduced the introduction of the Bill of Rights, by amendment and consent of two-thirds of the states, in which is a declaration that "a well-regulated militia

[Kneedler *et al. v.* Lane *et al.*]

being necessary to the security of a free state, the rights of the people to keep and bear arms shall not be infringed."

I contend that the act of Congress under discussion violates this declared right, by absorbing the militia into the army, as contradistinguished from the militia; by taking all the material which constitutes the militia and calling them out individually without requisition on the states, and placing them under officers not chosen by the states. It disregards the organization of the militia altogether, not only in providing other than militia officers, but in its total disregard of state regulations and exemptions. Heads of departments of the states, judges of the several courts, ministers of the gospel, professors in colleges, school directors, are exempt by our militia law.

But the mode adopted for calling out the forces of the country, disregading the militia system, disregards all these. These were within the militia, but as the militia itself is overthrown by the act in question, exemptions fall with it. It is possible that this power may be exercised, and the states live through it; but although they may not fall, their foundations will be fatally sapped; and if the precedent remain, it will in time become the authority for their extinction.

The constitution authorizes Congress "to provide for calling out the militia to suppress insurrection and repel invasion." During the Whiskey Insurrection in this state, President Washington called upon the militia for this purpose, by a requisition on the governor, and in person commanded them. So the militia were called out from many of the states during the war with Great Britain, and in every instance a requisition made by the president upon the governors of the states. It is true that in 1814, the question was much agitated in Congress whether or not, under the power to "raise armies," the militia might not be conscripted by the federal authority. The bill which proposed this had the sanction of high names; but it differed much from this act, and was never finally acted on, because of the termination of the war by the peace of Ghent. The discussion on this bill was able, but partisan, and furnishes little aid to a judicial examination, and hence I have not recurred to it much in taking the view herein expressed. That a government like that of Great  Britain may resort to conscription to fill the ranks of her armies, and has done so on many occasions, is no argument or precedent for that practice under the federal constitution. Even in England, this is far from the ordinary mode of recruiting the army, and it will hardly be contended that the exception to the rule, will establish a custom by which to define the meaning of the words "to raise and support armies," used in our federal constitution, so that *ex vi termini*, conscription or draft, both involuntary modes, were thereby meant.

But the precedent would go for nothing in this inquiry, even if the practice had been common in England. The difference between the construction of the British and Federal constitutions is radical. In the former, all governmental powers not expressly prohibited to the government may be lawfully exercised. In the latter, whatever power is not expressly granted is withheld. There is no grant of such a power to the latter, as I have endeavoured to show, and no restraint upon it in the former, as the exercise of it proves.

This remark is equally applicable to the difference between the state and federal constitutions. Between them the same difference in construction exists. The governmental powers of the states extend to all rightful subjects, not prohibited, and the national only to such as are granted. It therefore does not advance the argument a step in favour of those who contend for the constitutionality of the Conscription Act, to point to instances in which drafts have been made by state authorities. Militia duty is compulsory in all the states. They are not prohibited from compelling it any more than from compelling the payment of taxes. It is in this way, and in this way only, in my opinion, that the national forces can be compulsorily raised; that is to say, by a requisition on the state authorities for militia men in a just proportion to population.

Why have not the militia been called out in the present emergency? They are composed of the men the draft proposes to furnish. They are to be governed, while in the service, as Congress shall prescribe. They may be retained for one, two, or three years, or while the insurrection lasts, and will become just as good soldiers in the one character as the other. They are the constitutional power for that purpose, if the army be not sufficient to effect the object without them. Why not employ them? "There is but one of two alternatives," says Judge Story, "which can be resorted to in cases of insurrection, invasion, or violent opposition to the laws: either to employ regular troops or to employ the militia to suppress them:" Story on Con. § 1201. If it be said that the militia will be inefficient, which I deny, with equal training, I insist that the imperfection of the system is no justification for the overthrow in part, or in whole, of the constitution.

There is nothing on earth that I so much desire, as to witness the suppression of this unjustifiable and monstrous rebellion. It must be put down to save the constitution, and the constitutional means for the purpose I believe to be ample; but we gain but little, if, in our efforts to preserve it when assailed in one quarter, we voluntarily impair other portions of it. Its entirety is vital; it must all stand, or it *will* all fall; it can never be apportioned. Believing that I have shown that the power " to raise and sup-

[Kneedler *et al. v.* Lane *et al.*]

port armies" is limited to voluntary enlistments, and necessarily so limited that the militia of the states may remain in full force, I am impelled, by no choice of alternatives, to the conclusion that as the act of Congress transcends these limits, and by force of law attempts to abolish the militia, instead of calling on them to suppress the insurrection now so wide spread, it is violative of the Constitution of the United States and void.

I most sincerely confess, that it would have been a much more agreeable duty to me to have been able at this time and at all times, to give my full accord to the measures resorted to to restore the peace and order of our once happy country; but looking to the constitution, at the reasons for its provisions, and then to the solemn obligation which I have voluntarily come under to support the constitution, I cannot, even at the risk of misrepresentation of motives, hesitate, where the question is a judicial one, to express my unmixed conviction, as I have done, of the enactment in question.

Recently standing on the slopes of Runnymede, memory sent a thrill to my heart in admiration of those old barons who stood up there and demanded from a tyrannical sovereign that the lines between power and right should be then and there distinctly marked, and my feelings compelled a grateful and involuntary respect for the fidelity with which their descendants have maintained what they then demanded and obtained, although often overshadowed by insurrection and war. Our forefathers marked those lines in the federal constitution. I must adhere to them. I cannot help it; and while I live I trust to heaven that I may have the strength to say that I will ever do so.

There is no legal authority, in my opinion, in the officers of the government to hold the complainant against his consent. I am therefore in favour of enjoining them as prayed for until further hearing, and I agree to the same order in the other cases.

The following opinions were also delivered by Strong, J., and Reed, J., against granting the injunction prayed for, and in favor of the constitutionality of the act of Congress.

STRONG, J.—The complainants having been enrolled and drafted, under the provisions of the Act of Congress of March 3d 1863, entitled "An act for enrolling and calling out the national forces, and for other purposes," have presented their bills in this court against the persons who constitute the board of enrolment, and against the enrolling officers, praying that they may be enjoined against proceeding, under the act of Congress, with the requisition, enrolment, and draft of citizens of the commonwealth, and of persons of foreign birth who have declared their intention to become citizens under and in pursu-

[*Kneedler et al. v. Lane et al.*]

ance of the laws, to perform compulsory military duty in the service of the United States, and particularly that the defendants may be enjoined from all proceedings against the persons of the complainants, under pretence of executing the said law of the United States. The bills having been filed, motions are now made for preliminary injunctions until final hearing. These motions have been argued only on the part of the complainants. We have therefore before us nothing but the bills and the special affidavits of the complainants. It is to be noticed that neither the bills nor the accompanying affidavits aver that the complainants are not subject to enrolment and draft into the military service of the United States, under the act of Congress, if the act be valid, nor is it asserted that they have been improperly or fraudulently drawn. It is not alleged that the defendants have done anything, or that they propose to do anything not warranted and required by the words and spirit of the enactment. The complainants rest wholly upon the assertion that the act of Congress is unconstitutional and therefore void. It is denied that there is any power in the federal government to compel the military service of a citizen by direct action upon him, and it is insisted that Congress can constitutionally raise armies in no other way than by voluntary enlistment.

The necessity of vesting in the federal government power to raise, support, and employ a military force, was plain to the framers of the constitution, as well as to the people of the states by whom it was ratified. This is manifested by many provisions of that instrument, as well as by its general purpose, declared to be for "common defence." Indeed such a power is necessary to preserve the existence of any independent government, and none has ever existed without it. It was therefore expressly ordained in the eighth article, that the Congress of the United States should have power to "provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions." It was also ordained that they should have power to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress. Nor is this all. It is obvious that if the grant of power to have a military force had stopped here, it would not have answered all the purposes for which the government was formed. It was intended to frame a government that should make a new member in the family of nations. To this end, within a limited sphere, every attribute of sovereignty was given. To it was delegated the absolute and unlimited power of making treaties with other nations, a power explicitly denied to the

states. This unrestricted power of making treaties involved the possibility of offensive and defensive alliances. Under such treaties the new government might be required to send armies beyond the limits of its territorial jurisdiction; and in fact, at the time when the constitution was formed, a treaty of alliance, offensive and defensive, was in existence between the old Confederacy and the government of France. Yet more. Apart from the obligations assumed by treaty, it was well known that there are many cases where the rights of a nation and of its citizens cannot be protected or vindicated within its own boundaries. But the power conferred upon Congress over the militia is insufficient to enable the fulfilment of the demands of such treaties, or to protect the rights of the government, or its citizens, in those cases in which protection must be sought beyond the territorial limits of the country. The power to call the militia into the service of the federal government is limited by express terms. It reaches only three cases. The call may be made " to execute the laws of the Union, to suppress insurrections, and to repel invasions," and for no other uses. The militia cannot be summoned for the invasion of a country without the limits of the United States. They cannot be employed, therefore, to execute treaties of offensive alliance, nor in any case where military power is needed abroad to enforce rights necessarily sought in foreign lands. This must have been understood by the framers of the constitution, and it was for such reasons doubtless that other powers to raise and maintain a military force were conferred upon Congress, in addition to those which were given over the militia. By the same section of the eighth article of the constitution it was ordained, in words of the largest meaning, that Congress should have power to " raise and support armies," a power not to be confounded with that given over the militia of the country. Unlike that, it was unrestricted, unless it be considered a restriction that appropriations of money to the use of raising and supporting armies were forbidden for a longer term than two years. In one sense this was a practical restriction. Without appropriations no army can be maintained, and the limited period for which appropriations can be made, enables the people to pass judgment upon the maintenance and even existence of the army every two years, and in every new Congress. But in the clause conferring authority to raise armies, no limitation is imposed other than this indirect one, either upon the magnitude of the force which Congress is empowered to raise, or upon the uses for which it may be employed, or upon the mode in which the army may be raised. If there be any restriction upon the mode of exercising the power, it must be found elsewhere than in the clause of the constitution that conferred it. And if a restricted mode of exercise was intended, it is remark-

able that it was not expressed, when limitations were so carefully imposed upon the power given to call for the militia, and more especially when, as it appears from the prohibition of appropriations for the army for a longer time than two years, the subject of limiting the power was directly before the minds of the authors of the constitution. This part of the constitution, like every other, must be held to mean what its framers, and the people who adopted it, intended it should mean. We are not at liberty to read it in any other sense. We cannot insert restrictions upon powers given in unlimited terms, any more than we can strike out restrictions imposed.

There is sometimes great confusion of ideas in the consideration of questions arising under the Constitution of the United States, caused by misapprehension of a well-recognised and oft-repeated principle. It is said and truly said that the federal government is one of limited powers. It has no other than such as are expressly given to it, and such as (in the language of the constitution itself) " are necessary and proper for carrying into execution" the powers expressly given. By the tenth article of the amendments, it is ordained that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people. Of course there can be no presumption in favour of the existence of a power sought to be exercised by Congress. It must be found in the constitution. But this principle is misapplied when it is used, as is sometimes the case, to restrict the right to exercise a power expressly given. It is of value when the inquiry is whether a power has been conferred, but of no avail to strip a power, given in general terms, of any of its attributes. The powers of the federal government are limited in number, not in their nature. A power vested in Congress is as ample as it would be if possessed by any other legislature—none the less because held by the federal government. It is not enlarged or diminished by the character of its possessor. Congress has power to borrow money. Is it any less than the power of a state to borrow money? Because the federal government has not all the powers which a state government has, will it be contended that it cannot borrow money, or regulate commerce, or fix a standard of weights and measures, in the same way, by the same means, and to the same extent as any state might have done, had no federal constitution ever been formed? If not, and surely this will not be contended, why is not the federal power to raise armies, as large and as unfettered in the mode in which it may be exercised, as was the power to raise armies possessed by the states before 1787, and possessed by them now in time of war? If they were not restricted to voluntary enlistments in procuring a military force, upon what principle can Congress

be? In Gibbons *v.* Ogden, 9 Wheat. 196, the Supreme Court of the United States laid down the principle that all the powers vested by the constitution in Congress are complete in themselves, and may be exercised to their utmost extent, and that there are no limitations upon them, other than such as are prescribed in the constitution.

It is not difficult to ascertain what must have been intended by the founders of the government when they conferred upon Congress the power to "raise armies." At the time when the constitution was formed, and when it was submitted to the people for adoption, the mode of raising armies by coercion, by enrolment, classification, and draft, as well as by voluntary enlistment, was well known, practised in other countries, and familiar to the people of the different states. In 1756, but a short time before the Revolutionary War, a British statute had enacted that all persons without employment might be seized and coerced into the military service of the kingdom. The act may be found at length in Ruffhead's British Statutes at Large, vol. 7, p. 625. Another act of a similar character was passed in 1757: British Statutes at Large, vol. 8, p. 11. Both were enacted under the administration of William Pitt, afterwards Lord Chatham, reputed to have been one of the staunchest defenders of English liberties. They were founded upon a principle always recognised in the Roman empire, and asserted by all modern civilized governments, that every able-bodied man capable of bearing arms, owes personal military service to the government which protects him. Lord Chatham's acts were harsh and unequal in their operation, much more so than the act of Congress now assailed. They reached only a select portion of the able-bodied men in the community, and they opened wide a door for favouritism and other abuses. For these reasons, they must have been the more prominently before the eyes of the framers of the federal constitution, when they were providing safeguards for liberty and checks to arbitrary power. Yet, in full view of such enactments, they conferred upon Congress an unqualified power to raise armies. And, still more than this, coercion into military service by classification and draft from the able-bodied men of the country was to them a well-known mode of raising armies in the different states which confederated to carry on the Revolutionary War. It was equally well known to the people who ordained and established the constitution, expressly "in order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, and secure the blessings of liberty for themselves and their posterity." It is an historical fact, that, during the later stages of the war, the armies of the country were raised not alone by voluntary enlistment, but also by coercion, and that the liberties and independ-

[Kneedler *et al. v.* Lane *et al.*]

ence sought to be secured by the constitution, were gained by soldiers made such, not by their own voluntary choice, but by compulsory draft. Chief Justice Marshall, himself a soldier of the Revolution, than whom no one was better acquainted with revolutionary history, in his Life of Washington (vol. 4, p. 241), when describing the mode in which the armies of the government were raised, makes the following statement: "In general, the Assemblies (of the states) followed the example of Congress, and apportioned on the several counties within the states the quota to be furnished by each. This division of the state was again to be subdivided into classes, and each class was to furnish a man by contributions or taxes imposed on itself. In some instances, a draft was to be used in the last resort." This mode of recruiting the army by draft, in revolutionary times, is also mentioned in Ramsey's Life of Washington (vol. 2, p. 246), where it is said: "When voluntary enlistments fell short of the proposed numbers, the deficiencies were, by the laws of several states, to be made up by drafts or lots from the militia." Thus it is manifest that when the members of the convention proposed to confer upon Congress the power to raise armies, in unqualified terms, and when the people of the United States adopted the constitution, they had in full view compulsory draft from the population of the country, as a known and authorized mode of raising them. The memory of the Revolution was then recent. It was universally known that it had been found impossible to raise sufficient armies by voluntary enlistment, and that compulsory draft had been resorted to. If, then, in construing the constitution we are to seek for and be guided by the intention of its authors, there is no room for doubt. Had any limitation upon the mode of raising armies been intended, it must have been expressed. It could not have been left to be gathered from doubtful conjecture. It is incredible that when the power was given in words of the largest signification, it was meant to restrict its exercise to a solitary mode, that of voluntary enlistment, when it was known that enlistments had been tried and found ineffective, and that coercion had been found necessary. The members of the convention were citizens of the several states, each a sovereign, and each having power to raise a military force by draft, a power which more than one of them had exercised. By the constitution, the authority to raise such a force was to be taken from the states partially, and delegated to the new government about to be formed. No state was to be allowed to keep troops in time of peace. The whole power of raising and supporting armies, except in time of war, was to be conferred upon Congress. Necessarily, with it was given the means of carrying it into full effect.

I agree that Congress is not at liberty to employ means for

the execution of any power delegated to it, that are prohibited by the spirit of the constitution, or that are inconsistent with the reserved rights of the states, or the inalienable rights of a citizen. The means used must be lawful means. But I have not been shown, and I am unable to perceive, that compelling military service in the armies of the United States, not by arbitrary conscription, but, as this act of Congress directs, by enrolment of all the able-bodied citizens of the United States, and persons of foreign birth, who have declared their intention to become citizens, between the ages of twenty and forty-five (with some few exceptions), and by draft by lot from those enrolled, infringes upon any reserved right of the states, or inter feres with any constitutional right of a private citizen. If personal service may be compelled,—if it is a common duty, this is certainly the fairest and most equal mode of distributing the public burden.

It was urged, in the argument, that coercion of personal service in the armies is an invasion of the right' of civil liberty. The argument was urged in strange forgetfulness of what civil liberty is. In every free government the citizen or subject surrenders a portion of his absolute rights in order that the remainder may be protected and preserved. There can be no government at all where the subject retains unrestrained liberty to act as he pleases, and is under no obligation to the state. That is undoubtedly the best government which imposes the fewest restraints, while it secures ample protection to all under it. But no government has ever existed, none can exist, without a right to the personal military service of all its able-bodied men. The right to civil liberty in this country never included a right to exemption from such service. Before the federal constitution was formed, the citizens of the different states owed it to the governments under which they lived, and it was exacted. The militia systems of the states then asserted it, and they have continued to assert it ever since. They assert it now. No one doubts the power of a state to compel its militia into personal service, and no one has ever contended that such compulsion invades any right of civil liberty. On the contrary, it is conceded that the right to civil liberty is subject to such power in the state governments, and the history of the period immediately antecedent to the adoption of the federal constitution shows that it was then admitted. Is civil liberty now a different thing from what it was when the constitution was formed? It is better protected by the provisions of the constitution, but are the obligations of a citizen to the government any less now than they were then? This cannot be maintained. If, then, coercion into military service was no invasion of the rights of civil liberty en-

[Kneedler *et al. v.* Lane *et al.*]

joyed by the people of the states before the federal constitution had any existence, it cannot be now.

Again: it is insisted that if the power given to Congress to raise and support armies be construed to warrant the compulsion of a citizen into military service, it must, with equal reason, be held to authorize arbitrary seizures of property for the support of the army. The force of the objection is not apparent. Confessedly the army must be raised by legal means. By such means it must also be supported. It has already been shown that enrolment and draft are not illegal; that to make them illegal, a prohibition must be found in the letter or in the spirit of the constitution. Arbitrary seizures of private property for the support of the army are illegal and prohibited. Not only does the constitution point out the mode in which provision shall be made for the support of the army, but in numerous provisions it protects the people against deprivation of property without compensation and due course of law. Exemption from such seizures was always an asserted and generally an admitted right, while exemption from liability to being compelled to the performance of military service was, as has been seen, never claimed. There are therefore limitations upon the means which may be used for the support of the army, while none are imposed upon the means of raising it.

Again: it is said this act of Congress is a violation of the constitution, because it makes a drafted man punishable as a deserter before he is mustered into service. The contrary was declared by Justice Washington, when delivering the judgment of the Supreme Court of the United States, in Houston *v.* Moore, 5 Wheaton. Under the Act of 1795, the drafted men were not declared to be subject to military law until mustered into service. This is the act of which Judge Story speaks in his Commentaries. But in the opinion of Judge Washington, Congress might have declared them in service from the time of the draft, precisely what this act of Congress does. Judge Washington's opinion, of course, explodes this objection.

The argument most pressed in support of the alleged unconstitutionality of the act of Congress is, that it interferes with the reserved rights of the states over their own militia. It is said the draft takes a portion of those who owe militia service to the states, and thus diminishes the power of the states to protect themselves. The states, it is claimed, retain the principal power over the militia, and therefore the power given to Congress to raise armies must be so construed as not to destroy or impair that power of the states. If, say the complainants, Congress may draft into their armies, and compel the service of a portion of the state militia, they may take the whole, and thus the entire power of the states over them may be annulled, for want of

any subject upon which it can act. I have stated the argument quite as strongly as it was presented. It is more plausible than sound. It assumes the very matter which is the question in debate. It ignores the fact that Congress has *also* power over those who constitute the militia. The militia of the states is also that of the general government. It is the whole able-bodied population capable of bearing arms, whether organized or not. Over it certain powers are given to Congress, and others are reserved to the states. Besides the power of calling it forth, for certain defined uses. Congress may provide for its organization, arming, and discipline, as well as for governing such portion as may be employed in its service. It is the material, and the only material contemplated by the constitution, out of which the armies of the federal government are to be raised. Whether gathered by coercion or enlistment, they are equally taken out of those who form a part of the militia of the states. Taking a given number by draft no more conflicts with the reserved power of the states than does taking the same number of men in pursuance of their own contract. No citizen can deprive a state of her rights without her consent. None could therefore voluntarily enlist, if taking a militiaman into military service in the army of the United States is in conflict with any state rights over the militia. Those rights, whatever they may be, it is obvious cannot be affected by the mode of taking. It is clear that the states hold their power over the militia, subordinate to the power of Congress to raise armies out of the population that constitutes it. Were it not so, the delegation of the power to Congress would have been an empty gift. Armies can be raised from no other source. Enlistments in other lands are generally prohibited by foreign enlistment acts, and even where they are not, they may, under the law of nations, involve a breach of neutrality. Justly, therefore, may it be said the objection now under consideration begs the question in debate. It assumes a right in the state which has no existence, to wit, a right to hold all the population that constitutes its militiamen exempt from being taken in any way into the armies of the United States. When it is said, if any portion of the militia may be coerced into such military service the whole may, it is but a repetition of the common but very weak argument against the existence of a power, because it may possibly be abused. It might with equal force be urged against the existence of any power in either the state or general government. It applies as well to a denial of power to raise armies by voluntary enlistment. It is as conceivable that high motives of patriotism, or inducements held out by the federal government, might draw into its military service the entire able-bodied population of a state, as that the whole might be drafted. We are not to deny the existence of a

power because it may possibly be unwisely exercised, nor are we to presume that abuses will take place. Especially are we not at liberty to do so in this case, in view of the fact that the general government is under constitutional obligations to provide for the common defence of the country, and to guarantee to each state a republican form of government. That would be to impose a duty, and deny the power to perform it.

These are all the objections, deserving of notice, that have been urged against the power of Congress to compel the complainants into military service in the army. I know of no others of any importance. They utterly fail to show that there is anything in either the letter or the spirit of the constitution to restrict the power to "raise armies," given generally, to any particular mode of exercise. For the reasons given, then, I think the provisions of the act of Congress under which these complainants have been enrolled and drafted, must be held to be such as it is within the constitutional power of Congress to enact. It follows that nothing has been done, or is proposed to be done by the defendants that is contrary to law, or prejudicial to the rights of the complainants.

An attempt was made on the argument to maintain that those provisions of the act of Congress which allow a drafted man to commute by the payment of $300, are in violation of the constitution. But this is outside of the cases before us. By these provisions the complainants are not injuriously affected, and the bills do not complain of anything done, or proposed to be done, under them. It is the compulsory service which the plaintiffs resist; they do not complain that there is a mode provided of ridding themselves of it. If it be conceded Congress cannot provide for commutation of military service by the payment of a stipulated sum of money, or cannot do it in the way adopted in this enactment, the concession in no manner affects the directions given for compulsion into service. Let it be that the provision for commutation is unauthorized, those for enrolment and draft are such as Congress had power to enact. It is well settled that part of a statute may be unconstitutional, and the remainder in force. I by no means, however, mean to be understood as conceding that any part of this act is unconstitutional. I think it might easily be shown that every part of it is a legitimate exercise of the power vested in Congress, but I decline to discuss the question, because it is not raised by the cases before us.

Nor while holding the opinions expressed, that no rights of the complainants are unlawfully invaded or threatened, is it necessary to consider the power or propriety of interference by this court, on motion, to enjoin federal officers against the performance of a duty imposed upon them in plain terms by an act of Congress. Upon that subject I express no opinion. I have

said enough to show that the complainants are not entitled to the injunctions for which they ask, and I think they should be denied.

Dissenting opinion by

READ, J.—The power of the government of the United States extends over all the states and territories of the Union. It has no rival in the state governments, whose power is strictly confined to their own territorial limits. It is the only representative of the people recognised by foreign nations, in their various relations with us, in time of war and peace. All the powers, therefore, vested in the national government, are necessarily supreme and paramount, and cannot be rightfully disobeyed by her citizens. This general government has the sole and exclusive power of declaring war and making peace, of raising and supporting armies, of providing and maintaining a navy, of laying and collecting taxes, duties, imposts, and excises, to pay the debts, and provide for the common defence and general welfare of the United States, and of borrowing money on the credit of the United States. The avowed object of these and other powers, vested in the general government, was to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to the people of the United States and their posterity. It was therefore solemnly declared, and made a fundamental article of the national constitution, that the constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

The power to raise armies for the United States being vested solely in Congress, the legislative branch of the government, it must "exist without limitation; because it is impossible to foresee or to define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite; and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defence:" 1 Federalist, No. 23.

"The result from all this is, that the Union ought to be invested with full power to levy troops, to build and equip

[Kneedler *et al. v.* Lane *et al.*]

fleets, and to raise the revenues which will be required for the formation and support of an army and navy in the customary and ordinary modes practised in other governments:" Id. p. 151; and "there can be no limitation of that authority which is to provide for the defence and protection of the community in any manner essential to its efficacy, that is, in any manner essential to the formation, direction, or support of the national forces:" Id. p. 150.   The necessity of employing a regular force in case of seditions and insurrections, is forcibly portrayed in the 28th number of the Federalist.

No person is naturally exempted from taking up arms in defence of the state,—the obligation of every member of society being the same.   Those alone are excepted who are incapable of handling arms, or supporting the fatigues of war.   This is the reason why old men, children, and women are exempted.   "The clergy cannot naturally, and as a matter of right, arrogate to themselves any peculiar exemption.   To defend one's country is an action not unworthy of the most sacred hands:" Vattel, book 3, ch. 2, § 10, ed. 1760; 2 Burlamaqui, Politic. Law, part 4, ch. 1, § 14, p. 158.

Every citizen is bound to serve and defend the state as far as he is capable; and it would seem that the duty incumbent on every citizen to defend his country, as well from foreign aggression or injury as from intestine disorders, was fully recognised by the common law: Vattel, Id. § 8; Bowyer's Const. Law of England, p. 484.

In the first constitution of Pennsylvania, and in those of several other states, the duty of the citizen to yield his personal service when necessary, or an equivealent thereto, is distinctly asserted.   This is the more remarkable in our state, as, owing to the preponderating influence of the Society of Friends, the colony had no efficient militia law, at any time, and in the earlier and later periods of its history none at all.   In 1756, the Assembly prepared a new militia bill, by which all the male inhabitants were subjected to military duty, commutable for a fine in the ordinary courts of justice.   The officers, however, were still elective, for which reason the governor objected to the bill.   He also required that persons alleging conscientious scruples against bearing arms should appear in open court, and declare to what society they belonged; that they were truly and religiously opposed to war; and that a court-martial should be authorized to punish by death or otherwise, as was provided by the English militia bill.   But the House, unwilling to strengthen the hands of the executive by giving him the appointment of the officers, and to lodge such powers in courts-martial, refused to remodel their bill: Gordon's Hist. of Penna. 340.

The battle of Lexington having roused the indignation of the

people, the committee of correspondence of the city and county of Philadelphia to supply the want of a militia law, called a meeting of the citizens, who resolved to form a military association, for the protection of their property, their liberty, and their lives. This association extended through every county of the province, its members furnishing themselves with the necessary arms. The assembly approved the association, and engaged to provide for the pay and sustenance of those called into actual service. The committee of public safety prepared articles for the government of this military association, but the citizens refused to sign them, alleging that many persons, rich and able to perform military duty, claimed exemption under pretence of conscientious scruples. Both parties addressed the Assembly, the committee of correspondence, and of the officers and soldiers of the military association, saying, emphatically, "Be this as it may, self-preservation is the first duty of nature, which every man indispensably owes not only to himself, but to the Supreme Director and Governor of the Universe, who gave him being. In political society, all men, by the original compact, are required to unite in the defence of the community against such as would unlawfully deprive them of their rights, and those who withdraw themselves from this compact are not entitled to the protection of the society. The safety of the people is the supreme law. He who receives an equal benefit should bear an equal burden."

The Assembly imposed a fine on all able-bodied effective male white persons capable of bearing arms, not associators, between the ages of sixteen and fifty years; ministers of the gospel, of all denominations, schoolmasters in actual employ, and servants purchased *bonâ fide*, and for a valuable consideration, only excepted, which fine was largely increased by the first Assembly under the state constitution: 5th April 1776; 14th February 1777, McKean's ed., p. 22.

The Revolutionary Congress was a body entirely dependent on the will of the several states and the good feeling of their citizens; for the Articles of Confederation were not finally ratified by all the states until the 1st March 1781. The Congress assigned the quota of troops to the several states, and they followed the example by apportioning to the several counties the quota to be furnished by each: 4 Marshall's Life of Washington, p. 241. This division of the state was again to be subdivided into classes, and each class was to furnish a man by contribution, or taxes imposed. In some instances a draft was to be used in the last resort. Pennsylvania concentrated the requisite power in the president, Mr. Reed, and authorized him to draw forth the resources of the state, under certain limitations, and if necessary to declare martial law over the state: 2 Ramsay's Life of Washington, p. 246.

The Articles of Confederation did not really increase the powers of Congress, for the land forces were to be raised by the several states upon requisitions for their several quotas, and the legislature of each state was to appoint the regimental officers, raise the men, and clothe, and arm, and equip them in a soldierlike manner, at the expense of the United States, and march them to the place appointed. All the action, therefore, of the confederacy was upon the states, and not upon the people, and its entire inadequacy to fulfil the purposes of a general government was felt and acknowledged by all reflecting men. It was simply a confederacy, while the Constitution of 1787 is a truly national government, acting not upon the state governments, but directly upon the people of the United States, as a nation, by whose free will it was established.

The power, therefore, to raise and support armies was from sheer necessity given to Congress, for it was a right which could not from the nature of things be reserved to the people nor to the states, who could not step beyond their own narrow limits. It is clear then that whatever means might be required to raise an army could be used by the Congress, and they were the sole judges of its expediency and propriety. Now there is not a word in the constitution limiting the natural power of the government over its citizens to oblige them to render personal service as soldiers, nor is there a single phrase implying that they can only be compelled to serve when they choose to do so by voluntary enlistment.

The plan of General Knox, secretary of war, submitted to Congress by General Washington (18th and 21st January 1790), contemplated as liable to service all persons between the ages of eighteen and sixty, and stated certain general principles on which it was formed; the fourth is in these words: "That every man of the proper age and ability of body is firmly bound by the social compact to perform personally his proportion of military duty for the defence of the state:" 7 Niles's Reg. 296.

- Rhode Island was the last state which ratified the constitution. On the 29th May 1790, their convention made a declaration of rights, the 18th paragraph of which was: "That any person religiously scrupulous of bearing arms ought to be exempted upon payment of an equivalent to employ another to bear arms in his stead:" 1 Elliot's Deb. 371. They at the same time proposed certain amendments to the constitution, the sixth of which was: "That no person shall be compelled to do military duty, otherwise than by voluntary enlistment, except in cases of general invasion, anything in the second paragraph of the sixth article of the constitution, or any law made under the constitution, to the contrary notwithstanding:" Id. 372.

The works of Burlamaqui, Montesquieu, Puffendorf, Grotius,

Locke, Vattel, and all the writers on government and the laws of nations, were familiar to the statesmen of the Revolution, and were largely used in their discussions, which from necessity involved the fundamental principles of civil society: Votes of Assembly, 1770 to 1789, p. 3, &c. No one, for instance, can read the second chapter of the third book of Vattel's Law of Nations, without seeing that the clause to raise and support armies, and the consequent power to oblige every able-bodied man to become a soldier, is but an embodied expression of the sound views of this enlightened writer. The very volume I quote from bears the marks of the studies, most probably, of some of the great men who framed the constitution, and to whom the use of the library had been tendered: Vattel, book 3, ch. 2, vol. 2, p. 3, &c., ed. 1760, in Philadelphia Library.

There can therefore be no doubt that the contemporaneous construction of this clause was that adopted by General Knox and approved by President Washington, particularly when we advert to the amendment of Rhode Island, proposed four months afterwards, to confine this compulsory power to cases of general invasion.

In the second war of independence, Mr. Monroe, then secretary of war, with the approbation of Mr. Madison, a framer of the constitution, and one of the authors of the Federalist, proposed a plan to Congress by which the free male population of the United States, between eighteen and forty-five years, be formed into classes of one hundred men—each class to furnish —— men for the war, within thirty days after the classification, and replace them in the event of any casualty. If any class failed to provide the men required of it, within the time specified, they should be raised by draft on the whole class, any person thus drafted being allowed to furnish a substitute. This, therefore, was a compulsory draft, and the argument of Mr. Monroe, in favour of the power of Congress, is clear, full, and exhaustive, and never has been answered: 7 Niles's Reg. 137, 17th October 1814; Id. 139.

It was opposed by the peace men of that day, gentlemen who favoured the Hartford Convention, and who were entirely opposed to the general administration, and the further prosecution of the war. Mr. Charles J. Ingersoll supported the measure in a very able speech, and after a lapse of thirty-seven years, his deliberate judgment was in favour of its constitutionality. The war was drawing near to a close, all parties expected peace, and the news of it in February 1815, stopped all further warlike preparations: 3 Annals of 13th Congress 807; Ingersoll's Hist. of Second War, 2d series, vol. 2, ch. 7.

In the state of New York, then strongly in favour of the administration and the vigorous prosecution of the war, at a

[Kneedler *et al. v.* Lane *et al.*]

special session of the legislature called by Governor Tompkins, Mr. Van Buren introduced a bill into the Senate to raise twelve thousand men by drafting, and placing them in the service of the United States, which, after being amended, became a law on the 24th of October 1814. It was stigmatized as a conscription bill by the opposition, and in the council of revision, Chancellor Kent reported objections, the first of which was, "Because the Constitution of the United States has granted to Congress the power to raise and support armies, and with it the exclusive power to lay and collect imposts, and the concurrent power to lay and collect taxes, duties, and excises, in order to provide for the common defence and general welfare." These objections were, however, overruled by Governor Tompkins, Chief Justice Thompson, and Spencer and Yates, Justices of the Supreme Court, and the bill became a law: Street's New York Council of Revision 443. The same legislature passed an act to raise a corps of four thousand sea fencibles, and also an act for raising two regiments of men of colour.

Governor Tompkins was an ardent supporter of the war, and a most popular executive, and was rewarded by a grateful people by being twice elected to the high office of Vice-President of the United States.

A bill of a similar character was introduced into the Senate of Pennsylvania, entitled "An act to raise for a limited time a military force," which passed that body by a vote of twenty-one to nine, but was lost in the House. Mr. Nicholas Biddle, then a member of the Senate from Philadelphia, made a very able speech in favour of the bill, and voted for it: Senate Journal, 1814, Lowrie's Rep. p. 49; Id. 75; Id. 135; Aurora, January 21st 1815.

On the 3d March 1863, Congress passed "An act for enrolling and calling out the national forces, and for other purposes," by which all able-bodied male citizens, and persons of foreign birth who shall have declared on oath their intention to become citizens, between the ages of twenty and forty-five years, except as therein excepted, are declared to constitute the national forces, and to be liable to perform military duty in the service of the United States, when called out by the president for that purpose. These forces were divided into two classes. Those who were drawn by lot, after having been regularly enrolled, unless exempted by law, were either to serve as soldiers or to procure substitutes, or to pay $300. The service is therefore compulsory, or, in the words of the Declaration of Rights to our first constitution, the drafted man must yield his "personal service," or "an equivalent thereto," for Congress has decided it is necessary. I cannot, therefore, doubt that this act of Congress, in the present situation of the country, is a clearly constitutional exercise of power

9 Wr.—19

by the Supreme Legislature of the Union. This is the view entertained by two judges of the United States courts, both men of eminent learning and talents, and living in different districts —I mean Judge Betts, of New York, and Judge Cadwalader, of Pennsylvania: 12 Stat. at Large 731; Washington Chronicle, September 19th 1863; 20 Legal Int. 300.

If there ever was an occasion to call every man into the service of his country, it is the present one, when we are engaged in combating the most formidable, wicked, and causeless rebellion known in history, of which the object of its traitorous leaders is to destroy the Union, to erect a purely slave confederacy, and to make Pennsylvania a border state, exposed to the annual inroads of unprincipled enemies. I am, therefore, for using the whole population, if necessary, of the loyal states to extinguish this treasonable rebellion. I have no idea of allowing northern sympathizers to stay at home, whilst loyal men fight their battles and protect their property. I would oblige all such men to render their full share of military service, and if I had the power I would place the New York rioters in the front ranks of the army.

We have, however, been referred to the example of England, as showing that the framers of the constitution contemplated the armies of the Union should only be raised by voluntary enlistment. This has been said without a sufficient examination of the acts of the English Parliament, all of which were perfectly familiar to our Revolutionary statesmen.

In 1704, 1756, 1757, 1778, and 1779, acts were passed for recruiting of his majesty's land forces and marines, directing a speedy and effectual levy of able-bodied men to serve as soldiers. The commissioners under these acts were required to levy and raise all able-bodied idle and disorderly persons who cannot, upon examination, prove themselves to exercise and industriously follow some lawful trade or employment, or *to have some substance sufficient for their support and maintenance,* to serve his majesty as soldiers. If, upon their delivery to the military officers, such men shall appear more proper for service by sea than by land, they may be delivered over to any commissioned officer of his majesty's fleet, to serve as common sailors. None were to be impressed under sixteen or above the age of fifty, or who had a vote in the election of members of Parliament: 4 Anne, ch. 10; 29 Geo. 2, ch. 4; 30 Geo. 2, ch. 8; 18 Geo. 3, ch. 53; 19 Geo. 3, ch. 10.

If an able-bodied man had sufficient substance, however idle and disorderly he might be, he could not be impressed, and the evident object of these acts was to force the poor man to serve at all events, and never to call compulsorily upon the nobility and gentry, and the middle classes of the kingdom. Lord Mahon

[Kneedler *et al. v.* Lane *et al.*]

gives a strong instance of this in the case of a gentleman being by some mistake pressed for a foot soldier, and confined in the Savoy, and as the *habeas corpus* act of Charles the Second applied only to criminal cases, could only be released from imprisonment upon an application to the secretary of war : Lord Mahon's Hist. vol. 2, p. 255, 1758.

Impressment for the navy has always existed in England. In speaking of these modes of raising men for the army and navy, a very able writer of the present day says : " But perhaps the greatest anomaly in our laws—the most signal exception to personal freedom—is to be found in the *custom of impressment* for the land and sea service. There is nothing incompatible with freedom in a conscription or forced levy of men for the defence of the country. It may be submitted to in the freest republic like the payment of taxes. The service of every subject may be required in such form as the state determines. But impressment is the arbitrary and capricious seizure of individuals from among the general body of citizens. It differs from conscription as a particular confiscation differs from a general tax:" 2 May's Const. History of England 259.

In England, when the militia cannot be filled by volunteers, the men (the privates) are selected by a compulsory ballot, and by an Act of 30th June 1852, the Queen was authorized to raise eighty thousand private militiamen, which might be increased to one hundred and twenty thousand : 14 Law Magazine 58; 21 Stat. at Large 90.

In fact, conscription or its equivalent has been resorted to by every civilized nation. The English government have never had in any single portion of the world, in active service, a native army much exceeding sixty thousand, the number which invaded France in 1814, whilst the armies of the other allied powers amounted to a million of men.

The present rebellion, according to Lord Coke, is a war. " So when by invasion, insurrection, rebellion, or such like, the peaceable course of justice is disturbed and stopped, so as the courts of justice be, as it were, shut up, *et silent leges inter arma*, then it is said to be time of war ;" and such also is the opinion of the Supreme Court of the United States, and of this court : Co. Litt. 2496; 2 Wilson 363; Pratt on Contrabands 75; Prize Cases Sup. Court U. S., 20 Legal Int. 84; Monongahela Ins. Co. *v.* Chester, 7 Wright 491.

The individuals making war against us are both traitors and enemies, and it is waged upon a scale of the greatest magnitude, calling into the service of the country an army of eight hundred thousand men. It is therefore the duty of the government to use every means within the scope of their authority to recruit the armies of the Union, and to sustain the gallant soldiers and

generals who, by their glorious efforts and sacrifices, are gradually but certainly restoring the Union to the full extent of its ancient limits.

I am therefore of opinion that the act in question is constitutional, and that on this ground the motion for a special injunction should be refused. Here I might stop, but as I have grave reasons for believing that this court has no power in the premises, it is proper to state my views upon this point.

The proposition submitted to this court by the counsel of the plaintiffs is that a state tribunal should prohibit an officer of the United States, acting in strict conformity to an act of Congress, from performing the duties imposed upon him by law. I cannot think we have any such power. If we have it, has not the governor or the legislature the same power? and if so, to what must it inevitably lead?—a collision between the national government and one or more of the branches of the state government, of which the judiciary is certainly the weakest. We have had serious lessons on this subject, which should teach us to be careful in asserting that the state authorities are to be the judges of the constitutional powers of the general government.

In 1812 the judges of the Supreme Court of Massachusetts, all of whom in turn were chief justices, gave their opinion that Governor Strong, and not the president, was the judge of the exigencies in which the militia could be called into the service of the United States: 8 Mass. 549. This opinion was solemnly overruled by the unanimous decision of the Supreme Court of the United States upon this same question: Martin *v.* Mott, 12 Wheat. 19; 5 Gray 121.

A celebrated convention, in 1815, in relation to Mr. Monroe's bill for a draft, used this language: " The power of compelling the militia and other citizens of the United States, by a forcible draft or conscription, to serve in the regular armies, as proposed in a late official letter of the secretary of war, is not delegated to Congress by the constitution, and the exercise of it would be not less dangerous to their liberties than hostile to the sovereignty of the states. The effort to deduce this power from the right of raising armies is a flagrant attempt to pervert the sense of the clause in the constitution, which confers that right, and is incompatible with other provisions in that instrument. The armies of the United States have always been raised by contract, never by conscription, and nothing more can be wanting to a government possessing the power thus claimed, to enable it to usurp the entire control of the militia, in derogation of the authority of the state, and to convert it by impressment into a standing army." They also denounced as unconstitutional the law authorizing the enlistment of minors and apprentices without the consent of parents and guardians. The remedy proposed by the convention was con-

[Kneedler *et al. v.* Lane *et al.*]

tained in its first resolution : " Resolved, That it be, and hereby
is recommended to the legislatures of the several states repre-
sented in this convention, to adopt all such measures as may be
necessary to protect the citizens from the operation and effects
of all acts which have been or may be passed by the Congress
of the United States, which shall contain provisions subjecting
the militia or other citizens to forcible drafts, conscriptions, or
impressments, not authorized by the Constitution of the United
States :" 7 Niles's Reg. 307 ; Id..312.

We may presume that neither the executive nor legislative
branches of our state government would adopt so unpatriotic a
course, originally marked out by a body of men who, however
respectable in private life, were believed by the dominant party
and the people of that day to entertain designs of a treasonable
character. Their reward was a forced retirement from public
life, and involuntary political oblivion.

But this appeal is made to the state judiciary, who clearly
have no more right to interfere with an officer of the United
States, holding any citizen under the authority of the United
States, under a law of the United States, upon an allegation of
unconstitutionality, than the state executive or the state legisla-
ture would have. This is clear. The Supreme Court of the
United States have indeed decided this question in direct terms,
intended to prevent all interferences of state authorities with the
execution of the laws of the United States by their own officers :
Ableman *v.* Booth, 21 Howard 532. It will be recollected that
the present application is a substitute for the writ of *habeas
corpus*, which has been suspended ; and that the plaintiffs in the
cases before us allege that they have been drafted, and have
received notice of the draft, and are placed on the footing of
enlisted soldiers, and liable to be punished as deserters, should
they fail to report for duty, which they have done. All these
facts appear on the face of the plaintiffs' bills of complaint,
and the court is judicially apprised that they are in custody
under the authority of the United States. Chief Justice Taney
says, " They then know that the prisoner is within the dominion
and jurisdiction of another government, and that neither the
writ of *habeas corpus* nor any other process issued under state
authority, can pass over the line between the two sovereignties.
He is then within the dominion and exclusive jurisdiction of the
United States." " No judicial process, whatever form it may
assume, can have any lawful authority outside of the limits of
the jurisdiction of the court or judges by whom it is issued, and
an attempt to enforce it beyond these boundaries is nothing less
than lawless violence," which would be resisted by force : Id.
524.

The doctrine contended for by the plaintiffs' counsel is simply

[Kneedler *et al. v.* Lane *et al.*]

the Calhoun heresy of nullification, exploded by General Jackson, applied not by a convention or a state legislature, but by a state judiciary, who may, by preliminary injunctions, stop the raising of armies and the collection of taxes, duties, imposts, and excises, and thus paralyze the arm of government when stretched out to repel a foreign foe, or to suppress a rebellion, backed by several hundred thousand men in the field. I cannot agree that this court can nullify an act of Congress by any prohibitory writ.

I therefore think this court has no power to entertain these bills, and of course no authority to grant the injunctions prayed for, in which I find I am supported by the Supreme Court of Michigan : Am. Law Reg. vol. 2, N. S. 598.

But I am also of opinion that we have no power, sitting as a court of equity, to grant the relief prayed for. Our authority is alleged to proceed from the 5th clause of the 13th section of the Act of 16th June 1836, which is in these words : The Supreme Court (and now all the Courts of Common Pleas and District Courts), shall have the power and jurisdiction of Courts of Chancery, so far as relates to " V. The prevention or restraint of the commission or continuance of acts contrary to law and prejudicial to the interests of the community, or the rights of individuals :" Brightly's Purd. 401.

Now, neither in this provision nor in the report of the revisers, nor in any of the decisions of the court, do I find any warrant to grant injunctions to stop the proceedings of officers of the United States, under acts of Congress regularly enacted. If such be our power, then the sooner the legislature interposes its legitimate power to alter the law, and to prevent the various courts of the state from exercising a jurisdiction with which they never intended to invest them, the better.

I am therefore of opinion that, under the Act of Assembly, we have no such jurisdiction as is here claimed.

The injunctions thus granted were only preliminary, were limited to the cases of the three plaintiffs in these bills, and were in the following terms :—

" Order, November 9th 1863. Preliminary injunction (in each case) granted for the protection of the plaintiff, on his giving bond with surety, to be approved by the prothonotary, in the sum of $500, according to law, and refused for any other purpose." No security was entered, and no writs of injunction issued in either of the three cases. On the 12th of December 1863, after the term of LOWRIE, C. J., had expired, and AGNEW, J., had taken his seat as one of the judges of the Supreme Court, Mr. *Knox* appeared for the defendants in each case, and applied to Judge STRONG, then holding the Court at Nisi Prius, to dissolve the injunctions which had been granted as above stated. Judge STRONG received the motions, and appointed the 30th December

[Kneedler *et al. v.* Lane *et al.*]

for their hearing, and, as in the former proceed'ng, requested his brethren to sit with him. The motions to dissolve were argued before all the judges on that and the succeeding day, by Mr. *Knox* for the defendants, and Messrs. *George W. Biddle, Peter McCall,* and *Charles Ingersoll,* for the complainants. On the 16th January 1864, Judge Strong, representing the majority of the court, made the following order: "And now, to wit, January 16th 1864, it is ordered by the court, that the orders heretofore made in all these cases be vacated; and the motions for injunctions are overruled."

Separate opinions in favour of dissolving the injunctions were read by Judges STRONG, READ, and AGNEW, and the joint dissenting opinion of Chief Justice WOODWARD and Judge THOMPSON, was read by the Chief Justice.

The opinion of the court was delivered by
STRONG, J.—When the motions for preliminary injunctions were made in these cases, and all the judges of the Supreme Court were invited to hear the argument, and advise what orders should be made, I was of opinion that there was no equity in the complainants' bills, and I advised that the injunctions asked for should be denied. I thought then, as I think now, that the Act of Congress of March 3d 1863, under which the defendants were acting, is constitutional, and therefore that they had neither done nor proposed to do, anything contrary to law or injurious to the complainants. The reasons upon which my opinion was founded I then reduced to writing, and they are on file in this court. They are not all which I might have given. Upon the power of a state court to enjoin a federal officer against the performance of a duty imposed upon him by an Act of Congress, I refrained from expressing any opinion. I refrain now. Yet I had no doubt then, and I have none now, that these bills do not present a proper case for the interference of a court of equity, by injunction, even if the Act of Congress were unconstitutional. The facts charged exhibit no case for the action of a court of equity. No chancellor ever enjoined in such a case, and I think it has never before been supposed that he has any jurisdiction over such a wrong (if it be a wrong) as these complainants ask to be restrained. During the whole of the two arguments to which I have listened, one in support of the original motions, and the other against the present motions to dissolve the injunctions, I have heard no reference to an authority for the position that a court of equity has any right to interfere in such a case. I believe no authority of the kind can be found. Reference has indeed, been made to our Act of Assembly of June 16th 1836, which confers upon this court and the several Courts of Common Pleas, power to "prevent or restrain the commission or continuance of acts contrary to law, prejudi-

[Kneedler *et al. v.* Lane *et al.*]

cial to the interests of the community or the rights of individuals ;" but until now it has never been supposed that this act extends the preventive power of this court beyond that possessed by any English chancellor.   No one has ventured to assert that every civil wrong may be restrained by injunction, and that a judge sitting in equity can enjoin against any act that a common law court and jury can redress.   It was jurisdiction and power in equity that the legislature intended to bestow upon our courts; and it has never been seriously claimed that they bestowed more than is possessed and exercised by courts of equity in England and in other states.   But when, before these cases, was an injunction ever granted to restrain the commission of a merely personal tort ?   What chancellor ever asserted he had such power ?   It was hinted in the argument, that the power must be vested in this court, because the privilege of the writ of *habeas corpus* has been suspended in certain cases.   The hint will not bear examination.   How can the suspension of the writ of *habeas corpus,* either by Congress or any branch of the federal government, enlarge the jurisdiction of this court ?   Or how can the restoration of this privilege curtail its jurisdiction ?   The extent of the powers of every court in this state is defined by state law.   It is not in the power of Congress to enlarge it, either by direct or indirect action. Besides, if the suspension of the privilege of the writ of *habeas corpus* could confer upon a state court a power to enjoin against an arrest (a power which, without the suspension, it would not possess), then the Constitution of the United States, in authorizing it in cases of rebellion or invasion, when the public safety may require it, has merely converted a *habeas corpus* into an injunction, and substituted a bill in equity for a common law writ.   Then the object sought to be accomplished by the constitutional provision has utterly failed.   Manifestly, the constitution contemplates the possible necessity of arrests without the interference of courts in times of rebellion or invasion, and it has provided for such cases by authorizing a denial of the privilege of the writ of *habeas corpus.*   But what does this amount to, if the very act of taking away the writ enlarges the power of state courts of equity, and justifies them in interfering to prohibit the arrests ?   I will not however, pursue this subject further ; I mention it at all only because I would not have it thought that I admit the power of this court to interfere by injunction, even if the defendants proposed wrongfully to force the complainants into the military service of the United States.

When the injunctions were ordered in these cases, I endeavoured to show that the Act of Congress of March 3d 1863 is constitutional ; that consequently the bills exhibit no wrong done, or threatened to be done to the complainants, and that for this reason they have no equity.   I have heard nothing since which

[Kneedler *et al. v.* Lane *et al.*]

has raised even a doubt of the correctness of the opinion I then gave. Very much might be added to what I said in vindication of the constitutional power of Congress to enact the law, and in refutation of the objections urged against it; but I should hardly be justified in entering again upon a discussion of that subject before these cases came up for final decrees.

It was strenuously insisted at the argument that the present motions should not be entertained, because the defendants have neither demurred to the bill, nor put in an answer, nor presented affidavits, denying the facts averred, and because the cases stand now as they did when the orders for the injunctions were made. It is said that a preliminary injunction will not be dissolved until an answer has been put in, or at least until affidavits on the part of the defendants have been filed. In answer to this, it may be said that whatever may be the extent of the rule thus invoked in opposition to these motions, it is still but a rule of practice existing for the relief of the court, and not for the protection of complainants. An interlocutory injunction is entirely at the discretion of the court. It is not a thing of right. Complainants cannot demand it. It is always granted or dissolved, according to the will of the chancellor, and if at any stage of the cause he sees fit to dissolve it, no right of the complainants is taken away. I admit the general rule to be that when an application to dissolve an injunction is made before answer, it must be supported by affidavits on the part of the defendant in answer to those upon which the injunction was obtained. Decisions to this effect may be found in any number. But the rule is applicable only to cases where the *facts* averred in the bill and special affidavits of the complainants are disputed. It has no relation to cases where the defect is in the complainant's equity, not in the evidence of his facts. More frequently a motion to dissolve an injunction is based upon a denial of the facts charged in the bill, but a defendant may move to dissolve it on the sole ground of want of equity in the bill: Minturn *v.* Seymour, 4 Johns. Chan. 173; Canal Company *v.* Railroad Company, 4 Gill & Johnson 7. When the motion is made for such a reason, it need not be supported by affidavits, and a bill requiring such support would be absurd. The facts all appear in the bill of the complainant. They are not controverted. Nothing is in issue but the equity arising out of conceded facts, and affidavits either asserting or denying that would be a novelty indeed. Neither courts of law or courts of equity, in any case, require the law or the equity to be made to appear by affidavits. The decision cited in support of the rule of practice referred to have no relation to such cases as the present, which are motions to dissolve injunctions for want of equity in the bill. They could not have been cited unless the distinction between the facts which raise an equity and the equity

itself had been overlooked. Thus in the case first above cited, Chancellor Kent allowed a motion to be made to dissolve an injunction granted by himself, for the want of equity in the bill, though the defendant had not answered. Nor does it appear that he had submitted any affidavits. And in the Canal Company *v.* Railroad Company, above cited, it was said by Chancellor Bland, in reference to a motion to dissolve an injunction, that " if it should appear the facts as stated in the bill, looking to the bill alone, gave rise to no equity, it is very certain that the injunction would be dissolved, whether the defendants had answered or not, or however imperfectly they might have answered." The contest in these cases relates solely to the question whether the complainants have any equity on their own showing. Clearly they have not, if the Act of Congress is constitutional. Now, it is not denied that, if the defendants, before these motions were made, had put in answers admitting all the facts charged in the bills, as they might have done, it would be the duty of the court to dissolve the injunctions, if the facts raise no equity in favour of the complainants, and that such a course would be perfectly regular. In what particular would the conscience of the court be better informed had such answers been put in, than it is now ? At most, then, the objection urged with so much vehemence to entertaining the present motions, the objections that the cases stand now as they did when the injunctions were granted, is but the minutest technicality, and interposed not in furtherance of justice, but to defeat it. In truth, however, it does not rise even to the dignity of a technicality, for the present motions are founded, not upon a denial of anything that could be verified by affidavit, but upon a want of equity in the bills, and to such motions the rule requiring answers controverting the facts alleged by the complainants is totally inapplicable.

And were it not so, if the rule is for the protection of the court, and not of the complainants, as no one doubts, and if the dissolution of the preliminary injunctions, equally with the grant of them, lies wholly in the sound discretion of the court, as all the books agree, there are abundant reasons in these cases why the motions to dissolve should be entertained, and why the orders heretofore made should be set aside.

The orders were made at Nisi Prius, and they are in fact but the orders of a single judge, though he undoubtedly took the opinions of all his brethren. Still the orders were his, and his alone. They could be nothing more. Our Act of Assembly, of July 26th 1842, P. L. 433, § 9, turns all cases in equity, brought in the Supreme Court, over to the judge at Nisi Prius, and they come into the Supreme Court in banc only after final decree. And it was at Nisi Prius that these motions were made. The judge before whom they were made has called in the other

judges, not to decide but to advise what disposition shall be made of them. This he has done from respect to them, and because they advised when the injunctions were ordered. It is not easy to see that any other course would have been decorous. The motions are therefore pending. Nothing can be gained or secured by a continuance of the injunctions. The bills on their face show that the complainants must have gone into the military service of the United States, and beyond any possible interference of the defendants, or that they had commuted, or had been exempted before the injunctions were ordered, and even before the motions for injunctions had been argued.

The orders of the judge at Nisi Prius can, therefore, have no possible beneficial effect upon the condition of the complainants, while if they remain, made as they were, in accordance with the advice of a majority of the judges of the Supreme Court, and upon the ground that the Act of Congress is unconstitutional, they hold out to every drafted man a temptation to resist all attempts to coerce him into military service. Unnecessarily to continue such a temptation is cruelty, if a majority of the Supreme Court now believe the Act of Congress to be constitutional, and that consequently forcible resistance to it would be a crime.

Again, the orders for the injunctions were made *ex parte*, after argument on behalf of the complainants alone. No one attended for the defendants. It is true, there was an appearance on record for the defendants in one of the cases, and notice of the motion was served on the solicitor, who appeared in that case. But there was no appearance in the other two cases, and there was no proof of notice of the motions to all the defendants. They are not the same in the several cases. If there was laches in responding to the notice of the motion in one case, there is no proof of any laches in the other two. And in fact the injunctions were ordered against official action of government officers. To the government, laches is not to be imputed.

Nor ought it to be overlooked that the orders for the injunctions were in their character extraordinary and unprecedented. When before was an Act of Congress ever declared unconstitutional by a state court in deciding upon a motion for an interlocutory order? A just respect for the government under which we live, demands that if there was a mistake in such a case, the court should seize with avidity the earliest opportunity to rectify it, instead of persisting in the error under cover of a rule adopted only to secure its own convenience. I may add that in other cases there has been no hesitation in listening to applications for the correction of mistakes into which even the Supreme Court in banc has been supposed to have fallen. This very week a motion was entertained in the Supreme Court to change a final judgment given at Pittsburgh at October Term last. It was

[Kneedler *et al. v.* Lane *et al.*]

supported by no affidavit, nor had there been any change of the record, or any new pleadings. Yet not a judge hesitated to entertain the motion, or to hear an argument in its support and another against it. If such motions are allowed in reference to final judgments, how can it consistently be said that a motion to dissolve injunctions ordered on interlocutory motion, based on the reason that the bill exhibits no equity, may not be entertained, unless accompanied by affidavits denying not the facts, but the equity?

Once more. The records show that the injunctions ordered in these cases have never been issued. They would have been fruitless if they had been. The complainants have filed no bonds, nor have they taken out any injunctions. They have rested satisfied with the orders. The matter therefore remains perfectly within the jurisdiction of the court, even if the dissolution of an injunction itself was not discretionary. These are quite sufficient reasons, in my judgment, for entertaining the present motions, even if the rule of practice, on which the complainants rely, applies to such cases as these. And manifestly it does not. There is nothing in the way of deciding these motions on their merits. And as I am satisfied that the bills of complainants have no equity, and that the Act of Congress is such as Congress has the constitutional power to enact, I think the orders for preliminary injunctions made in all these cases should be rescinded, and that the motions for the injunctions should be overruled.

Such being the opinion of a majority of the judges of the Supreme Court, the orders are directed to be vacated, and the motions for injunctions are overruled.

Concurring opinion of

READ, J.—Upon the present motions heard before us at Nisi Prius, several questions were discussed at length by the counsel for the complainants. Upon the one, which was essential in any aspect to entitle them to ask for the interference of this court, the alleged unconstitutionality of the Act of Congress of the 3d March 1863, I have not changed my views, as already expressed in my opinion delivered at Pittsburgh, on the 9th November last. Upon a calm and dispassionate reconsideration of the question, I am firmly of opinion that this act is a perfectly constitutional exercise of the power vested in Congress by the constitution, and binding upon us as judges of the supreme judicial tribunal of the state, and upon all the people of the United States. Upon this point I shall say nothing more.

Another question urged upon us, by one of the counsel, was our power to prohibit and restrain by injunction officers of the United States, acting under the authority and in strict con-

[*Kneedler et al. v. Lane et al.*]

formity to an Act of Congress, from performing their official duties, and thus practically nullifying it within the State of Pennsylvania. For such a position no authority was or could be cited. No state court, before the filing of these bills, had ever been asked to exercise such a power against the general government, unless a precedent is to be found in the conduct of South Carolina in the days of President Jackson. .

It was, however, argued that as a power to discharge these individuals from the custody of the officers of the United States by the writ of *habeas corpus* issued by this court, existed before the suspension of that writ by the president, under the Act of Congress, that, therefore, this proceeding might be resorted to in order to attain the same end, and thus defeat the intention of the legislature of the United States. If this can be done by a state court, then the suspension of the *habeas corpus* by Congress, when, in cases of rebellion or invasion, the public safety requires it, is evaded and practically nullified. Such cannot be the law of the land.

The *habeas corpus* operates upon a person in custody; the present injunctions go a step further: they prohibit the individuals from being taken into custody, and if they are legally operative, then the officers of the United States never can have them in their custody. Now, the courts of the United States have no authority to grant the writ of *habeas corpus* for the purpose of inquiring into the cause of the imprisonment, where the prisoner is in the custody of state officers acting solely under state laws, unless under special provisions intended to provide for the effectual execution of Acts of Congress, or for the protection of citizens or subjects of a foreign state under certain circumstances. I think the converse of the proposition is true without any exception, that no state tribunal can issue a writ of *habeas corpus*, and under it discharge a person in the custody of an United States officer acting in strict conformity to an Act of Congress, and holding him by virtue of the authority thus vested in him. In such a case the writ can only be issued by the courts and judges of the United States, who are the only tribunals to decide upon the legality and validity of the imprisonment. This arises from the nature of the state and general governments, so well described by Chief Justice Taney in Ableman *v.* Booth, which really rules the present question. The origin and extent of this decision will be better understood by referring to the opinions of two of the judges of the Supreme Court of the United States, who sat in that case, delivered some years before it was decided. Justice Nelson, in his charge to the grand jury in 1851, on the subject of the Fugitive Slave Law, uses this language (1 Blatchford's C. C. Rep. 635, 640):—

"Another subject," says the learned judge, "arising out of

[Kneedler *et al. v.* Lane *et al.*]

the provisions of this law, and which has a material bearing upon its execution, it is proper should be noticed. By the second section of the third article of the constitution it is declared that, 'The judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States and treaties made or which shall be made under their authority.' The power, therefore, it will be seen, to execute this Act of Congress, belongs to the tribunals and authorities of the general government; and in respect to these, can be executed only by such courts or officers as are specially designated in the act for that purpose. The power, therefore, is exclusive in these courts or officers, both as it affects the tribunals of the state and others of the federal government. Neither can act or interfere in the execution of the law, and in case of any attempt by either to interfere or exercise the authority, its acts would be *coram non judice* and void. These propositions are elementary, and so obvious as to require no further comment.

"It seems to be supposed, however, in some quarters, that the state power exercised by its tribunals, under the writ of *habeas corpus*, forms an exception to this generally-admitted doctrine; and that through the agency of this writ, the fugitive may be taken out of the hands of the federal officers, and the authority or propriety of the arrest or detainer be inquired into, and the person be discharged or remanded, according to the judgment of the state magistrate. This is the exception claimed to the exclusive power of the federal officers designated in the act.

"It is apparent, if this exception can be maintained, that there is an end of the complete execution of the law; *or, indeed, of any law of the general government by which the party is subject to an arrest.* It is not claimed that the state magistrate can, under this writ, administer the act and enforce its provisions, as that authority, as we have seen, is confined to the tribunals appointed by the act for the purpose. The fugitive must therefore be taken, if taken at all, out of the hands of the federal officers by force of some other law. And the question whether he or she shall be discharged or remanded, will depend upon the application of that law to the particular case. What that law is, or may be, must necessarily depend upon state regulation; and the rights of the claimant under the constitution and laws of the Union, will thus be determined by a law of the state.

"The effectual abrogation of the act, by the interposition of this writ, if admitted, will be still more apparent, when we reflect that the power exercised under it is such as the state legislatures may choose to prescribe; and that the state tribunals are not only invested with that power, but, if they act at all, are bound to act in obedience to and in conformity with it. There is no limit, therefore, to the extent of the powers that may be exer-

cised under this proceeding, in respect to the arrest and detainer of the fugitive, but the discretion of the state legislatures. They may confer jurisdiction upon their magistrates to re-examine and revise the acts and decisions of the federal tribunals, out of whose hands the fugitive is taken, and the state magistrate would be bound to execute the power accordingly. It is manifest that it would be impossible to uphold the due execution of the law, with the admission of any such authority.

" Conceding, however, the soundness of this general view, and the inability of the state tribunals to interfere with the federal authorities, when they are acting upon cases arising under the constitution, laws of Congress, or treaties, still it is argued that they possess the power under this writ to inquire into the legality of the authority under which the prisoner is held, and *which may involve the constitutionality of the law*, and the jurisdiction of the court or officer. But it is obvious, that the existence of either on the part of the state tribunals would be fatal to the authority of the constitution, laws, and treaties of the general government. No government could maintain the administration or the execution of its laws, civil or criminal, if their constitutionality or the jurisdiction of their judicial tribunals were subject to the determination of another."

Having proceeded to say he considers this question settled, he says : " There have been different opinions entertained by the judges of the states, as to their power under this writ to decide upon the validity of a commitment or detainer by the authority of the United States. But those who have been inclined to entertain this jurisdiction, admit that it cannot be upheld where it appears from the return that the proceeding belonged exclusively to the cognisance of the general government.

" These views of the paramount authority of the laws of the federal government in no way endanger the liberty of the citizen. The writ of *habeas corpus* secured to him under that government affords the appropriate and effectual remedy for any illegality in the process or want of jurisdiction in the courts, or for any unconstitutionality of the law."

The distinction between the states and the general government upon this point was clearly pointed out by Judge Sumner in the Massachusetts Convention, called to determine whether the Constitution of the United States should be ratified or not. " Congress," said he, "have only power to suspend the privilege to persons committed by their authority. A person committed under the authority of the states will still have a right to the writ :" 2 Elliot's Debates 108.

Doctrine of a similar character had been previously laid down by the late Mr. Justice McLean, in Norris *v.* Newton, 5 McLean 92, at the May Term 1850, of the Circuit Court of the United

[Kneedler *et al. v.* Lane *et al.*]

States for the State of Indiana; and the germ is to be found in the opinion of Judge Story, in Prigg *v.* The Commonwealth, 16 Peters 53. The power to raise and support armies is exclusively vested in Congress, and their legislation upon the subject is necessarily exclusive, and can be neither controlled nor limited by any state authority, whether executive, legislative, or judicial, for the legislature cannot deposit such a power in any tribunal whatever.

Upon this point, however, in addition to the high authority of the Supreme Court of Michigan, quoted in my former opinion, we have the deliberate and well-considered opinions of two able judges of the New York Supreme Courts, in the seventh and fifth judicial districts of that state.

In the matter of Jordan and Others, Judge E. Darwin Smith, of the seventh judicial district, held that where, on a return to a writ of *habeas corpus,* a state judge or court is *judicially apprised* that the party is in custody under the authority of the United States, such judge or court can proceed no further. The prisoner is then within the dominion and exclusive jurisdiction of the United States: 2 Am. Law Reg., N. S. 749.

After speaking of the case of Ableman *v.* Booth, which he approves, the learned judge says: "Upon this theory, every citizen owes to his country a divided duty,—to the national government he owes *allegiance* and the duty of submission and obedience to its laws, and to the state government obedience and submission to its laws; each in their proper sphere. Within the sphere of the national government, its judiciary protects his rights and vindicates his wrongs; and within the sphere of the state government, its judiciary enforces his duties, protects his rights, and gives redress for the injuries he may receive in person or property:" 2 Am. Law Reg., N. S. 758.

"In many localities in this country," says the learned judge, "aside from the states which have professedly renounced the national authority, it is notorious that there are some evil-disposed persons in sympathy with the enemies of the country, who are opposed to the war, and who evince a spirit of hostility to the government by hindering enlistments and volunteering; by enticing enlisted men to desert; in secreting deserters; and resisting by force their arrest and return to the army; and who, by opposition to the draft, and various other modes of proceeding, are seeking to defeat the operations of the government in conducting the war. It would be surprising if such men could not find some convenient judge who would issue writs of *habeas corpus,* and by this process discharge all persons brought before him, on the ground that the laws of Congress authorizing enlistments or the draft, and arrest of deserters, and perhaps the war

[Kneedler *et al. v.* Lane *et al.*]

itself, were unconstitutional, and thus give the colour of law to their disloyal acts and proceedings."

An opinion of a similar tenor was delivered by Judge Bacon, of the fifth judicial district, in the matter of Charles E. Hopson, an abstract of which was furnished by the reporter, Hon. A. L. Barbour: 3 Am. Law Reg. N. S. 189. Mr. Mitchell, one of the editors of the Register, kindly furnished me with the full opinion of Judge Bacon, which is a very able one.

I think, therefore, the argument drawn from the use of the *habeas corpus* by state courts, to take persons out of the custody of officers of the United States, acting under the authority of an Act of Congress, fails entirely, and shows conclusively that the present mode of proceeding by injunction to effect the same object cannot be supported.

I am also of opinion that the words of our Act of Assembly do not cover these cases, as I have said in my former opinion. Before the Act of 1836, it is conceded that no such power was reposed in any court in this Commonwealth; and can it be supposed that the legislature of that day intended to grant to any court the authority to interpose the state power to prohibit the execution of an Act of Congress under the words, "the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals?" The legislature could not give to any person or tribunal the power to stop the execution of an Act of Congress. If they could not do so in direct terms, they could not do it under the cover of general expressions; and they would not do so when the rebellious action of South Carolina, in attempting to prevent the execution of the tariff laws, had been so lately rebuked by the hero of New Orleans, whose action was sustained and approved by the people of Pennsylvania without distinction of party.

I am also of opinion that this is not a proper subject for the jurisdiction of a court of equity; and upon all these grounds I am in favour of dissolving these injunctions, which never should have been granted. No security as required by the terms of the preliminary injunctions, has ever been entered by either of these complainants, nor have of course any writs of injunction been taken out in either of the cases, and no reason has been assigned for this omission to bring home to the defendants the action of this court. This gives us full possession of the case, and in the language of Chancellor Kent, "The granting and continuing of the process (injunction) must always rest in the sound discretion of the court:" 2 Johns. Ch. 205.

I am also of opinion that my brother Strong was entirely right in receiving the motions to dissolve the injunctions at Nisi Prius, being the only place in which they could be made, and in

9· WR.—20

[Kneedler *et al. v.* Lane *et al.*]

calling in his brethren to assist him in hearing the rules, and that the motions were perfectly regular, requiring no affidavits; for the whole case turned upon the bills and affidavits filed by the complainants. The views expressed by my brother Strong, as to the entire regularity of the whole proceeding, I concur in. I was therefore for entertaining the motions, and am now for dissolving the injunctions.

The southern secessionists contended that their allegiance was due to the states, and overpowered any duty which they owed to the United States of America, and this mischievous heresy has led to the present causeless rebellion, and has made traitors of its blind and reckless supporters. The allegiance of every American citizen is due to his country, the United States—if a native, by his birth; if naturalized, by the very terms of the constitution, and the express words of the Acts of Congress, which make him a citizen of the United States. Each citizen has therefore the same common country, which he is bound to serve and defend as far as he is capable.

The mottos of the Father of his country were " *Deeds not words,*" and " *For God and my country :*" Sparks's Life of Washington 522. At his death, the Senate of the United States, in addressing President Adams, expressed to him "their deep regret for the loss their country sustains in the death of General George Washington." And in his reply the president said, he received with the most respectful and affectionate sentiments in this impressive address, " the obliging expressions of your regret for the loss our country has sustained in the death of her most esteemed, beloved, and admired citizen."

In his Farewell Address, this great man, after expressing the debt of gratitude he owed to his *beloved country* for the many honours conferred upon him, uses this language to his fellow-citizens : " The unity of government, which constitutes you one people, is also now dear to you. It is justly so." " Citizens by birth or choice of a common country, that country has a right to concentrate your affections. The name of AMERICAN, which belongs to you in your national capacity, must always exalt the just pride of patriotism, more than any appellation derived from local discriminations."

The armies of the Union are not fighting for any single state, but they are fighting for their common country, the United States of America, as Americans; and those who have perished in this contest for the preservation of the Union, have died under the national flag, which I trust will soon wave over the whole undivided territory of our glorious and once happy Union.

AGNEW, J.—These bills were presented to Mr. Justice Woodward, at Nisi Prius, who called in his brethren to sit with him.

[Kneedler *et al. v.* Lane *et al.*]

The bills were presented on behalf also of all other citizens entitled to the same remedy, and prayed that the defendants, as officers of the draft, should be restrained "*from further proceeding with or under the enrolment, requisition, and draft of citizens of this Commonwealth.*" All of the judges delivered opinions, and a majority directed a preliminary injunction as to the complainants specially.

Afterwards the solicitors of the defendants, representing the government in this behalf, but who had not appeared at the argument, moved the Court of Nisi Prius, Mr. Justice Strong then occupying the bench, to dissolve the preliminary injunction, on the grounds of a want of jurisdiction, that the bill will not lie for a tort only *in posse,* and that the law for enrolling, &c., the national forces is constitutional, and ought not to have been arrested, and the officers exposed to punishment. It is objected *in limine* that the preliminary hearing having been before a full bench, it is incompetent and indecorous in a single judge at Nisi Prius to entertain the motion to dissolve without new facts arising in the cases.

By the constitution of the Nisi Prius, it is a court of but one judge, and he sits singly to hear all cases at law and in equity. It is true, the bench is filled by alternation, but the court remains always the same, though the person changes. The motion was made to the same court, though to a different individual, and therefore he was not incompetent to receive it. Being made, certainly it was not indecorous to call in all the judges to hear it. This only exhibits the deference of the judge to his brethren. Had Mr. Justice Woodward decided the case alone, as he could have done, certainly it would not have been incompetent or indecorous in him to have rectified his own error, if he had become satisfied he had committed a pernicious mistake. I think I can safely say his love of justice would have caused him to do so at once. I can perceive no reason why the whole bench should not do the same. Then why should a difference in the sitting judge cause a different result? or why should the doors of justice be open under one judge, and closed under another?

The case was still pending, having reached no final judgment. In fact the record shows that the complainants had not given security, and the injunctions have not been issued. No real harm can be done the complainants, while the government is suffering from a hurtful precedent. The proceeding is in chancery, and allows the largest discretion to reach justice. If the court had summarily interposed between the law and its execution, stopping the machinery of government with a sudden jar, it was as much the duty of the court to retrace its steps hastily, when convinced of error, as it certainly is a sentiment of patriotism and courtesy to the federal government.

[Kneedler *et al. v.* Lane *et al.*]

It is true, as a general rule, that a court will not be moved summarily to dissolve an injunction without a suggestion of new facts, and will leave the party to an issue formed in the due course of pleading. The learned arguments to prove what is not denied can scarcely be deemed necessary. But this is no such case, and cannot be disposed of by such a rule. It touches the vital powers of the government, arrested violently in their execution by a state tribunal, at a time of great peril. The government was not represented at the preliminary hearing, and ought not to be prejudiced by the fault (if any) of its agents. Government, which acts only through agents quickened by no personal interest, is never to be considered derelict where the default is still open to correction. No new facts need be alleged. The facts of the bill are not denied. It was the conclusion only stated in the bill which was denied. The alleged error was patent upon the face of the bill. The court heard but one side, the opponents of the law. The hearing took place in the midst of an exciting political campaign, when the spirit of party was assailing the law with furious lashes, and vigorously hounding on all its own adherents to the chase, to be in at the death. The decision was by a bare majority against the earnest dissent of two judges, and partially established non-coercion, a doctrine rooted in, and half-brother to, secession. The late chief justice, whose honest mind, I have no doubt, felt penetrated by these surroundings, in delivering the opinion of the majority, had expressed some distrust of his own convictions, and conceded that further argument, on final hearing, might possibly change the result.

Under these circumstances, and in a case of such momentous importance, the majority planting the decision upon a gross violation of the constitution by the people's representatives, never was a judge more justifiable, by sound discretion, exalted patriotism, high decorum, and purity of purpose, than was the judge ordering this motion to be heard before us all. In this he was virtually approved by all, for none of us refused to sit.

We heard the case, and now it must be decided. Shall we refuse to restore the federal government to its rightful position on a mere technicality? We know it is only a rule of procedure to protect the court against the annoyance of defeated suitors. Shall we stick in the bark, when we know the only true question raised in the bill itself is the rightful power of Congress to pass the law? The complainants must stand on this ground at last in the final decree. What new fact can be urged? It is admitted the answer cannot deny the facts. The government relies only on its rightful authority to do the acts alleged in the bill. The issue is the invalidity of the law, and this appears now as fully as it can appear hereafter. Then why this labour upon a

point which involves nothing, and decides nothing? When we have laboured with all our powers, in the end all we can say is, *mons laboravit et mus cucurrit.*

But, on the other hand, if we permit this unsubstantial technicality to prevail, what is its effect? It leaves the draft officers liable to a penalty in either way. If they disobey the injunction they will be attached. If they obey it, they will be displaced. In either direction they must suffer. If we have fallen into a grievous error, shall we not retrace our steps, and relieve the officers from their predicament, and the government from injustice?

We make no precedent for ordinary suitors. On the contrary we tell them it cannot be drawn into one, for while we recognise the rule we declare it has no place here before us, as chancellors, in a matter of pure discretion, so vital to the federal government, and under the circumstances surrounding the case. If others, professing and doubtless possessing equal patriotism, are willing to permit this merest shadow of a technicality to interpose between the court and restitution of the rights of the government, I regret they so magnify art above justice, but I cannot adopt their views.

It is said that the new member of the bench is bound by the rule of *stare decisis.* I bow to this safe maxim wherever it applies, and conceive it would be sad indeed if the reputation of this court were to suffer by my breach of it.

But it is admitted that on a final hearing I must decide as my views and conscience dictate. And why not now? I find the case before me, and I certainly cannot decide it against all my convictions of law, duty, and patriotism. But it is thought it would be asserting a principle contrary to the genius of the constitution and the safety of society, that causes should not be governed by solemn decisions, but the result of elections. I question the propriety of introducing the results of the election here, and think that the application of such a test, which leaves us without a judicial mind, and makes us the mere registers of popular edicts, savours more of offence than argument.

What mind can for an instant suppose that any bench, having a proper self-respect, can be governed by the popular upheavings, and reverse a solemn decision to satisfy popular demands? It needs no argument to prove to sane men that such a principle would do violence to public security and judicial propriety. By what authority of position or propriety can any one say that the opinions of any member of the bench are not the result of sound law and pure motives, but the registration only of popular edicts? What has turned the thoughts of any one into such a channel, instead of following the obvious open path of decorous inquiry? Is this such a case? Do we violate any principle here?

On what principle, therefore, is *stare decisis* quoted to me? Is it merely to sustain the decision of a ·bare majority against a strong dissent establishing the doctrine that national forces cannot be raised to suppress insurrection, nor indeed used for such a purpose? made in a one-sided hearing of the opponents of the law, in a preliminary way, during a time of high excitement, when partisan rage was furiously assailing the law.   A decision tending to encourage a general rush into the court, and to put an end to the levying of troops, and inciting to forcible resistance under a persuasion of the law's invalidity.   The decision has become no rule of right, and has fixed no status of society, while it is founded, in my judgment, in most pernicious error.   Surely this is no case for *stare decisis.*

I make no point of the popular verdict in this state.   I shall not write it up; and I am sure I am under no necessity to write it down.

To prevent misconstruction, I desire to say I refer to the pressure of the late political canvass upon the former decision, only to indicate the unconscious influence of preconceived opinions.   These predispositions seem to operate as if by a law of our nature, and are exemplified even in religion, which descends from father to son, and often controls the judgment, rendering it blind to the most palpable errors.   A like influence is also to be found in the prevalence of national prejudices and errors.

Believing that law, duty, patriotism, and justice require the preliminary order to be rescinded, I proceed to the grounds which, in my judgment, place the power of the government above successful disproof.

The bills before us pray for relief against the Act of Congress, of the 3d of March 1863, for "enrolling and calling out the national forces," politically known as the Conscription Law. The ground of relief is its alleged unconstitutionality.

The essential features of the law are these: It ascertains who shall be liable to military duty, and provides for their enrolment.   It authorizes a draft by lot of the number required by the president to be called into service, and provides for enforcing the call, and it empowers the president to assign them to service as he shall determine.

Is this mode of raising a national military force to suppress the existing rebellion unconstitutional?   The presumption is, that Congress has acted within the scope of its powers; and as said by Chief Justice Marshall, in Fletcher *v.* Peck, 6 Cranch 87: "It is not on slight implication or vague conjecture, the legislature is to be supposed to have transcended its powers, and its acts considered void.   The opposition between the constitu-

tion and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

It is conceded that the power of Congress is two-fold: First, to raise national forces under the clause " to raise and support armies." Secondly, to call forth the militia " to execute the laws of the Union, suppress insurrections, and repel invasions." But the constitutionality of the law is denied on the grounds that national armies can be raised only by voluntary enlistment, and not by draft; and that this law is not an exercise of the power to call forth the militia, but comes into conflict with the clauses in the constitution relating to the militia. The grounds of conflict alleged are, that national forces cannot be raised to suppress insurrections, but the militia must be called forth; that this law covers the whole ground of the militia, exhausting it entirely, and is therefore an unauthorized substitute for the militia of the states, annulling the remedy provided by the constitution for insurrection.

Can the national armies be raised or recruited by draft ?

That the United States are a nation, and sovereign in the powers granted to them, is not denied. Their national characteristics are seen in the powers themselves, and their supremacy provided for in the instrument. They possess all the functions of a nation in the law-making, executing, and judging powers.

We cannot conceive of a nation without the inherent power to carry on war. The defence of person and property is a right belonging by nature to the individual, and to every individual, and is not taken away by association. It therefore belongs to individuals in their collective capacity, whenever thus threatened or assailed. The constitution, following the natural right, vests the power to declare war in Congress, the representatives of the people. It is noticeable that the constitution recognises this right as pre-existing, for it says, to *declare* war, which presupposes the right to *make* war. The power to declare war necessarily involves the power to carry it on, and this implies the means; saying nothing *now* of the express power " to raise and support armies," as the provided means.

Vattel, book 1, c. 2, § 18, after proving the national duty of self-preservation, growing out of the nature and obligations of association, says: "Since then a nation is obliged to preserve itself, it has a right to *everything* necessary for its preservation. For the law of nature gives us a right to everything, without which we cannot fulfil an obligation; otherwise it would oblige us to do impossibilities, or rather would contradict itself, in prescribing us a duty, and at the same time debarring us of the only means of fulfilling it."

Burlemaqui, in his Politic Law, part 1, c. 1, § 11, also says:

"The law of God no less enjoins a whole nation to take care of their preservation than it does private men."

Again, in section 12: "Herein it is certain that the sovereign in whose hands the interest of the whole society is lodged, has the right to make war. But if it be so, we must of course allow him the right of employing the *several means* necessary for that end. In a word, we must grant him the power of *levying troops*, and obliging them to perform the most dangerous duties, even at the peril of their lives. And this is one branch of the right of life and death, which manifestly belongs to the sovereign."

The right to the means carries all the means in possession of the nation. Every able-bodied man is at the call of the government; for assuredly in making war, as there is no limit to the necessity, there can be no limit to the force to be used to meet it. Therefore if the emergency require it, the entire military force of the nation may be called into service.

But the power to carry on war and to call the requisite force into service, inherently carries with it the power to coerce or draft. A nation without the power to draw forces into the field, in fact would not possess the power to carry on war. The power of war without the essential means, is really no power; it is a solecism. Voluntary enlistment is founded in contract. A power to command differs essentially from a power to contract. The former flows from authority, the latter from assent. The power to command implies a duty to obey, but the essential element of contract is freedom to assent or dissent. It is clear, therefore, that the power to make war, without the power to command troops into the field, is impotent; in point of fact, is no governmental power, because it lacks the authority to execute itself.

So much can be argued conclusively, from the fact that the Union is a government of national powers, and has the express authority to declare war and to provide for the common defence and general warfare.

But when we reach the express grant of the means of making war, we find it a general grant of the power "to raise and support armies," without any exception as to the extent, the mode, or the means; only that appropriations for the purpose shall not be made for more than two years, which strengthens the grant in every other aspect.

Here there is a grant in the broadest language to raise armies, and the purposes (of which I shall say more presently) are vital and fundamental. What is the rule of interpretation to be applied as settled by the federal judiciary?

In Gibbon *v.* Ogden, 9 Wheaton 188, Marshall, C. J., says: "We know of no rule for construing the extent of such powers other than is given by the *language* of the instrument which confers them, taken in connection with the *purposes* for which

they were conferred." Then speaking of the misapplication of the doctrine of strict construction, in language which seems as if written for this time and occasion, he says: "If they contend for that narrow construction, which, in support of some theory not to be found in the constitution, would deny to the government those powers which the words of the grant as usually understood import, and which are consistent with the general views and objects of the instrument; for that narrow construction which would cripple the government, and render it unequal for the objects for which it was declared to be instituted, and to which the powers given as fairly understood render it competent; then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the constitution is to be expounded."

In Martin *v.* Hunter, 1 Wheaton 304, Mr. Justice Story said: "This instrument (the constitution), like any other grant, is to have a reasonable construction, according to the import of its terms; and when a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly or by necessary implication."

It is conceded that in construing the constitution, we must take it as a whole, and not confine the question to a single isolated grant of power. But where a general power is vested in plain and absolute language, without exception or proviso, for high, vital, and imperative purposes, which will be crippled by interpolating a limitation, the advocate of the restriction must be able to point out somewhere in the constitution a clause which declares the restriction, or a higher purpose which demands it. But by so much more, that the life of a nation is greater than the life of an individual, which may be taken to preserve it; so much greater is the high purpose of raising an army to preserve the nation, than the protection of the rights of the individual. The minor purpose, when urged as a reason for the limitation, cannot therefore be allowed to control the meaning of the plain language used for the major purpose.

Then the inherent powers of a nation to make war for self-preservation, carrying with them all the means of making war effective, the express power to declare war and to raise and support armies, coupled with the express power to pass all laws necessary and proper to carry these powers into effect—all unite in sustaining the power to raise armies by coercion, and these are in turn sustained by the high, vital, and essential purposes of the grant. In addition, the considerations derived from the constitutional duties of the government, and the constitutional restrictions upon the states, enforce this conclusion.

[Kneedler *et al. v.* Lane *et al.*]

If, as inferred only, the constitution denies coercion, what is its purpose in this?

The power to raise armies by draft lies somewhere; if not in the Union, it belongs to the states. But if it abide in the latter only, how is it to be used at all? They cannot declare war, for this power clearly belongs to the nation alone. They cannot make treaties, contract alliances for mutual assistance, make peace, or do any act requiring forces to answer such stipulated duties, for these powers belong to the federal government, and are forbidden to the states. They cannot " grant letters of marque or reprisal;" "keep troops or ships of war in time of peace; enter into any agreement or compact with another state or with a foreign power; or engage in war, unless when actually invaded, or in such imminent danger as will not admit of delay."

It does not belong to the states to provide for executing the laws of the Union, or for suppressing insurrections. Nor does it belong to one state to defend others against invasion. Of what use then is the compulsory power to raise armies, to the states, as such?

But it does belong to the United States to provide for the common defence and general welfare; to declare war; to execute the laws of the Union; to suppress insurrections, and repel invasions; to protect the states themselves against invasion and domestic violence; and to guarantee to them a republican form of government. If we deny to the Union the means of raising armies by draft, and leave coercion to the states, how are all these high federal duties to be performed?

When it is said that the Congress shall have power to call forth the militia for *three* purposes, it is clear this is not a call by the *states* of their own militia. Congress organizes, arms, and disciplines, while it is left to the states to officer and train only. The states cannot constitutionally know when and for what purpose to call out the militia. This belongs to Congress, which has legislated, vesting the power in the president, and prescribing the terms of its exercise. See Acts of 28th February 1795 and 3d March 1807, Brightly's Dig. 440. He is to designate the states from which the militia shall come, and direct whither they shall go. The whole affair is national, not state.

The three purposes alluded to also indicate this. By what authority will Pennsylvania draft her militia to resist an invasion of Louisiana, suppress insurrection in Florida, or execute the federal laws in Texas? She cannot bind herself by treaty or alliance to furnish troops. She cannot throw herself back upon her powers as an independent sovereign state, for she is under the constitution, and this vests the power over the militia for these *federal* purposes in the Union. Nor can she limit the

requisition of the president under the law. She cannot say, I will draft so many, or a proportion only. Indeed she can say nothing, for if it rested with the state alone to call out her militia to execute the federal duties, even on the call of the president, the Union would be at the will of the state, and in no better condition than under the Articles of Confederation. If the executive of the state refuse to draft, supported as he might be by his own people, what remedy has the federal government? Not even impeachment, for that would depend on the state legislature.

Then what becomes of this power to draft as residing in the state only, this *parens patriæ* power, so much referred to? It is of no value to the Union, for the state *is neither permitted nor commanded* in the constitution to use it for national purposes. It is of little value to the state, for the federal government must protect her against invasion, and against domestic violence, if her *posse comitatus* fail. Thus we have reached a point where an admitted sovereign power is sunk somehow between the two governments, and neither can exercise it for any national or valuable purpose.

It is therefore a strong fact in the constitution itself, that correlative to the power of the Union to raise armies, and to organize, arm, and discipline the militia, and call them forth, is the omission of all authority in the states to raise forces for national purposes; and coinciding with this, that there are constitutional restrictions incompatible with the exercise of any such power.

It is thought the drafting power is incompatible with the provision for due process of law. It would be a sufficient answer to say, this being true, that the state itself could not draft; for the 9th section of the 9th article of the state constitution has a provision precisely equivalent, as shown by Mr. Justice Curtis, in Murray's Lessee *v.* Hoboken Land Company, 18 How. 276, the expression "law of the land" being tantamount to "due process of law."

But it is not denied that wherever technical phrases were used, or expressions having a fixed meaning when the constitution was ratified, we should adopt their technical or received sense. Hence we interpret "*habeas corpus*," "bill of attainder," "levying war," "trial by jury," by their known meaning at the time. But the language "to raise and support armies," was neither technical nor fixed in meaning, as to any particular mode or means ascertained at the time, and was composed of words of ordinary import. They have no special history bearing upon their use. The power to draft is admitted in the state. When the states parted with powers contained in language apt to carry the draft no exception was made, and due process of law was not prescribed in any particular form. On the other hand, as we have already shown, the inherent power of a nation, and duty

of self-preservation, the expressed grant of the power to make war, with the means of carrying it on, the duties to the nation and the states imposed upon the national government, and the duty to individuals to protect their rights, guaranteed by the federal constitution, all give to the words their natural, general, and obvious scope.

Then, how can it be said the phrase "to raise and support armies" cannot mean to include a draft, because this would not be by due process of law?

What is due process of law? Does it mean when a power is given in plain language, it shall not be exercised, because no exact precedent of due process of law can be found in some antecedent form of government? Does it mean that Congress is incompetent to declare the due process of law, by prescribing a reasonable legal form of procedure through which the power is to be exercised? If so, what will become of the Fugitive Slave Law, and all laws under those peculiar powers conferred on the general government, having (at the ratification of the constitution), no precedent perhaps in the annals of any country or period? The argument which would construe the meaning of the words to raise and support armies, by the provision for due process of law to exclude coercion, it seems to me, is unfounded in any just interpretation of the instrument.

The sum of the argument is simply this: that no mode can be used but one known before to Great Britain or the United States, under the Articles of Confederation.

As to the historical argument, though charmed with the richness, fulness, and classic elegance of the effort, as a contribution to legal literature, I must say the history itself leaves no impression on my mind, for several reasons. There is no special history bearing directly on the clause in question to help us out. The historian admits the power of "conscription" in the state, which therefore could impart it to the Union. The history of Great Britain is equivocal, and the distinction between conscription and impressment, known at the formation of the constitution, is the strongest reason why the latter at least should have been provided against. Colonial history furnishes no argument, for impressment was a complaint against the king to be found in the Declaration of Independence, and yet no provision was introduced. The history, under the Articles of Confederation, proves nothing, for the weakness of the confederation was one of the very reasons for forming the constitution. The history, since its adoption, is no better, for since 1789 until now, a conscription has never been necessary. The war of 1812 is no exception. So far as our territory was involved, it was a war of invasion by a distant ocean-divided country, incapable (owing to the then state of naval affairs) of throwing a large force upon our shores, as compared with the

[Kneedler *et al. v.* Lane *et al.*]

magnitude and power of this rebellion. It was at a period when the proportion of the population to the number needed was vastly greater, and when the spirit of union and patriotism was easily invoked against a common foe, while now the country is a prey to rebellion, irruption, disloyalty, want of sympathy, and all the ills of an insurrection within its own bosom. The whole current of history, therefore, proves the most incomprehensible dullness in a body of men heretofore renowned for their wisdom, in not providing against a tyranny alleged to be so gross, yet within their view; or it speaks trumpet-tongued against the very interpretation it is invoked to support.

I have alluded to, but not developed, the federal duty of protection to the personal rights of individuals. The right of war is at the foundation of all governmental protection. If the rights of citizens be invaded by foreign powers, a resort to arms is the only answer to justice denied. If their rights be denied by states, against the declared provision of the constitution securing equality of privilege, military force is the final remedy. Turn to article 1, section 9, art. 4th, and to the Amendments, and see how many and important are these rights. If state privileges be denied, contracts impaired, *ex post facto* laws enforced, personal liberty abridged, the trial by jury infringed, or any other right thus secured denied, this fact brings us into the federal courts, whose judgments become law, and therefore entitled to the aid of the military arm of the nation, to compel their execution. Let bitter interstate controversy arise, and the people become blind to justice, and insensible to reason, and the value of this sovereign, controlling power immediately rises to view.

Yet, with the federal constitution before our eyes, securing to the citizen all his great and fundamental rights of personal and civil liberty, and pledging each branch of the government, by the solemn sanctions of oaths, and the penalty of impeachment to the execution of its laws, it is argued that the military power necessary to the final and complete protection of these liberties, cannot be given to it, but must be vested in separate state sovereignties, wanting in power beyond their own boundaries, incapableof contract by treaty or alliance, inferior in means, unpledged to federal duty, and discordant in purpose and in action.

And on what plea is this? Forsooth, on the plea that the states are the only true representatives of popular rights, a position founded in a total disregard of the fact, that in respect to the powers and duties vested by the constitution (which by its own terms is the supreme law, and the security of these rights), the federal government is the first and highest representative of the popular will, as well as the strongest bulwark of popular rights. Is not the executive elected by the people, and directly responsible to them? Are not the members of the House the representatives of

the people, elected by them, and holding the purse-strings of the nation, thereby controlling both army and executive? Thus the people themselves control both state and federal governments, with this advantage, too, in favour of the nation, that a majority of the whole people control it for the benefit of all, while the states are controlled by jarring and discordant interests. This argument, which thus saps the vital powers of the nation at their centre, has, it seems to me, no illustration more fitting than the fable of Æsop, in which the members are represented as rebelling against the stomach, the source of all their strength.

There are strong considerations in support of the power to draft, arising in the character of that voluntary enlistment which lies at the bottom of the opposite argument.

Courtiers may whisper in the ear of royalty, the king can do no wrong—demagogues may sound the praises of the people—but courts of justice, as well as human nature, can found nothing in the mere willingness of men to perform legal duties in the absence of the sanctions of the law. What is the true foundation of civil liberty? Why are laws and constitutions formed? For what are penalties and criminal jurisprudence established? Why are governmental powers given to protect society against sedition and insurrection? Clearly to defend man against himself.

Why does the constitution guarantee to the states a republican form of government? Does not this import that a majority, or some large portion of the people, is potent to destroy their own liberties? Why protect the states against domestic violence, enforce the execution of the laws, and suppress insurrection by the arm of military power? Do not all these imply popular commotion and disorder, at variance with the theory of unreserved submission to the general good, and therefore at variance with popular willingness to enlist?

Then no matter how grateful the flattering incense to the pride of popular vanity, mere willingness is no substitute for authority, and no foundation for governmental power. In the name of civil liberty and a nation's welfare, are the security and prosperity of this government to be rested on the changing passions of mankind, unsupported by a power of command?

Who are the people? Were they those who, according to the forms of the constitution, in 1860 chose a president? He wields the lawful authority of the nation, yet it may be said he represents minority views, and popular willingness will thereupon refuse to enlist. Were they those who, in 1862, revolutionized the popular voice of the great states of New York, Pennsylvania, Indiana, and Illinois? Or were they those who produced a counter-revolution in 1863, in the same states, thereby reinstating popular willingness? And remember this is no unmeaning ques-

tion, when you consider the power of state executives as the exponents of state willingness.

Can it be, that this Heaven-ordained Union, the light of nations, the hope of the world, the protector of states, the defender of personal rights, the guaranty of free government, should depend for its own safety, and for the performance of all its high duties, on the ever-changing hues of popular opinion, or the varying moods of state executives?

When the voice of the people, through the forms of the constitution, speaks from the ballot-box, we listen to it as the great rule of government, and submit to what it decides. But like every other act of power, it is potent only within the scope of its authority. Then surely the interests of a nation have not been made dependent on the discordant tones of local divisions. If their voices speak to us from the ever-changing spots on the chess-board of states, how shall we learn this lesson of willingness in national affairs? Is it the intention of the constitution that every great popular rising, founded itself upon the extremes of popular opinion, shall depend for its suppression on the unstable willingness of men to enlist? Yet this is the doctrine which scouts the power to enforce war by arms, and rests it upon the mere impulses of the people. I speak of national forces, not forgetting the militia, as we shall presently see.

I deny then that interpretation of the constitution which would, by mere implication, destroy its language, its design, its consistency, its wisdom, its duty, its power, and its protection; and, for myself, I would protest against this suicide of national life, in the name of patriotism and civil liberty, of my country's welfare, its honour and renown.

Must we forget all history and our own short recollections? Must we ignore that conduct of states which brought the constitution into existence, "in order to form a more perfect union, establish justice, *insure domestic tranquillity, provide for the common defence, promote the general welfare,* and secure the *blessings of liberty* to ourselves and our posterity?" Then after all this, must we forget the whiskey insurrection, the opposition to the embargo, and to the war of 1812, the South Carolina nullification, and the Dorr rebellion?

Must we blot out our own memory of the last three years, when states and people rose against the constitution and authority of the Union, and ordained them null and void—when the ministers of justice, and all federal officers in these states resigned, or were forced to retire—when the forts, arsenals, and other property of the government were seized, and its armies surrendered? Must we forget that when the states were first called on for troops, states not then in rebellion, through their executives, hurled back the president's proclamation into his

face; and that troops sent to the succour of the government to save its capital from capture, and its archives from destruction, were murdered in the streets of a neighbouring city? Are we to ignore the fact staring Congress in the face at the time of the passage of this very law, that the impulses which first drew out volunteers were dying away; that as war was prolonged, and death, disease, and discharge thinned the ranks of the voluntary element, as disasters overtook us, and the scales of battle hung in doubtful equipoise, the spirit of enlistment drooped, flagged, and died away, while the ties of home and interest, and the spirit of disaffection, more potent than patriotism, asserted their sway over the remaining elements?

Shall we ignore all these speaking histories, all these bitter recollections, and the plainly written powers of the constitution, to trust our country to the changing, fitful moods of voluntary enlistment? Shall we throw the ability of the federal government to make war and to execute all its high duties, into the boiling cauldron of party politics, watch its ebullitions, and wait to see whether the zealous abolitionist, the cautious conservative, or the non-coercionist shall succeed in the civil contest? Shall we meanwhile leave the general government, the protector of our rights, the only unit in council or action, to struggle feebly against a giant usurpation, whose clutch is upon its throat, and whose venom is penetrating every vein and fibre?

Then where in the constitution does the opponent of this power find his arguments? Does he fly to the letter? It is a wall of adamant to national security and state repose. Does he ask of design? It proclaims peace to the nation and safety to the state. Does he fall back on duty? It is bound all round to protection, with "bands of iron and hooks of steel." But it is to none of these he flies. It is to a mere inference which recoils to his destruction—a barb that stings—a shaft that impales.

Finally, it is said that this law is incompatible with the provisions of the constitution in relation to the state militia; that the militia are a state institution continued by the constitution, which cannot be taken away, but only regulated in the mode provided; that this law covers the whole ground of the militia, and exhausts it entirely; that therefore it is an unauthorized substitute for the militia, annuls the remedy provided by the constitution for insurrection, and substitutes a new and unprovided one.

This whole argument proceeds upon the basis that national forces cannot be raised to suppress insurrection, and that it can be suppressed only by the use of the state militia, and upon the further ground that the military element of the population cannot be exhausted in the execution of any power granted to the federal government, even when essential to its execution.

[Kneedler *et al. v.* Lane *et al.*]

It therefore substantially denies the supremacy of the federal over the state law, when the subject-matter, viz., the military element, is one over which they have concurrent jurisdiction.

If it be true that insurrection *can* be suppressed by the use of the national forces, then the power to draft, to suppress insurrection, falls within the power to raise and support armies, as already shown. If it be true that insurrection can be suppressed *only* by the use of the militia, then it is also true that the militia only can be used to execute the laws of the Union and to repel invasions; for the same argument which proves the incompatibility of the one necessarily proves the incompatibility of the other two, for all are engrafted upon the same stem. The incompatibility supposed to arise out of the maxims, *Expressio unius, est exclusio alterius,* and *Expressum facit, cessare tacitum,* applies to the first and last terms of the clause, as well as to the middle.

Now, clearly, it is not the intention of the constitution, if its own laws be resisted, or an invasion be attempted, to forbid the use of the national forces raised and in readiness for the emergency; and to require the government to await the tardy process of calling out the militia, Yet the advocate of this incompatibility must submit to this conclusion, for his argument proves all three terms in the clause to be upon the same footing.

These militia, at times, may be a great additional aid to the national forces, but surely are not intended to supersede them. Then on what different footing does insurrection stand? None in the constitution, for there it is only one of the triple prongs of the same power. None in the urgency, importance, or necessity of the duty. Invasion may come suddenly from a foreign foe, while enforcement of the laws is twin brother to suppression of insurrection, for both suppose breach and resistance to law.

Neither the reason of the thing nor the obligation of the government, admit of the enforcement of any of these three duties being confined to the militia. It owes security to the nation collectively—its laws, its authority, and its soil. It owes protection to the states individually—their territories, their domestic tranquillity, and their freedom of government. Are the arms of the Union powerless for these purposes, and can the militia only perform these duties? The question answers itself—to state the case is to refute it.

The assumption is also contrary to ancient practice and uniform construction. By the Act of 3d March 1807, § 1, Congress provided for the use of both land and naval forces to suppress insurrection. The Act of 2d March 1833, § 5, provided for the use of the same forces when the laws, their execution, or the process of the courts are obstructed by military force in a state. During the nullification movement, President Jackson garrisoned

9 WR.—21

Castle Pinckney and Fort Moultrie with regulars, under the immediate command of General Scott, and anchored vessels of war in the harbour of Charleston, under the orders of Commodore Elliott. In later days, the army has been used in Kansas and in Utah. Who ever intimated that these laws and executive acts were unconstitutional, and that the militia alone should have been called for? But *tempora mutantur*, &c.

The truth is, that instead of the power to call forth the militia being in exclusion of any of the preceding grants of the power of war, to raise armies, maintain a navy, &c., or operating as an exception or proviso, it is a continuation of the enumeration of powers, and is an additional grant, subsidiary to the former, as its place in the section, its terms, its design, and the subject-matter all import. While the framers of the constitution intended that the nation should possess the primary and essential means of self-preservation, in its fullest extent, by the power to declare war, raise armies, and maintain navies, and provide for the common defence, &c., they also foresaw, through the genius of the people, the nature of the government as a representative democracy, and the force of other powers and limitations operating; that it would be unlikely a large standing army would be always on foot, and the nation thereby ready for every emergency. The election of representatives being biennial, the origination of revenue bills confined to the representatives, appropriations to the army limited to two years (or one Congress), and the spirit of opposition to standing armies, made it unlikely that a sufficient regular force should be ever ready to meet unexpected opposition to law, powerful insurrections, and sudden invasions. No better illustration need be furnished than the actual state of the national forces at the time of the Whiskey Insurrection and at the outset of this rebellion, and even at this hour, if we reduce the force to the enlisted regulars, as the argument calls upon us to do. Hence the power to call out the militia in the three cases was added. Addition is not exclusion, and it does not say you *shall not* use the national force because you *may* use the militia.

The constitutional authority to use the national forces creates a corresponding duty to provide a number adequate to the necessity. The duty is vital and essential, falling back on the fundamental right of self-preservation, and the powers expressed to declare war, raise armies, maintain navies, and provide for the defence. Power and duty now go hand in hand with the extremity until every available man in the nation is called into service, if the emergency require it; and of this there can be no judge but Congress.

They may proceed, therefore, to the exhaustion of the whole element from which the state draws its militia, for the people

under the two powers are the same, while the supremacy of the national power, provided in § 2 of article 6, necessarily draws to itself the whole number, if required by the exigency, to the exclusion of the state power.

And in reason, why should a major power be restricted by a minor ? The power to raise armies comprehends for its purposes the whole scope of the purposes of armies, while the authority to call out the militia is confined to the enumerated three.

But it is a mistake, in fact, to say this law exhausts the militia. It enrolls probably all, for how can any be drafted without all be known ? But the draft is confined to so many as are needed for the emergency, while the others remain in the militia. And if you deny the power to repeat the draft, what is that but to say your force shall not increase with the necessity ?

Nor is it true that the enrolment under this law exhausts the militia. Neither the law of Congress nor the laws of the states, so far as we know them, have enrolled all able-bodied men capable of militia duty. A wide margin yet exists in the law of the nation; but we do hear of this margin being written all over in the seceded states.

As to the objection to the 13th section, providing the punishment of desertion for those who fail to appear, it is only necessary to say, we cannot presume the complainant will be guilty of failing to perform his legal duty subsequent to the draft, when he finds the law is valid which drafts him. He asks us to relieve him from the draft, not from a military trial for misconduct. Whenever he chooses to incur the proposed penalty for disobeying a valid law, it will be in time for the proper tribunal to arrest an illegal mode of punishment.

The question of jurisdiction is unnecessary to a decision. The point is too important, the cases too numerous, and the labour too great. It should therefore be left for a decision when it shall have to be met.

For all these reasons, I concur in rescinding the order for a preliminary injunction.

WOODWARD, C. J.—The judgment of this court, pronounced at Pittsburgh on the 9th of November last, against the constitutionality of the Act of Congress of March 3d 1863, which is commonly known as the Conscript Law, was as regular, fair, and solemn a judgment as this court ever rendered. The parties had a full opportunity to be heard. The defendants did not avail themselves of it, for they persistently refused to appear, either by themselves or their counsel, to argue the single question involved, or to object to our jurisdiction or to the form of proceeding. On the 23d of September, when the court assembled to

hear the argument, we required proof of notice to counsel to be filed of record, and waited the return of a special messenger whom we despatched in unsuccessful search for the counsel. The argument was not permitted to proceed on behalf of the plaintiffs until more than usual pains were taken to secure to the defendants their constitutional right to be heard. But the court was treated with studious contempt. The defendants did not condescend even to allege the constitutionality of the Act of Congress. We have no right to hold counsel responsible for this treatment, because counsel generally act as they are acted upon, and the legal presumption is, in this instance, that they did not appear because they were instructed not to appear. The judgment was delayed for six weeks, an interval which bore the case beyond the excitements of a pending political contest—gave judges ample time to reflect on the grave question to be decided, and afforded the defendants space to repent of their contumacy, and to apply for leave to be heard, or to submit what we never refuse to receive—a printed argument.

Notwithstanding all this care and deliberation on our part, we were deprived of the assistance we were entitled to have from the competent counsel of the defendants. A party who has full opportunity to be heard is always treated as if he had been heard. He has had his day in court, though he has not improved it. The judgment we pronounced, therefore, was as binding upon the defendants as if they had been heard. It was binding upon all the citizens of the state, and was the highest judicial evidence that they yet have, that the Conscript Law was and is null and void. The judgment was subject to review by the Supreme Court of the United States; not indeed in its present form, for the decree of a special injunction, though it involve the decision of the constitutional question by the whole court, is what is technically called an interlocutory decree, and an appeal to the federal court lies only from judgment or decree, which is final as well as adverse to the federal government. It was easy, however, for the defendants to put the record into shape for review. Upon filing their answers to the bills of the plaintiffs we could have made the interlocutory decree final, without further argument or delay, and thus the record could have been got into the Supreme Court of the United States before the beginning of the present term, last month. Or, if the court had desired re-argument on the motion for final injunction, that could have been had while Judge Lowrie was still in office, and in time for review in the federal court early in its present term. No doubt delays were possible, if the purpose was to delay and not to speed justice; but it is equally clear that had there been any desire to obtain the opinion of the court of last resort, here was a good opportunity to obtain it.

[*Kneedler et al. v. Lane et al.*]

But though the court sat at Pittsburgh a week after each judge had delivered an opinion, and the interlocutory decree had been entered, and though the commission of Chief Justice Lowrie did not expire until the first Monday of December, yet no motion or effort was made by the defendants to prepare the record to be reviewed; no re-argument was asked for in this court, no explanation or apology for the non-appearance of the defendants was offered.

After Judge Lowrie was out of office, to wit, on the 17th day of December, the defendants, by counsel, appeared before Judge Strong, at Nisi Prius, who had been assigned to that court for that month, and moved to dissolve the injunction. This motion was grounded on no answer, plea, demurrer, affidavit, or reason filed of record. It is understood that plaintiffs' counsel had notice of the motion, and appeared and objected to it, but it was granted, and the other members of the court summoned to an argument upon it on the 30th of that month. When it came up before a full bench on that day, plaintiffs' counsel again objected to our entertaining the motion, but the argument of the question of practice, as well as of the constitutional question, was ordered by a majority to proceed, and we heard counsel on both sides on the three questions " of the regularity of the motion to dissolve," the constitutionality of the Act of Congress, and the jurisdiction of a court of equity to grant relief by injunction.

This proceeding is so extraordinary, that I have felt it my duty to mark the several stages of its progress, and to express, with all possible brevity, the opinions of my brother Thompson and myself on the three questions submitted. And first as to the motion to dissolve. The Nisi Prius is held by the several judges of this court alternately, month by month, when not in session in other parts of the state—it is ordered by statute to be held by a single judge, but a practice has grown up of late years, when a very important question is presented to the Nisi Prius judge, for him to assemble the whole court to hear the argument —a practice which is not forbidden by statute, and has some important advantages. In injunction cases, and especially where the motion for a special injunction involves the only question that is to be decided, and which must be decided speedily to be of any effect, the practice has the advantage of giving the parties the benefit of the opinions of the whole court, and preventing necessity of appealing to the court in banc. It speeds the justice which parties seek. But when the court hears such cases, it never rehears them unless a re-argument be specially ordered. Their decision, though docketed in the Nisi Prius, is really a decision of the Supreme Court, and is published among the authorized decisions of this court. Cooper's Case, reported in 9 Casey 278, and Ewing *v.* Thompson, 7 Wright 372, passed

in this way, under the former of which millions of property are held and enjoyed, and under the latter of which the title to the office of sheriff of Philadelphia for the time being was settled. Many other cases have been disposed of in the same manner. It this manner this constitutional question was tried and decided. The plaintiffs having filed their bills, moved before me at Nisi Prius for special injunctions, which motion was argued, as before stated, before the whole court, and decided by five several opinions of the judges, delivered *seriatim*, and which the state reporter has already given to the public.

I have said all the citizens of the commonwealth were bound to respect that decree. I include, of course, the judges of this court. A dissenting judge is as much bound by the decrees and judgments of the majority, regularly entered, as the majority themselves. In the case of Gratz *v.* The Pennsylvania Railroad Company, 5 Wright 447, where the opinion of the majority was delivered by my brother Strong, the dissenting judge considered the constitutional guaranties of the sinking-fund of the state palpably violated, and filed a dissenting opinion, which can be read in the Legal Intelligencer of December 20th 1861, and which concluded with these words: "That judgment" (the majority opinion) "is the law of the case to which I shall always hold myself and all other men bound, as much as if it had received what I have been unable to give it, the approbation of my conscience and judgment." That I believe to be the true doctrine as uniformly recognised in this court heretofore, and I am sure it is essential to the dignity and efficiency of the court.

Upon this principle I maintain, then, that a dissenting judge cannot, upon the same state of record and of facts on which the majority have granted an injunction, dissolve that injunction, nor set the majority to reviewing their decision. If he may, it is apparent that a dissenting judge may undo the work of the whole court, or, what is worse, compel them to go over the same ground again and again.

New trials and re-arguments can only be ordered by the court who first heard the case. These defendants should have applied to the court who granted the injunction, for their motion to dissolve it, upon the same state of facts on which it was granted; and had they done so, they would no doubt have been required to purge themselves of the contempt of which they had been guilty, and to exhibit some grounds for their motion.

I do not deny that a judge at Nisi Prius may dissolve a special injunction upon coming in of the answer to the plaintiffs' bill, provided it be a direct and full denial of the equity alleged, or upon an affidavit disproving the plaintiff's equity, for then the record presents substantial grounds for him to proceed upon; but where the record remains precisely as the court in banc left

it—no new fact alleged, no equity denied—I hold that a single judge at Nisi Prius has no right or power to question the decree, in behalf even of the most respectful defendants, much less in behalf of defendants who, without appearing in obedience to our *subpœna*, or alleging the constitutionality of the Act of Congress, or denying the equity on which the plaintiffs stand, simply demand that we dissolve the injunction most deliberately granted.

I have heard it said during the argument, that a motion to dissolve injunction is always in order as a matter of course. This is a great mistake. Sometimes a chancellor having granted a final injunction without argument or upon a very partial hearing, will entertain a motion to dissolve, to give the parties an opportunity to be fully heard, but the general rule is (and if ever there was a case where it ought to be observed this is that case), that a motion to dissolve will only be entertained after answer or plea, or upon affidavit impeaching the equity of the bill. In Eden on Injunctions, Vol. 1, p. 144, we read: "This order (to dissolve) will not be made without an affidavit in answer to the material allegations of the bill, and several of the motions upon this subject stood over to give the defendants time to file satisfactory affidavits." And again, on p. 145: "If the answer contains a sufficient defence to the case stated in the bill, the injunction will be dissolved. So where a plea is allowed, there is ordinarily an end of the injunction, but not always, and the court has said that an injunction is not absolutely dissolved on the allowance of the plea, but only *nisi*, because there may be some equity shown to continue it." This text of Eden is supported by reference to the best English authorities. The American authorities are full to the same point. In Read *v.* Consequa, 4 Wash. C. C. R. 174, Judge Washington said: "The motion which is now made to dissolve the injunction absolutely without the answer of the defendant being filed, is altogether unprecedented. If the injunction be granted till answer and further order, which is the usual form, it is never dissolved until the answer comes in, even although the defendant should live abroad, and the motion is accompanied by an affidavit to support it. In this respect the practice of the Court of Chancery and the Court of Exchequer, in England, is the same." With reference to the point of practice suggested by Judge Washington, I may remark that in the case before us the injunction was not granted subject to further order. The legal effect of it must be, therefore, that it was granted until the coming in of the answer. Where an answer plainly and distinctly denies the facts and circumstances upon which the equity of the bill is based, the injunction will be dissolved: Mene *v.* Ferrell, 1 Kelly's R. 7. But an injunction will not be dissolved, as a matter of course,

on the coming in of the answer denying the equity of the bill, if the complainant has adduced auxiliary evidence of his right: Orr *v.* Littlefield, 1 W. & Minot 13. In order to warrant the dissolution of an injunction upon bill and answer, it is necessary that the answer should deny all material allegations of the bill with the same clearness and certainty as they are charged: Buckner *v.* Breine, 9 Sm. & M. 3, 4. A denial from information and belief is not sufficient: 1 Hopkins 48; and see 1 Paige 100, 311, and 3 Sumner 78. Nor is an evasive or contradictory answer: 1 Bland 195, 199. Nor an answer merely literal, which does not traverse the substance of the charges: Everly *v.* Rice, 3 Greene 53. I refer also to the numerous cases to the same effect which are cited in the notes to 1 Eden on Injunctions, and in the 2d vol. of U. S. Equity Digest, from page 83 to page 92.

These cases, from nearly every state in the Union, settle with singular harmony the practice in injunction cases on the point now under consideration. If anything can be supported upon authority, they do establish, beyond all cavil or doubt, that an injunction granted after a full hearing and great deliberation, is not to be dissolved either by a single judge or the whole court upon mere motion, without answer, plea, or affidavit. And why should a court having any pretension to stability be expected to render a different judgment on precisely the same state of record and of facts in January from that which they rendered in November previously?

It is another principle of equity, that favours are not to be granted to a party in contempt. Who does iniquity shall not have equity, has long since crystallized into a maxim. When the defendants place themselves erect in court, and do what other defendants in such cases are required to do, answer the bills that have been filed against them, it will be soon enough for them to move for a dissolution of the injunction—it will be as soon as they will deserve to be listened to.

It cannot be said that any great public interest demands the entertainment of this motion, for the defendants have not been restrained from executing the Conscript Law against the three plaintiffs even, much less against any other citizen. What the public interest demands is a decision of the constitutional question in the Supreme Court of the United States—a decision which the president publicly declared he would facilitate—and which our ruling afforded the defendants an opportunity to obtain. But instead of shaping the case for that court, they have taken the very course to keep it out of that court, and the country is tortured with doubts and fears about drafts, which a decision of the constitutional question by the ultimate tribunal would relieve. Why should not such a decision be facilitated? Is the result feared? Suppose our judgment should be affirmed, and this

[Kneedler *et al. v.* Lane *et al.*]

Conscript Law, so uncongenial to the spirit of our institutions, should be set aside, who does not see that civil liberty would gain a new guaranty, whilst the government, remitted to the true constitutional mode of raising armies by voluntary enlistments, would strengthen itself in the affections of the people, by exercising the war power in a manner agreeable to them.

The time and manner of bringing forward this motion would seem to indicate that it was a sort of experiment upon the learned judge who has just taken his seat as the successor of Judge Lowrie. Does anybody suppose it would have been made if Judge Lowrie had been re-elected? I presume not. Are we to understand, then, that whenever an incoming judge is supposed to entertain different opinions on a constitutional question from an outgoing judge, every case that was carried by the vote of the retiring judge is to be torn open, rediscussed, and overthrown? God save the Commonwealth, if such a precedent is to be established! The *personnel* of this court is very changeable. In less than twelve years that I have been here, I have sat with twelve gentlemen, including the four brethren now with me. We come and go by elections, if other causes do not remove us; but let it never be said that our records are as unstable as ourselves, or worse still, as unstable as the vicissitudes of politics. Many estates in Pennsylvania are held and enjoyed to-day by virtue of votes that Judge Lowrie has cast in this court during the last twelve years. If this constitutional question, which was decided in the same way, is to be reopened, because his successor is presumed to differ in opinion, I see not how any of the other questions are to be considered settled or the cases concluded. If these defendants are entitled to have Judge Lowrie reversed in this summary and unprecedented manner, I know not how we are to deny other suitors the same privilege. The general rule is, that courts do not allow themselves to be experimented upon. I would hold to that rule very firmly. I cannot admit that a popular election should overthrow a judicial record. I maintain that the decision of 9th November is the law of this court, and will be until it is regularly reversed or avoided, according to established judicial rules, and as such is entitled to be respected and obeyed by all orderly and loyal citizens.

I must be understood as conceding to the members of the court from whom I differ, the same freedom of opinion and rectitude of purpose I claim for myself—and I do it most cheerfully—but I should be recreant to my convictions of duty if I did not enter a very earnest protest against this proceeding to dissolve a regularly and a carefully granted injunction in the manner proposed. Judge Thompson and I would dismiss the motion to dissolve as unfit to have been entertained, but as we are overruled in this by

a majority of the court as now constituted, something must be said of the other two questions discussed.

I do not intend to enter at large into the constitutional question again. Nor is it necessary, for the positions assumed in the opinions of the majority when the case was here before, much strengthened and confirmed by the last argument, were shaken by nothing that was advanced against them. [It may not be unprofitable, however, to state the results to which the discussions at bar and on the bench have come.

It is agreed on all hands that the government of the United States is a government of delegated powers; that the constitution is the instrument of delegation; that the powers intended to be conferred are either expressed therein or are such as are necessary for the carrying into effect the expressed powers; that the federal government is supreme in the exercise of its rightful powers, and that all governmental powers not delegated to the federal government, nor prohibited to the state governments, are reserved to the states and the people of the states. It is further agreed that if the power to enforce a draft against the people of a state be conferred on Congress, it is contained in the thirteenth clause of the eighth section of the first article, "to raise and support armies."

The clause which authorizes Congress to pass all laws necessary to carry the enumerated powers into effect, is sometimes mentioned as bearing on this question, but most thoughtlessly, for both the language of the clause and the judicial interpretation it has always received, import a grant of no new or additional power whatever, but only a recognition of the legislative duty to provide the necessary laws for carrying into effect the "foregoing powers." What the foregoing powers are will never be discovered from this clause, but only from the foregoing clauses.

All judges and lawyers are substantially agreed, therefore, that Congress does not possess the power to pass such an act as that of the 3d March, unless it be conferred by the thirteenth clause to raise and support armies. But here opinions begin to diverge upon the rules of construction to be applied to that clause.

On one hand it is contended that the words being simple, absolute, and unqualified, are to be received in their largest sense, and that they import a right to raise armies by any of the means that have ever been employed by civil governments, and conscription is claimed as one of the means practised by European governments, and sanctioned by General Knox when secretary of war, and by Mr. Monroe in the war of 1812. It is likened to the expressly conferred powers to levy and collect taxes, coin money, establish post roads, &c., all of which, it is argued, are

[Kneedler *et al. v.* Lane *et al.*]

unlimited powers, because plainly granted, and not expressly qualified. In further support of this view, Vattel, Grotius, Puffendorff, and other writers on national law, are cited for the principle that the right to call on its citizens or subjects for military service is an essential and inherent right of every government. When the attention of counsel was called to the fact that the Act of Congress under review does not provide for drafting citizens generally, but only a certain class of citizens, to wit, the able-bodied men between twenty-one and forty-five years of age, and that all citizens of that class who are between twenty-one and forty-five constitute the state militia, for calling whom forth another part of the constitution expressly provides, the answer was, that the sixteenth and seventeenth clauses of the 8th section (which are the militia clauses) conferred on Congress the chief control over the state militia, and hence it was inferred that Congress might draft them.

Such is an outline of the argument in support of the constitutionality of this statute.

Those of us who think the statute unconstitutional, answer the argument by urging these several considerations :—

1. That the constitution, being a written document, must be taken as a whole, and every specific grant, however unqualified the language in which it is expressed, must be so construed as to be consistent with other provisions of the instrument—in a word, that the document must be construed in such a manner as to give effect to every part of it. No lawyer will deny that this is a settled canon of construction. If a will devise Blackacre to A., in language which is unqualified, but in a subsequent clause gives half of Blackacre to B., no lawyer would insist on the positiveness of the first devise as a reason for excluding the second, but would receive the second as qualifying or limiting the first. Applying this familiar rule of construction to the case in hand, we say that if the 13th clause confers the power to draft any citizen for any war, it does not confer the power to draft the militia for suppression of insurrection, because another and an inconsistent mode is subsequently provided in the constitution for calling out the militia to suppress insurrections. I will not dwell on this argument, for it was fully presented in our former opinions; but I regret that so little of the subsequent discussion was directed to this point, which is the vital point of the controversy. Indeed the very case is that of a law for enrolling and drafting the militia to suppress an insurrection. Now, if the constitution does expressly declare that they shall be called forth under state officers to suppress insurrections, and does recognise the right of the states to maintain a militia, how can the same instrument authorize them to be drafted irrespective of state authority? If it declared in terms that they might be drafted, the constitution would be guilty of the inconsistency,

but it does not.   It is only by misapplying the provision which authorizes armies to be raised by enlistment, that the inconsistency is made to disfigure the fair face of the constitution.

As to the suggestion of counsel that the chief control of the militia is vested in Congress, this is a mistake.  No organ of the general government has any control over the militia until they have entered the military service of the general government, in pursuance of a call directed to the governor, or other proper military officer of the state.  This is the purport of the language of the constitution, and of the judicial construction it has uniformly received.   The militia are organized and disciplined by the states, according to rules prescribed by Congress, but this vests no more control in Congress than it would in an author whose work on military science the constitution might have adopted, instead of congressional rules of discipline.   And let nobody suppose this act to be the exercise of the power conferred by the 16th clause to call out the militia, for it is not that either in fact or form.   To call forth the militia in a body, with their state officers at their head, is very unlike drafting them, man by man, into the federal armies, under such officers as the president may choose to appoint over them.   The act does this latter thing, and therein it violates the constitution.

The argument then remains unimpaired, almost untouched, which is derived from the militia clauses of the constitution against the constitutionality of the Act of Congress.

2. But another limitation upon all the grants of power in the constitution is to be implied from the nature or genius of the government which the constitution formed.   It was to be a free and popular government.   Therefore the power to levy taxes, meant such taxes as would be necessary to the support of the government, levied in that equal and fair mode which free governments were accustomed to practise.   This power, though absolute in its terms, was not a power to farm out the public revenues after the manner of tyrannical governments of Europe, nor the power to levy taxes for works of internal improvement, or for purposes of speculation.

So with the power to borrow money, nobody would contend that it would justify forced loans, which governments have sometimes practised, nor loans for any other purposes than support of the government.

So again with the power to maintain a navy, whilst all readers of the constitution would imply the power to establish ship-yards, dry-docks, and naval asylums, no one would understand the press-gang to be legalized.   And here let it be remarked, as one of the curiosities of this subject, that impressment of militiamen into the federal armies is claimed to be constitutional, whilst no American voice has yet been raised in favour of impressment

into the federal navy. Yet the language is not more full or unqualified for raising armies than it is for maintaining a navy.

Take this very 13th clause—Congress shall have "power to *raise* and *support* armies." The power to support is as absolute as the power to raise, but does it mean that Congress may support armies by quartering them on the farmers of the country?

In all these instances, and in many more that might be cited; nay, in every instance of a granted power, the constitution is to be taken as intending such an exercise of it as is consistent with popular liberty, which it was the purpose of the constitution to secure. Limitations in behalf of liberty are always to be implied. And never can they be more in place than when, as here, citizens are complaining that the government is violating their liberty.

I think due attention has not been given to this argument—that all delegations of power are to be read in a manner consistent with the free and popular nature of the government.

Generally, deeds are construed most strongly against grantors, and so are political constitutions when granted by rulers to people, but not when granted by a people to their rulers. In this instance the rule is to be taken inversely, and the grant is to read most favourably to the grantors, because the natural tendency of political power is always from the many to the few, and the very end and aim of a written constitution, where the people write it, is to restrain this tendency. To construe a people's constitution so as to favour usurpation—to throw doubts into the scale of rulers—to set up questionable powers against the unquestionable liberty of the citizen, is an unwholesome practice which, however grateful to the passions of the hour, may prove fatal to the republic. It would not be difficult, indeed, to trace all the maladies the body politic has suffered, to this practice. A return to a strict construction of the constitution—by which I mean a construction that denies no expressly granted power, and no implied power which is essential to the full enjoyment of the express powers, but a construction which limits itself to these two conditions, and always keeps in view the nature, scope, and purpose of the constitution—would re-establish health and soundness. When the colonies revolted they became "free and independent states, with full power to levy war, conclude peace, contract alliances, establish commerce, and do all other acts and things which independent states might do." Amongst other things that such states might do, was to confederate, and they did confederate. Such states might form a general government as a common shield from external dangers, and a common agent for the conduct of external and inter-state relations, and they did so. Possessing, as states, all the sovereignty that pertains to any free government, they could impart to the general government all the powers essential to its purposes, without impairing

[Kneedler *et al. v.* Lane *et al.*]

their reserved powers to regulate all affairs purely domestic and local. They set down in detailed language the powers conferred, and retained in mass whatever was not granted away, or denied to themselves.

But if now we construe the grants irrespective of limitations which the scheme necessarily implies, and concede to Congress the power to pass all acts which they deem necessary to carry powers, so read, into effect, we had better have had no written constitution to dispute about. The government becomes whatever the government chooses to be—a limited monarchy or an unlimited despotism.

This power to raise and support armies meant the power which other governments, less free, exercised of raising armies by voluntary enlistments. The framers were not ignorant of the arbitrary and violent measures, by which despotic governments sometimes raised armies, but they were not forming a despotic government. Great Britain, according to Hallam, had repudiated conscription as fit only for paupers and vagabonds. Voluntary enlistments were her main reliance when we formed our constitution. This government, in all possible parts and forms, was to rest upon the consent of the governed. Did the framers mean, then, to pass by the example of the mother country, and plant in the constitution of this more free government the imperial and despotic power of conscription? Did the people of the states mean to place themselves under a more severe rule than they were under before they revolted? Did they achieve freedom only to give it up in the very act of adding new securities? Is it credible that people of free and independent states voluntarily surrendered to any government on earth outside of their own states, the power to force them from their homes and families into the tented field?

Until some evidence, historical or traditional, is produced in support of propositions which seem so monstrous to me, I must be pardoned for withholding assent to them.

3. The denial that the power to draft citizens was ceded to the general government, results in the conclusion that the power still remains with the states. No doubt the state may force its able-bodied men into the military service of the state. For here, *in the state,* is where that principle of natural law inheres, which has been erroneously ascribed to the general government. The state is *parens patriæ*. The Supreme Court of the United States said so in terms, in Wheeler *v.* Smith, 9 How. 78. As such, the state possesses this great right of summoning all her children to her defence, and what she gave to the general government was the power of raising armies by enlistments, and of calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions. I repeat, this Act of Congress is not

and does not profess to be a militia law in pursuance of the 16th clause, and as it is not warranted by either the text, the history, or the reason of the 13th clause, it has no foundation in the constitution to rest upon.

General Knox, in 1790, and Mr. Monroe, in 1814, expressed themselves in favour of a scheme of conscription, not indeed such as this law, but involving the same principle, and their good names have been much used in this argument. Against them may be set off the constitutional arguments of Mason and Webster—the refusal of Congress to pass such a law in 1814, when we were at war with one of the mightiest nations of the globe—and the facts that Washington put down the Whiskey Insurrection, Madison carried the country through the war of 1812, and Polk carried it through the Mexican war, without a resort to conscription or anything like it. Do not such names and facts more than answer the argument drawn from the suggestions of Knox and Monroe? Whilst great names ought not to weigh much in any argument, traditional testimony, or what it is commonly called among lawyers, contemporaneous construction, is entitled to great respect in fixing the meaning of any written document; that is to say, the generally received opinion amongst those most interested in a right interpretation of the document, is very high evidence of its meaning. This kind of testimony is altogether against such legislation as we are discussing. In all our history, since the formation of the constitution, the general opinion of statesmen has been, as I believe, adverse to forced recruits for either the army or the navy.

4. In one of the majority opinions, the 12th and 13th sections of the Conscript Law were alluded to as unconstitutional, on the ground that no citizen could be made liable to be shot as a deserter before he had entered the army, and Judge Story's Commentaries on the Constitution were cited to prove that militiamen are subjected to martial law only when in actual service, and not merely when called forth, before they have obeyed the call. To bring him within the meaning of being in actual service, there must be, says Judge Story, "some acts of organization, mustering, rendezvous, or marching, done in obedience to the call."

It is remarkable that this argument, founded in the very language of our most accredited commentator, was not noticed in the last discussion. Was it because of the insignificance of the interests at stake—only the liberties of three citizens? Is it nothing to the people of Pennsylvania that they are liable to be shot, and their memories branded as deserters, if they fail to answer a notice of a draft? When such questions press home upon the hearts of the people, is it unworthy of counsel to look into the constitutional rights of the people? The deserter

deserves to be punished, but he only can be a deserter who has become subject to martial law, and serving a paper notice on a man does not put him into actual service and subject him to martial law. It has been said that Judge Washington's *obiter dictum*, in Houston *v.* Moore, 5 Wh. 1, explodes this rule as stated by Judge Story. What was decided in Houston *v.* Moore, was the constitutionality of an Act of Assembly of the state of Pennsylvania for inflicting military punishment upon a militia-man neglecting to march with his detachment to the place of rendezvous, after being duly called out under the 16th cause of the 8th section of Article 1 of the Constitution of the United States. It was not the case of a draft under the 13th clause—it was not an Act of Congress that the learned judge was to decide upon. How an affirmance of the constitutionality of that state legislation can explode the rule of federal law laid down by Judge Story, is hard to understand. If it is meant that an unnecessary and inaccurate *obiter dictum* of Judge Washington or anybody else can explode a settled rule of constitutional law, that is staking the constitutionality of this part of the Act of Congress on a desperate venture. Some broader and more solid ground should be found to rest the argument upon.

For these reasons, as well as for those rendered before, we still maintain that the Enrolment Act is unconstitutional, and this brings us to the final question as to the remedy by injunction.

A few words as to the remedy. In the opinions of Judge Lowrie and Judge Thompson our Act of Assembly was referred to as our authority for restraining acts contrary to law and prejudicial to the rights of individuals. And it was shown that the acts complained of here were of that character if the Conscript Law be unconstitutional. If *habeas corpus* had not been suspended, that would have been the plaintiffs' true remedy, for in numerous cases, as was shown on the argument, state courts have delivered citizens from the military authority of the federal government on *habeas corpus*. But we are at present situated as if we had never had *habeas corpus*. It is impossible, therefore, to deny the equity jurisdiction on the ground that there is remedy at law. There is no remedy at law; and even where there is, the rule in equity is, that it must be an adequate remedy to oust the jurisdiction of equity. We had a great consideration a few years ago of the question whether equity would decree specific performance of a contract for sale of lands, there being remedies at law both by covenant and ejectment, but the equity jurisdiction was sustained on the ground of the inadequacy of the legal remedies. Had there been no legal remedies whatever, which is the case here, the case would scarcely have been made.

I say no legal remedies, for *habeas corpus* being suspended, it cannot be seriously urged that a civil action for assault and bat-

[Kneedler *et al. v.* Lane *et al.*]

tery would be a remedy for a citizen who denied the right of the government to put him into the army as a soldier.

But it is supposed that a state court cannot lawfully resist the execution of an Act of Congress. Here a distinction exists which never ought to be lost sight of. State courts have no power to interfere with or resist the *process or judgments of the federal courts,* and the rule is reciprocal—the federal courts have no power to disregard the process or judgments of state courts, as was determined in the notable case of Taylor *v.* Carryl, about The Royal Saxon, reported in 20 How. 583.

Of course, the appellate jurisdiction of the Supreme Court of the United States is to be excepted from this remark. In the forms of the constitution that court may review certain proceedings of state courts; but in all other respects, even where concurrent jurisdiction exists over the subject-matter, the federal and state courts mutually respect that jurisdiction which first attaches. The case of Ableman *v.* Booth, so much relied on, belongs to this class of questions upon judicial process, and all that fell from the chief justice in that case is to be restrained to the facts of the case. This is a rule always necessary to be imposed upon judicial language. That case is authority for nothing but the well-settled doctrine that state authorities cannot resist the *judicial* process of the United States.

But these defendants were not acting under any judicial process of the United States. They were mere ministerial agents of the executive department, engaged in executing what we held to be an unconstitutional Act of Congress, and, therefore, are not within the rule above stated, nor within the authorities cited to sustain that rule. Such ministerial agents have often been restrained by state courts and state judges generally, indeed, upon *habeas corpus,* where personal liberty has been at stake, but the right of state judges to inquire into the validity of ministerial proceedings under Acts of Congress, is as perfectly vindicated by *habeas corpus* cases as any other. I refer to Commonwealth *v.* Harrison, 11 Mass. Rep. 63; State *v.* Dimmick, 12 N. H. 194; Smith *v.* Shaw, 12 Johns. 257; State *v.* Brearly, 2 Southard 555; Maryland *v.* Rutter, 12 Niles' Reg. 115; Commonwealth *v.* Murray, 4 Binney 487; Commonwealth *v.* Barker, 5 Id. 428; Commonwealth *v.* Fox, 7 Barr 336; Olmstead's Case, Brightly's Rep.; Lackey's Case, Id. 269.

I think these authorities fully sustain the proposition of the learned counsel, that a state court has the right to prevent the invasion of the personal liberty of the citizen of the state by officers of the United States, acting under colour of an unconstitutional law, when the act complained of is not the subject of suit, prosecution, or proceeding in the courts of the United States.

9 Wr.—22

[*Kneedler et al. v. Lane et al.*]

And if a state court may do this in any form, we hold that this court may do it when sitting as a court of equity in a state where *habeas corpus* has been suspended. Our jurisdiction as a court of equity under our Act of 1836 has not been suspended, and any citizen has a right to appeal to it in defence of personal liberty. Courts of equity are accustomed to enjoin to prevent frauds, waste, nuisances, trespasses, obstructions, and diversion of watercourses, and in numerous other torts. The principle of injunctive relief against a tort is, that the inadequacy of the remedy at law is a sufficient equity, and will warrant an injunction against the commission or continuance of the wrong : Adams' Equity 478. The inadequacy of all remedies of law for infringement of personal liberty, when *habeas corpus* is suspended, is too. plain to be doubted or discussed, and the necessary consequence is, that courts of chancery would have jurisdiction, and the Act of Assembly clothes us with their powers. If courts of chancery have not jurisdiction of torts which touch liberty, what are we to say, that property is better guarded with us than liberty ? Who is willing to stand on that ground ? For one, I am not. I would not say that a man has more rights in his horse or his house than he has in himself. If equity will restrain torts in respect to lands and goods, much more will it restrain torts in respect to the immensely higher interest—human liberty—when all legal remedies have been taken away.

Whilst more might be said on these questions, I do not deem it necessary, after the full discussion they received from the whole court on the former occasion. I would dismiss the motion to dissolve, both because it is premature, and because I entertain no doubt of the unconstitutionality of the Act of Congress and of our right or duty to enjoin against its execution. And I am happy to add that my brother Thompson concurs in all of these conclusions, though he would doubtless have expressed them better than I have done.

Since this opinion was prepared, I learn what was not stated before, that the injunctions awarded in these cases have not been issued. Had this fact been disclosed when the motion to dissolve was made, or even when it was argued, it would have modified the line of discussion somewhat, that has been pursued.

But now that it has been disclosed, Judge Thompson and myself see in it only an additional reason for not granting the motion. Why dissolve an injunction which is not restraining the defendants ? It is not because the decree hinders or delays them—it can only be, it seems to us, to expunge a record which a majority of the court now think a majority should not have made in November. That is not the legal and constitutional method of reviewing the decree. We therefore dissent from the decision of the majority, even more earnestly than if the defendants were under restraint.

# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

MIDDLE DISTRICT—HARRISBURG 1863.